1    <u>PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY</u>

2    Name ___Edwards_____James_____E_____
           (Last)                    (First)                (Initial)

3    Prisoner Number ___V68959_____

4    Institutional Address ___Bldg.1 / #108_____CSP Solano_____

5    P.O. Box 4000     Vacaville, CA 95696-4000

6    ============================================================

                        UNITED STATES DISTRICT COURT
7                      NORTHERN DISTRICT OF CALIFORNIA

8    James Eugene Edwards                    )
     _____       )
     (Enter the full name of plaintiff in this action.)  )
9                                            )
                     vs.                     )   Case No. _____
10                                           )   (To be provided by the clerk of court)
     Warden Sisto, CSP Solano                )
11   _____       )   PETITION FOR A WRIT
                                             )   OF HABEAS CORPUS
12   _____       )
                                             )
13   _____       )
                                             )
14   _____       )
     (Enter the full name of respondent(s) or jailor in this action)  )
15                                           )

16   ============================================================

                      Read Comments Carefully Before Filling In

17   When and Where to File

18          You should file in the Northern District if you were convicted and sentenced in one of these

19   counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20   San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You should also file in

21   this district if you are challenging the manner in which your sentence is being executed, such as loss of

22   good time credits, and you are confined in one of these counties.  Habeas L.R. 2254-3(a).

23          If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in

24   one of the above-named fifteen counties, your petition will likely be transferred to the United States

25   District Court for the district in which the state court that convicted and sentenced you is located.  If

26   you are challenging the execution of your sentence and you are not in prison in one of these counties,

27   your petition will likely be transferred to the district court for the district that includes the institution

28   where you are confined.  Habeas L.R. 2254-3(b).

     PET. FOR WRIT OF HAB. CORPUS        - 1 -

1  <u>Who to Name as Respondent</u>

2  You must name the person in whose actual custody you are.  This usually means the Warden or

3  jailer.  Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced.  These are not proper

5  respondents.

6  If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11  1.  What sentence are you challenging in this petition?

12  (a)  Name and location of court that imposed sentence (for example; Alameda

13  County Superior Court, Oakland):

14  Santa Clara County Superior Court          San Jose

15  Court                                    Location

16  (b)  Case number, if known  210807

17  (c)  Date and terms of sentence  February 17, 2005; 27 years 8 months

18  (d)  Are you now in custody serving this term?  (Custody means being in jail, on

19  parole or probation, etc.)          Yes ✓    No _____

20  Where?

21  Name of Institution:  California State Prison Solano

22  Address:  2100 Peabody Road, Vacaville, CA 95696

23  2.  For what crime were you given this sentence?  (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known.  If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  (1) Conspiracy to violate CA Corp Code (CCC) 25401-CA Penal Code (PC) 182(a)(1); (2) First degree

27  burglary with intent to violate CCC 25401-PC 459-460; (3) Violation of CCC 25401; (4) Excessive

28  taking allegation-PC 12022.6(a)(2); (5) Aggravated white collar crime-PC 186.11

PET. FOR WRIT OF HAB. CORPUS     - 2 -

1       3. Did you have any of the following?

2             Arraignment:                            Yes _____    No __✓__

3             Preliminary Hearing:             Yes _____    No __✓__

4             Motion to Suppress:              Yes __✓__    No _____

5       4. How did you plead?

6             Guilty _____    Not Guilty _____    Nolo Contendere _____

7             Any other plea (specify) _See attached page 3(a) for answer._

8       5. If you went to trial, what kind of trial did you have?

9             Jury __✓__    Judge alone_____    Judge alone on a transcript _____

10      6. Did you testify at your trial?                 Yes _____    No __✓__

11      7. Did you have an attorney at the following proceedings:

12           (a)    Arraignment               Yes _____    No __✓__

13           (b)    Preliminary hearing        Yes _____    No __✓__

14           (c)    Time of plea              Yes _____    No __✓__

15           (d)    Trial                     Yes _____    No __✓__

16           (e)    Sentencing               Yes _____    No __✓__

17           (f)    Appeal                  Yes __✓__    No _____

18           (g)    Other post-conviction proceeding    Yes _____    No __✓__

19      8. Did you appeal your conviction?            Yes __✓__    No _____

20           (a)    If you did, to what court(s) did you appeal?

21                  Court of Appeal            Yes __✓__    No _____

22                  Year: _2007_        Result:_Judgments were affirmed_

23                  Supreme Court of California      Yes _____    No _____

24                  Year: _2007_        Result:_Petition for review was denied_

25                  Any other court            Yes _____    No _____

26                  Year: _____        Result:_____

27

28           (b)    If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS     - 3 -

Petition for Writ of Habeas Corpus                    James Eugene Edwards-V68959
Page 3(a)

4.    The court did not ask for my plea. Instead the court pled not guilty for me in spite of my
      objections and absent any counsel. See Claim Seven, infra and Exhibit 20.

1      petition?      Yes _____   No ✓

2      (c)   Was there an opinion?      Yes ✓   No_____

3      (d)   Did you seek permission to file a late appeal under Rule 31(a)?

4      Yes _____   No ✓

5      If you did, give the name of the court and the result:

6

7

8   9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9   this conviction in any court, state or federal?      Yes ✓   No_____

10      [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11 challenged the same conviction you are challenging now and if that petition was denied or dismissed

12 with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13 for an order authorizing the district court to consider this petition. You may not file a second or

14 subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15 U.S.C. §§ 2244(b).]

16      (a)   If you sought relief in any proceeding other than an appeal, answer the following

17      questions for each proceeding. Attach extra paper if you need more space.

18      I.   Name of Court: Santa Clara County Superior Court

19      Type of Proceeding: Petition for Writ of Habeas Corpus

20      Grounds raised (Be brief but specific):

21      a. Due Process-CA lacked personal and subject matter jurisdiction.

22      b. Right to a Fair Trial - see attached page 4(a).

23      c. Due Process - Petitioner is innocent.

24      d. Constitutional violations - see attached page 4(a)

25      Result: Denied      Date of Result: 10/23/07

26      II.   Name of Court: California Court of Appeals, Sixth Appelate District

27      Type of Proceeding: Petition for Writ of Habeas Corpus

28      Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS      - 4 -

Petition for Writ of Habeas Corpus                    James Eugene Edwards-V68959
Page 4(a)

9. (a)   If you sought relief in any proceeding other than appeal, answer the following questions for
         each proceeding. Attach extra paper if you need more space.

I.       Grounds raised (Be brief but specific):
         b.      Judge was biased preventing Petitioner from presenting evidence and witnesses.

         d.      Warrantless search and seizure, no Miranda, no Counsel at formal arraignment, no
                 formal arraignment, no speedy trial, no bail hearing and subject to selective
                 prosecution.

II.      Grounds raised (Be brief but specific):
         a.      The lower court abused its power in denying Petitioner's writ and not issuing an
                 Order to Show Cause.

|   |   |   |   |
|---|---|---|---|

1     a. Due Process - see attached page 5(a).

2     b. Due Process-CA lacked personal and subject matter jurisdiction.

3     c. Right to a Fair Trial - see attached page 5(a).

4     d. Due Process - Petitioner is innocent.  See page 5(a) for e.

5     Result: Denied     Date of Result: 1/15/08

6     III.  Name of Court: California Supreme Court

7     Type of Proceeding: Petitioner for Review

8     Grounds raised (Be brief but specific):

9     a. Same as II. as this was a review of CA Sixth District Court of Appeal's

10     b. denial of Petitioner's writ.

11     c.

12     d.

13     Result: Denied     Date of Result: 3/12/08

14     IV.  Name of Court:

15     Type of Proceeding:

16     Grounds raised (Be brief but specific):

17     a.

18     b.

19     c.

20     d.

21     Result:     Date of Result:

22     (b)  Is any petition, appeal or other post-conviction proceeding now pending in any court?

23     Yes _____  No ✓

24     Name and location of court:

25     **B. GROUNDS FOR RELIEF**

26     State briefly every reason that you believe you are being confined unlawfully. Give facts to

27     support each claim. For example, what legal right or privilege were you denied? What happened?

28     Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS    - 5 -

Petition for Writ of Habeas Corpus                    James Eugene Edwards-V68959
Page 5(a)

9. (a)   If you sought relief in any proceeding other than appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

II.      Grounds raised (Be brief but specific):
         a.      The lower court abused its power in denying Petitioner's writ and not issuing an Order to Show Cause.
         c.      Judge was biased preventing Petitioner from presenting evidence and witnesses.

         e.      Constitutional Violations - Warrantless search and seizure, no Miranda, no Counsel at formal arraignment, no formal arraignment, no speedy trial, no bail hearing and subject to selective prosecution.

1    need more space. Answer the same questions for each claim.

2        [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3    petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4    499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5        Claim One: See attached Page 6 - Claims, pages 1 - 35 for all eleven claims.

6

7        Supporting Facts: See attached Page 6 - Claims, pages 1 - 35 for all supporting facts of each

8        of the eleven claims.

9

10

11        Claim Two: See attached Page 6 - Claims, pages 1 - 35 for all eleven claims.

12

13        Supporting Facts: See attached Page 6 - Claims, pages 1 - 35 for all supporting facts of each

14        of the eleven claims.

15

16

17        Claim Three: See attached Page 6 - Claims, pages 1 - 35 for all eleven claims.

18

19        Supporting Facts: See attached Page 6 - Claims, pages 1 - 35 for all supporting facts of each

20        of the eleven claims.

21

22

23        If any of these grounds was not previously presented to any other court, state briefly which

24    grounds were not presented and why:

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS        - 6 -

Petition for Writ of Habeas Corpus                          James Eugene Edwards-V68959
Page 6 - Claims

### CLAIM ONE:
      In violation of Petitioner's right to Due Process of law, as guaranteed by the United States Constitution, the Fifth and Fourteenth Amendments, Santa Clara County and the State of California lacked personal jurisdiction when the Petitioner was charged, tried and convicted.

### SUPPORTING FACTS:
      Petitioner is a resident of Washington state and was doing business in Washington state. Petitioner has never established a business in California. Petitioner was **not** in Santa Clara County on any of the dates stated in the original complaint or the superceding indictment. Petitioner was **never** found **within** California.

      Petitioner was civilly sued by the Fort Worth, Texas office of the Securities and Exchange Commission on March 25, 2002. Through an illegal and unlawful process Petitioner was arrested, absent warrant – a Constitutional violation of Petitioner's rights, on an indirect civil contempt in Washington state and transported by the United States Marshal Service to Texas in July 2002. While Petitioner was in the custody of the United States Marshals the state of California filed a request for extradition based on Complaint No. 252891. In December 2002 Petitioner was transferred from the custody of the Unites States Marshal Service to the State of Texas. During the 17 months Petitioner fought extradition due to lack of jurisdiction and many other challenges, Santa Clara County obtained an indictment in June 2003.

      When Petitioner arrived in California in May 2004 and appeared before the Santa Clara County Superior Court the complaint was dismissed and superceded by the indictment absent preliminary hearing on the complaint which brought Petitioner to California. Absent extradition and Petitioner being moved against his will, Petitioner would not be in California and therefore would not be a person punishable by California under California Penal Code § 27(a).

      Petitioner challenged the jurisdiction of California over his person for over 5 years, with no response from the courts, notwithstanding the United States Supreme Court's decision in *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178 at 189 (1936):

      "They are conditions which must be met by the party who seeks the exercise of jurisdiction in his favor. He must allege in his pleading the facts essential to show jurisdiction. If he fails to make the necessary allegation, he has no standing."

According to the California Supreme Court:
      "U.S. Supreme Court is the law, even old ones." See *People v. Garcia,* (2006) 39 Cal. 4th 1070, 1080 and *Rodriquez v. Bethlehem Steel,* (1974) 12 Cal. 3d 382, 388.

      Finally, in October 2007, Santa Clara County Superior (hence forth SCC) Court put into writing in a denial of Petitioner's petition for habeas corpus how it believes California has personal

jurisdiction over Petitioner. The SCC court is relying on California Penal Code § 27(a) paragraph (1) by stating "any crime committed 'in whole or in part' in the state." See copy of opinion of Santa Clara County Superior Court, In re David Eugene Edwards and James Eugene Edwards, dated October 23, 2007, Lines 25-26 attached hereto as Exhibit 1.

Here is California Penal Code § 27(a) (hereafter PC § 27) in it's entirety:

§ 27. (a) The following persons are liable to punishment under the laws of this state:

(1) All persons who commit, in whole or in part, any crime **within** this state.

(2) All who commit any offense **without** this state which, if committed **within** this state would be larceny, carjacking, robbery, or embezzlement under the laws of this state, and bring the property stolen or embezzled, or any part of it, or are found with it, or any part of it, **within** this state.

(3) All who, being **without** this state, cause or aid, advise or encourage, another person to commit a crime **within** this state, and are **afterwards found therein**. (Bold emphasis added.)

The key words of each paragraph are **within** and **without**, which refer to the person's physical location in or out of California's geographical boundaries. There is no dispute that Petitioner was **never within California** to commit a crime in whole or in part. There is also no dispute that Petitioner was **never found in California**.

The SCC court quotes *People v. Betts,* (2205) 34 Cal. 4th 1039, 1046-1047 for it's authority and supposed precedence. However, in that case, the defendant was physically in Riverside, California when he committed his crime, then left the state (see page 1049 of *People v. Betts*), therefore the case is not relevant, is not precedence and does not give the court authority to rely on PC § 27 paragraph 1 in Petitioner's case, who was never physically in California.

The SCC court states in its decision on Page 2, Lines 20-22 (See Exhibit 1):

"Like most other states, California has addressed the problem of criminal activity that spans more than one state by adopting statutes that provide our state with broader jurisdiction over interstate crimes than existed at common law."

The Petitioner agrees with this statement, as paragraph (2) and (3) of California Penal Code § 27(a) addresses the issue of persons outside the state. Penal Code § 27(a)(1) however, strictly deals with persons **within** the state, not **without**.

Penal Code § 27(a) is not vague and is written in plain English. The SCC court cannot go outside the California Legislature's obvious intent just to suit its own purposes. *See Burnham v. Superior Court of California, County of Marin,* 495 U.S. 604 (1990) at 626:

"It may be that those evils, necessarily accompanying a freestanding "reasonableness" inquiry, must be accepted at the margins, when we evaluate *non*traditional forms of jurisdiction newly adopted by the states, *see e.g.* Asahi Metal

Industry Co., Ltd v. Superior Court of California, 480 U.S. 102, 115 (1987). But that is no reason for injecting them into the core of our American practice, exposing to such a "reasonableness" inquiry the ground of jurisdiction that has hitherto been considered the very *baseline* of reasonableness, physical presence."

The SCC court cannot rely on paragraph (1) and then make the following statement on Page 3, Lines 13-15 (See Exhibit 1):

"In this case, all of the crimes for which Petitioner were charged, tried and convicted were committed, in substantial part, within the State of California, County of Santa Clara, by Petitioners' sales agents, Michael Keller and William Whelan."

The SCC court has just claimed that Petitioner caused, advised or encouraged another person to commit a crime within California. Exactly as PC § 27(a)(3) states! See also Petitioner's trial transcript attached hereto as Exhibit 2, the prosecutor stating to the jury during closing arguments the following:

"It is not a defense that David Edwards never walked into John Bowes home, never set foot in California, doesn't know where Santa Clara County is."

The prosecution knows the Petitioner had no presence in the state of California so has to attempt to discredit it as a defense. And the prosecutor's chief investigator, Dalton Rolen, admitted at trial that he had no evidence of Petitioner's presence in the State of California. See copy of trial transcript attached hereto as Exhibit 3. Lastly, Governor Gray Davis swore under penalty of perjury on a Governor's warrant for the purpose of extradition dated November 13, 2002. See copy of governor's warrant attached hereto as Exhibit 4 stating:

"By intentionally committing an act or acts while **outside** the State of California."
(Bold emphasis added.)

All of the above statements from the SCC court, the prosecutor, and the Governor clearly refer to PC § 27(a)(3). So why does the SCC court refer to paragraph (1) in its opinion? Probably because Petitioner was never found in California as clearly required by paragraph (3). If a crime was committed in whole or in part then Penal Code § 27(a)(1) applies to Michael Keller and William Whelan only, as they are residents of California and were in California. Petitioner, however, has always been a resident of Washington state with no physical presence in California, as admitted by the prosecution. The law (PC § 27) does not allow the SCC court to attach the personal jurisdiction of persons **within** the state onto a person **without** the state. "Personal" jurisdiction meas just that - **personal**! And no where in the law is it transferrable! If a crime was committed by Petitioner, then Washington state had personal jurisdiction, not California. Ignoring the facts, the truth and the law, specifically Penal Code § 27(a) that they are relying on, the state of California is illegally and unlawfully depriving Petitioner of his freedom.

If the SCC court could rely on paragraph (1) of PC § 27(a) as stated in its opinion, then the California legislature wasted their time writing paragraphs (2) and (3), as they are superfluous and unnecessary. According to the SCC court, paragraph (1) is sufficient to attach personal jurisdiction over anyone **without** the state, if the government claims there is a connection to a person **within** the state who is accused of a crime. However, this is not the case. Personal jurisdiction is based on physical presence of a person within the geographical boundaries of the state of California. This is black letter law. Location, location, location – determines jurisdiction. See *People v. Godfrey,* 17 Johns. 225, 223 (N.Y. 1819), "It is the locus of the offense which determines jurisdiction, not the offense committed."

Personal jurisdiction is necessary, which California never had, to issue an arrest warrant, file a complaint, execute extradition, or return an indictment. All of these things happened, without personal jurisdiction, before Petitioner was ever brought to California by the extradition process. "Jurisdiction is fundamental - without it, courts cannot proceed at all in any case." *Ruhrgas v. Marathon Oil,* 526 U.S. 574 (1999).

See *Burnham v. Superior Court of California, County of Marin,* 495 U.S. 604 (1990) at II A:

"The proposition that the judgment of a court lacking jurisdiction is void traces back to the English Year Books,... Traditionally that proposition was embodied in the phrase *coram non judice,* "before a person not a judge" – meaning, in effect, that the proceeding in question was not a judicial proceeding because lawful judicial authority was not present, and could therefore not yield a *judgment.*"

"In *Pennoyer v. Neff,* 95 U.S. 714, 732 (1878), [11- S.Ct. 2110] we announced that the judgment of a court lacking personal jurisdiction violated the Due Process Clause of the Fourteenth Amendment as well."

"To determine whether the assertion of personal jurisdiction is consistent with due process, we have long relied on the principles traditionally followed by American courts in marking out the territorial limits of each State's authority."

At II B:

"Among the most firmly established principles of personal jurisdiction in American tradition is that the courts of a State have jurisdiction over nonresidents who are physically present in the State. The view developed early that each State had the power to hale before its courts any individual who could be found within its borders, and that, once having acquired jurisdiction over such a person by properly serving him with process, the State could retain jurisdiction to enter judgement against him, no matter how fleeting his visit."

The law is clear, a person must be **within** California or **found therein**. The United States Supreme Court clearly states that jurisdiction must be proven. The only acceptable **PROOF** as required by the United States Supreme Court is that the Petitioner was physically within California or found therein. Not smoke and mirrors or word games. The SCC court, the prosecution and the state admit the Petitioner was never in California. Therefore this Court can and must vacate the judgment with prejudice immediately. This is not an adversarial argument that requires a response from the Attorney General. The state openly admits that Petitioner was never within California or found therein, so they **cannot prove personal jurisdiction**, so neither can the Attorney General prove an impossibility.

The Petitioner is requesting a fast track decision based on the law and facts before this Court and immediately rule on this issue. There is no need for an evidentiary hearing; the state of California has no evidence to bring forward. The state of California has made it clear they are relying on some brand new legal theory, outside the written law (PC § 27(a)), that allows transferring personal jurisdiction from one person to another and have failed to support with any authority.

One last time, Penal Code § 27(a) requires the state of California to have evidence a person was **within** their geographical boundaries or **found therein**. The record evidences Petitioner was tried based on Penal Code § 27(a) paragraph (3), not paragraph (1), with absolutely **no evidence of Petitioner being found** in the state.

All the other grounds that follow, infra, though valid will become moot if this Court exercises its power, authority and responsibility to vacate the judgment with prejudice based on the lack of personal jurisdiction by the state of California. Petitioner respectfully requests that this claim be put on a fast track decision in order to correct a gross injustice and immediately free Petitioner.

## CLAIM TWO:

In violation of Petitioner's right to Due Process of law, as guaranteed by the United States Constitution, the Fifth and Fourteenth Amendments, Santa Clara County and the state of California lacked subject matter jurisdiction when the Petitioner was charged, tried and convicted.

## SUPPORTING FACTS

Petitioner does not reside in California. Petitioner does not operate a business in California. All business was conducted from Petitioner's office in Tacoma, Washington. Petitioner and/or his company **never** received a desist and refrain order or notice of any type from the California Department of Corporation, the Corporations Commissioner or any representative of the Department or Commissioner a violation may be occurring. Because Petitioner was never served notice – a Constitutional violation of Petitioner's rights – Petitioner was never given opportunity for hearing on an alleged violation of a regulatory statute Petitioner was not responsible to know, understand or adhere to.

> "A question of subject matter jurisdiction can be raised at any stage in the judicial process." *Gacer v. Quirk,* 86 F3d 451, 453 (5th Cir. 1996)

> "E[I]ngrained in our concept of due process is the requirement of notice. Notice is sometimes essential so that the citizen has the chance to defend charges. Notice is required before property interests are disturbed...These cases involved only property interests in civil litigation. But the principle is equally appropriate where a person, wholly passive and unaware of any wrongdoing, is brought to the bar of justice for condemnation in a criminal case." *Lambert v. People of the State of California,* (1957) 355 U.S. 225, 228, 78 S.Ct. 240, 243.

The California statutes and case law mandate notice is required, specifically a desist and refrain order, before California Corporations Code (hereafter CCC) § 25401 can be prosecuted as criminal.

1.    CCC § 25530(a) authorizes only the Commissioner to determine if CCC § 25401 has or is being violated, not the District Attorney.

2.    CCC § 25532© authorizes only the Commissioner to issue a desist and refrain order, not the District Attorney.

3.    CCC §§ 25533 and 25533.5, which must be read as one statute, allows the District Attorney to act without a referral from the Commissioner, but not without a desist and refrain order in his possession. No desist and refrain order was issued in Petitioner's case. See letters between Petitioner's court appointed investigator and the Department of Corporations attached hereto as Exhibit 5.

4.  The California Supreme Court has ruled that the CCC is a three <u>tiered</u> system, with the first step being administrative, and the last being criminal. *People v. Simon,* 9 Cal 4th 493, 37 Cal.Rptr.2d 278.

5.  Lastly, and most importantly, Petitioner can find no case law supporting a civil or criminal action where the Department of Corporations, and specifically the Commissioner, was not first involved in determining a violation of CCC § 25401.

For your convenience here are the relative statutes in their entirety:

CCC § 25401 - It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

CCC § 25530(a) - Whenever it appears to the **commissioner** that any person has engaged or is about to engage in any act or practice constituting a violation of any provision of this division or any rule or order hereunder, the **commissioner** may in the **commissioner's** discretion bring an action in the name of the people of the State of California in the superior court to enjoin the acts or practices or to enforce compliance with this law or any rule or order hereunder. ... (Bold emphasis added.)

CCC § 25532© - If, in the opinion of the **commissioner**, a person has violated or is violating Section 25401, the **commissioner** may order that person to desist and refrain from the violation. (Bold emphasis added.)

CCC § 25533 - The commissioner may refer any evidence available concerning any violation of this law or any rule or order hereunder to the Attorney General or the district attorney of the county in which the violation occurred, who may with or without this type of reference, institute appropriate criminal proceedings under this law. The commissioner and his or her counsel, deputies, or assistants may, upon request of the Attorney General or the district attorney, assist the prosecuting attorney in presenting the law or facts at the trial.

CCC § 25533.5 - The commissioner **shall** send a copy of a desist and refrain order issued under this law to the Attorney General and the district attorney of the county in which the person who is the subject of the order resides or maintains a principal place of business. There shall be no liability on the part of, and no cause of action of any nature shall arise against, the state of California, the department and its employees, the commissioner, the members of the commissioner's staff, or the commissioner's authorized representatives for the failure to provide to the Attorney General or the district attorney **a copy of the order as required by this section**. (Bold emphasis added.)

The SCC court stated in its opinion of the denial of Petitioner's petition for writ of habeas corpus on Page 3, Lines 20-26 of Exhibit 1:

"There is no merit to Petitioner's argument that the California Legislature intended for the Commissioner of the Department of Corporations to be the only one authorized to decide whether a Corp. Code § 25401 has been violated in the first instance. Corp. Code § 25533 expressly states that the district attorney of the county in which the violation occurred may institute appropriate criminal proceedings with or without a reference from the Commissioner. Corp. Code §§ 25533.5 and 25540 have no bearing on the district attorney's authority to institute criminal proceedings."

The SCC court[1] has said that the district attorney is authorized to determine if CCC § 25401 has been violated all on his own because of CCC § 25533. That same logic would mean that the district attorney is also authorized to issue desist and refrain orders. All desist and refrain orders listed on the Department of Corporations' web site are signed by the Commissioner and/or Lead Corporations Counsel, absolutely no district attorneys. Nor would any district attorney in his right mind entertain the idea that he has the authority to issue desist and refrain orders. So, the district attorney has no authority to issue desist and refrain orders neither does he have the authority to determine if CCC 25401 has or is being violated.

The California Supreme Court agrees with Petitioner about CCC § 25530, giving power to the Commissioner, not the district attorney:

"Section 25530 gives the Commissioner of Corporations the power to enjoin the proscribed conduct and, where he deems it to be in the public interest, to seek ancillary relief on behalf of injured persons." *People v. Simon,* 9 Cal 4th 493, 37 Cal. Rptr.2d 278, pg 515 (1995)

What are the "criminal proceedings" that the SCC court refers to and CCC § 25533 authorizes? If we look to the second paragraph of CCC § 25533, listed as CCC § 25533.5, then we see that the legislature intended that a desist and refrain order **must exist** in order for the district attorney to act. So much so, that they included language to relieve the Department of Corporations of any civil liability for wrongful actions of a district attorney. Q. What civil liability could there possibly be? A. The district attorney prosecuting a person without a desist and refrain order in his possession, therefore lacking subject matter jurisdiction. The statute ends with the words "**a copy of the order as required by this section**", for which there can be no stronger language written into a statute by the legislature.

The statutes CCC §§ 25533 and 25533.5 cannot be read as separate statutes, but as one. The SCC court says the law CCC § 25533.5 has no merit and has no bearing, but then gives no explanation for its purpose or existence. Once again, the SCC court cannot disregard the legislature because it does not suit its purposes, with no reason, no explanation. **The law is not irrelevant, every word is relevant and has meaning and merit**. The law is clear that the district attorney may act without a referral, in that Petitioner agrees, however the district attorney may not act without a

---

[1] The Sixth District Court of Appeals and the California Supreme Court denied Petitions without review.

desist and refrain order in his possession. In other words he may act without a referral from the commissioner, but he may not act before the commissioner has FIRST determined a violation of CCC § 25401 has occurred and issued a desist and refrain order, as CCC § 25533.5 requires and the California Supreme Court clearly stated:

> "Thus, the conduct proscribed by section 25401 is subject to a three-tiered system of regulation. The prohibition on sale of securities by means of false or misleading statements or omission of material facts, like all regulatory provisions of the Corporate Securities Law of 1968, is **first subject to administrative enforcement**." (Bold emphasis added.) *People v. Simon*, 9 Cal. 4th 493, 37 Cal.Rptr.2d 278.

The language is clear, concise and not open to interpretation in the above statement by the California Supreme Court and also in CCC § 25533.5, a desist and refrain order is required. There is no language in the law (CCC § 25533.5) to imply "if a desist and refrain order exists", it **must exist!** Again, Petitioner can find no civil or criminal case where the commissioner was not first involved in determining if CCC § 25401 has been violated. Nor has the California courts or prosecution produced one.

The SCC court also refers to *People v. Simon* in their decision on Page 3, Lines 26-27 and Page 4, Lines 1-2 (See Exhibit 1) stating:

> "*People v Simon*, (1995) 9 Cal.4th 493, 522 simply establishes that knowledge of the falsity or misleading nature of a statement or the materiality of an omission, or criminal negligence in failing to investigate and discover them are elements of the criminal offense described in Section 25401."

Here again the SCC court is choosing what words will help the prosecution's case and ignoring the rest. In *People v. Simon*, the California Supreme Court, did not simply establish one thing as the court states. The *Simon* decision deals with two main issues:

First, that "25401 is not a strict liability offense" and to be criminal there must be mens rea and scienter. Petitioner agrees with this, there is no argument.

Secondly, the California Supreme Court dealt with the very nature of the California Corporation Code itself, and the order of enforcement. In *People v. Simon* the court declares that administrative enforcement is FIRST. That the codes are subject to a three tiered system of enforcement, not three options. Words mean things and the California Supreme Court meant tiers, not options.

*People v. Simon* declares that mens rea and scienter and administrative enforcement are all necessary elements, not just one or the other. Petitioner opines about administrative enforcement, that CCC § 25533.5 requires, and the SCC court, in an obvious slight of hand, refers to mens rea and scienter. Petitioner is talking about oranges and the court refers to apples. Yes mens rea and scienter are necessary but so is a desist and refrain order, so is administrative enforcement to occur

FIRST. All three are elements necessary to make CCC § 25401 criminal. All three are required by law. One of them is definitely missing in this case, and Petitioner will argue that mens rea and scienter are also missing in Claim Four, infra.

No slight of hand or word games will produce a desist and refrain order, the court therefore can only misdirect the argument away from the requirements of CCC § 25533.5 or say the law has no merit and no bearing. Ignoring the legislature and their own Supreme Court:

"Provisions of the Corporate Securities Law of 1968, is first subject to administrative enforcement." *People v. Simon* (Emphasis added.)

Did the California Supreme Court say this about CCC § 25401? YES!

CCC 25533.5: "The commissioner **shall** send a copy of a desist and refrain order... a **copy of the order as required by this section**." (Bold emphasis added.)

Did the legislature of the state of California write this into law? YES!

There is a logical order of the statutes as written by the legislature. That order being first CCC §§ 25530(a) and 25532© where the commissioner determines a violation, not the district attorney, then the commissioner issues a ruling or order, not the district attorney. Next is CCC §§ 25533 and 25533.5 that authorizes criminal action only when a desist and refrain order has issued and delivered to the district attorney. The California Corporations Code requires administrative enforcement first and the California Supreme Court has declared it so in *People v. Simon*.

"A lack of personal or subject matter jurisdiction exists when the court acted in some manner inconsistent with the constitutional due process, or otherwise acted beyond the powers granted to it under the law." *Cupp v. Murphy*, 412 U.S. 291, 294-96 (1973)

Therefore, if the state of California cannot produce a desist and refrain order as required by law, then they do not have subject matter jurisdiction and lack the authority to prosecute. The judgment must be vacated with prejudice and Petitioner released.

## ADDITIONAL AUTHORITIES:

"The basic principle that a criminal statute must give fair warning of the conduct that it makes a crime has often been recognized by this Court." *Bouie v. City of Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed. 2d 894, 350, 351 (1964)

"When a similarly unforeseeable state-court construction of a criminal statute is applied retroactively to subject a person to criminal liability for past conduct, the effect is to deprive him of due process of law in the sense of fair warning that his contemplated conduct constitutes a crime." *Bouie v. City of Columbia*, supra pgs 354, 355

"Thus we have struck down a state criminal statute under the Due Process Clause where it was not sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties." *Bouie v. City of Columbia,* supra pg 351; *Connally v. General Const. Co.,* 29 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322.

"No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *Bouie v. City of Columbia,* supra pg 351 citing *Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888.

"An unforeseeable judicial enlargement of a criminal statute, applied retroactively, violates the federal due process right to fair warning of what constitutes conduct...("The Due Process Clause... protects criminal defendants against novel developments in judicial doctrine.") A judicial construction of a statute may violate due process if the defendant was "unfairly surprised in a way that affected his legal defense." *Clark v. Brown,* 442 F.3d 708, No. 02-99007, pg 721 (9th Cir. 2006) citing *Bouie v. City of Columbia,* 378 U.S. 347, 33 (1964) citing *Darnell v. Swinney,* 823 F.2d 299, 301 (9th Cir. 1987).

"No judgment of the court is due process of law, if rendered without jurisdiction in the court, or notice to the party." *Scott v. McNeal,* 154 U.S. 34, 46, 38 L.Ed. 896, 14 S.Ct. Rep. 1108

## CLAIM THREE:

Santa Clara county violated Petitioner's right to due process of law, as guaranteed by the United States Constitution and the Fifth and Fourteenth Amendments, by committing multiple acts of fraud in order to extradite, prosecute and convict Petitioner.

## SUPPORTING FACTS:

To charge Petitioner in an indictment of being "**within**" Santa Clara County, when Petitioner was not, is an act of fraud according to California Penal Code § 134:

> "Every person guilty of preparing any false or ante-dated book, paper, record, instrument in writing, or other matter or thing, with intent to produce it, or allow it to be produced for any **fraudulent or deceitful purpose**, as genuine or true, upon any trial, proceeding, or inquiry whatever, authorized by law, is guilty of felony." (Bold emphasis added.)

The entire indictment is an act of knowing fraud by prosecutor Paul Colin and his chief investigator Dalton Rolen, to which they conspired from the very beginning.

The conspiracy to fraudulently prosecute and convict Petitioner started when Paul Colin and Dalton Rolen met with Lawrence Warfield in Arizona. They met and planned their schemes in January 2002 before Mr. Warfield was appointed receiver in a federal civil case, filed March 25, 2002 in the Northern District of Texas, against Petitioner. This was confessed at trial by Dalton Rolen. See copy of trial transcript attached hereto as Exhibit 6. It was after that meeting, on March 25, 2002, the Fort Worth, Texas office of the Securities and Exchange Commission filed a federal civil case against Petitioner and others. The same day the federal civil case was filed Mr. Warfield, the prosecutor's chief "expert" witness, was appointed receiver. He then illegally and unlawfully raided Petitioner's office and home, see Claim Five, infra, and shortly thereafter Paul Colin and Dalton Rolen started their string of lies and perjury, on application for requisition for purpose of extradition, Complaint No. 252891 and Indictment 210807. Petitioner never entered homes in Santa Clara County. Petitioner was **not** charged with conspiracy to commit burglary, he was charged with FIRST DEGREE BURGLARY, California Penal Code § 459-460(a).

First, Dalton Rolen swore under penalty of perjury on the original Complaint Number 252891 Petitioner, along with three others, on or about the given dates entered the homes of various people in Santa Clara County and on or about April 29, 2002 Petitioner did offer to sell a security in California. At Petitioner's trial Mr. Rolen stated under oath those individuals never told him Petitioner entered their home and that he knew Petitioner's office was shut down March 25, 2002, prior to the date of April 29, 2002. See copy of trial transcripts attached hereto as Exhibit 7. Specifically, he admitted that he had no evidence Petitioner was ever within the state of California or ever entered anyone's home, as he swore to under oath. He also admitted at trial that count 42 of complaint 252891 never happened. The original Complaint No. 252891 was superceded prior to Petitioner receiving a preliminary hearing with Indictment No. 210807 (See Claim 8, infra). It was shown through testimony by Mr. Rolen the dates listed in count 11 on the Indictment coincided with the taped conversations Mr. Rolen had with Petitioner and his son and that no offer or sell was

ever made to Bertha Cummings. Mr. Rolen, posing as Bertha Cummings' son, made an offer to buy however Mr. Rolen was told no. See Exhibit 7.

Secondly, the prosecutor, Mr. Colin, knowingly and purposely committed fraud and perjury on his extradition documents stating "that the ends of public justice require that the accused **be brought back** to this State at the public expense." See extradition request application attached as Exhibit 8. Having no evidence that Petitioner was ever in California, to make this statement is an act of FRAUD. It is not the Petitioner's intent to address the illegal extradition, but to show that the deception and acts of fraud were from the very beginning of this process. Mr. Colin knew he did not have jurisdiction over the Petitioner, so every document had to infer that Petitioner was physically in California, implying jurisdiction. An act of calculated deception and fraud.

Next, on the indictment Mr. Colin charged Petitioner with committing every act **within** California, not from **without** California. It is an act of fraud to charge one thing and then at trial present no evidence that Petitioner was actually in California and then tell the jury its no defense that Petitioner was never in California. Also, on the indictment there is no specific statement of how CCC § 25401 was violated as only the language of the statute was quoted. Petitioner had no way of knowing what he was actually being accused of until trial.

Here's what the United States Supreme Court says about fraudulent indictments:

"Where guilt depends so crucially upon such a specific identification of fact, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute." and

"It enables his conviction to rest on one point and the affirmance of the conviction to rest on another. It gives the prosecution free hand on appeal to fill in the gaps of proof by surmise or conjecture." *Russell v. United States,* 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962)

"An indictment not framed to apprise the defendant with reasonable certainty, of the nature of the accusation against him... is defective, although it may follow the language of the statute." *United States v. Simmons,* 96 U.S. 360, 362, 24 L.Ed. 819

"In an indictment upon a statute, it is not sufficient to set forth the offence in the words of the statute, unless those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished,...". *United States v. Carll,* 105 U.S. 611, 612, 26 L.Ed. 1135; see also *United States v. Cruikshank,* 92 U.S. 542, 558, 23 L.Ed. 588.

Lastly, Mr. Warfield, the co-conspirator in this fraudulent prosecution, lied under oath about not having any evidence of business contracts that he illegally obtained from the Petitioner. He knowingly and willfully deceived the jury during questioning and presentation of evidence

attempting to show Petitioner's company, Resource Development International, was a fake. Two weeks after trial Mr. Warfield questioned a former employee of Petitioner during a deposition about a contract Mr. Warfield had in his possession. See copy of deposition transcript and contract attached hereto as Exhibit 9. Mr. Warfield had a significant financial incentive to convict Petitioner by any means, including perjury, as he was awarded 2.5 million dollars by the judge at sentencing. See sentencing report attached hereto as Exhibit 10. Also, the evidence submitted at trial showed that Mr. Warfield was already making an average of $30,000 a month as receiver, more financial incentive to convict Petitioner.

The SCC court's response to all these acts of fraud is that they are "irrelevant". The SCC court makes no attempt to quote any case law, or quote any laws, or even to try to show that the fraud is harmless. The SCC court again ignores the facts, the law (PC § 134) and the United States Supreme Court.

> "There is no question of the general doctrine that fraud vitiates the most solemn of contracts, documents, and even judgments." *U.S. v. Throckmorton,* 98 U.S. 61, 65 (1870). See also *Claredon v. Thomson,* 23 U.S. 538 (1998).

This Court must vacate the judgment with prejudice based on the many acts of fraud and deception by the prosecution and immediately release Petitioner.

## CLAIM FOUR:

Santa Clara County conducted a miscarriage of justice and violated the Fifth and Fourteenth Amendments to the United States Constitution by convicting Petitioner who was actually innocent of all charges.

## SUPPORTING FACTS:

Petitioner was charged on Indictment #210807 of being **within** Santa Clara County on every charge, including the conspiracy charge of violating CCC § 25401 and the first degree burglary charges. Petitioner proved at trial that if there was a conspiracy, it took place in Tacoma, Washington, not in Santa Clara County. Mr. Whelan testified that he contacted Petitioner and came to Tacoma, Washington to discuss offering Resource Development International (RDI) private contracts to his friends and clients. Therefore no conspiracy took place within California. See trial transcript attached hereto as Exhibit 11.

It is beyond ridiculous and absurd to attach burglary charges to a charge of violating CCC § 25401, but for the prosecution to accuse residents of Washington state, with knowledge that they were never in California is criminal. The charges are very specific on the burglary charges, stating Petitioner entered people's homes in Santa Clara County. No charge of conspiring to commit burglary or aiding and abetting burglary. At trial the prosecutor went in circles and contradicted himself over and over, purposely confusing the jury of the charges. Burglary, like CCC § 25401, requires criminal intent, the only persons, Michael Keller and William Whelan, co-defendants in the criminal case, who actually entered the homes and talked to the clients testified they had no criminal intent, and were not aware of violating CCC § 25401.

Keller and Whelan made a deal to plead nolo contendre. Because of the guilty plea the prosecutor did not have to prove criminal intent of Keller and Whelan, so no burglary was possible. Also, because the prosecutor could not prove criminal intent, he tells the jury, in Petitioner's case, criminal intent is not necessary. No criminal intent necessary for burglary or violating CCC § 25401, imagine that!

Jury Instruction 2.02 of Petitioner's trial:

"Even if the evidence does not show that agents of the defendants acted with criminal intent, the defendants may still be found liable for the actions of innocent agents who acted under the direction or assistance or aid of the defendants."

The prosecutor told the jury even if Keller and Whelan were innocent agents the Petitioner could be found guilty. How can innocent agents be charged with a felony and plead nolo contendre? Keller and Whelan now have a felony record for burglary and securities fraud, how is that innocent? Doesn't the law require them to have had criminal intent to be charged and found guilty? YES IT DOES! Keller and Whelan cannot be convicted and be innocent agents both. Therefore, criminal intent, mens rea and scienter are all necessary elements that must be proven at trial, which the SCC court referred to in its decision on Page 3 of Exhibit 1 (See Claim One, supra.) Since all contact was done by Keller and Whelan, who have now been convicted, they must have had criminal intent.

None was entered into evidence and they testified they had none. Again, without criminal intent, no burglary is possible.

> "Keating argues that the conviction violated his rights to due process and against ex post facto laws because the jury was permitted to convict him of aiding and abetting persons who did not violate the law." *Keating v. Hood,* 922 F.Supp. 1482, 1486-88, 1492-94 (C.D. Cal. 1996).

Lastly on this issue, the legislature of California NEVER intended for someone accused of violating CCC § 25401 to be charged with burglary. Burglary is listed in California Penal Code § 667.5(c)(21) as a crime of violence if another person besides an accomplice is present. When did white collar crimes become an act of violence that under California law is a strikeable offense and not eligible for 50% good time? Pursuant to the language in the Indictment (See copy of Indictment attached hereto as Exhibit 12.), Petitioner was charged with and convicted of **entering** homes with the intent of violating CCC § 25401. Petitioner defended this charge at trial by proving Petitioner not only **never** entered the homes of those for which he was convicted of first degree burglary but Petitioner was not even in California. Petitioner was **not** charged with conspiracy to commit burglary or aiding and abetting others to commit burglary.

The prosecution attempted to prove that there were three omissions precipitating the violation of CCC § 25401 by Petitioner even though these alleged omissions were not on the indictment. See Exhibit 12. The omissions proffered through testimony of prosecution witnesses and defended by Petitioner at trial are:

1.   that Petitioner had a legal obligation to disclose he was involved with a company named Dennel Finance, who was being civilly sued by the Securities and Exchange Commission (SEC);

2.   that Petitioner had a legal obligation to disclose whether commissions would be paid; and

3.   that Petitioner had a legal obligation to tell clients Petitioner's company was a fake.

The prosecutor led the jury to believe that the Petitioner was an owner of Dennel and that Petitioner's company, RDI, started up after the SEC action, both were proved to be lies. Petitioner proved at trial that he had no ownership of Dennel Finance and that he was just an investor. RDI was formed in January 1999 before the SEC action against Dennel was filed in March 1999. Lastly, Petitioner showed he had every reason to expect that Dennel would prevail in the federal civil suit however it really was irrelevant because by the time the Dennel case was decided in December 2000, RDI had no longer been taking new clients for six months, since June 2000. See copy of letter from Petitioner's company to clients dated, May 20, 2000, attached hereto as Exhibit 13. Therefore, the accusation of omitting telling investors about Dennel was neither an omission nor an illegal act.

Petitioner showed at trial he had indeed disclosed commissions may be paid as a part of his private contract however some witnesses testified they could care less about commissions. See copy

of Client Consulting Agreement, paragraph 8 attached hereto as Exhibit 14. This omission was not only a lie, but irrelevant and not criminal.

Lastly, and of course most importantly, Petitioner proved his company was not a fake. If story telling by the prosecution's key witness, Lawrence Warfield, who had a multi-million dollar incentive to convict someone is "evidence" then no one in America is safe from the injustice of wrongful prosecution. Mr. Warfield was given "expert" status by the biased judge (See Claim Eleven, infra.), and therefore his word alone was the only evidence that RDI was a fake. No actual bank records were entered into evidence, no bank officers testified to the accuracy of Mr. Warfield's "spreadsheets", no real evidence, that the jury was led to believe must exist, was entered into evidence and no other testimony that RDI was a fake, but Mr. Warfield's. Even though the defense proved that Mr. Warfield had a huge financial interest in convicting the Petitioner, the objection to his expert status was denied without a finding in fact and law.

It was also shown at trial, that Mr. Warfield had already committed perjury in the federal civil case by declaring he had a search warrant when he raided the Petitioner's home and office by force. See Claim Five, infra, for details of Mr. Warfield's illegal actions on March 25, 2002. So, Petitioner showed the court that Mr. Warfield was capable of committing perjury, a felony, to obtain his goals, yet again the court would not remove his testimony or his expert status. See trial transcript where Mr. Warfield testifies he had no search warrant when entering home and office of Petitioner pursuant to federal civil case attached hereto as Exhibit 15. It was this search and seizure, absent warrant, where Mr. Warfield obtained all the evidence he testified to during Petitioner's California criminal trial.

Mr. Warfield testified Petitioner's company was a fake and there were no real investments. Yet, two weeks after Petitioner's trial ended Mr. Warfield used a business contract illegally obtained from Petitioner's office during a deposition of an RDI employee. See Exhibit 9. Petitioner submitted this new evidence at sentencing. The prosecution only stated it was a renewals of previous arguments and the court agreed the jury was not privy to the new material Petitioner filed on February 13, 2005, yet denied Petitioner's motion for new trial anyway. It was an impossibility for the jury to have seen it, because Petitioner did not obtain copies until after trial. See trial transcript attached hereto as Exhibit 16.

Here is the United States Supreme Court's answer to that:

"...to disclose these contracts which he could have used to impeach the witnesses, violated his right to due process under *Brady v. Maryland,* 373 U.S. 83, which held that the prosecution's suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." *United States v. Bagley,* 473 U.S. 667 (1985)

Also in *Bagley* - "A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial."

"When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within the general rule (of *Brady*)."

"A new trial is required if 'the false testimony could... in any reasonable likelihood have affected the judgment of the jury..." 405 U.S. at 154.

"First, it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment, *Mooney v. Holohan,* 294 U.S. 103." *Napue v. People of the State of Illinois,* 360 U.S. 264 (1959)

"It is no consequence that the falsehood bore upon the witness credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is any way relevant to the case, **the district attorney has the responsibility and duty to correct** what he knows to be false and elicit the truth." *Alcorta v. State of Texas,* 355 U.S. 28 (Bold emphasis added.)

Other supporting evidence at trial of Petitioner's innocence are:

1.   Mr. Martindale admitted that he received a phone call from BIL bank in Luxembourg asking if he was satisfied with his **investment** in RDI.

2.   It was shown at trial by the prosecution's witness, Lawrence Warfield, that money was sent overseas into several different locations and out of Petitioner's control, just as the contracts stated.

3.   It was shown at trial that Petitioner had a legitimate business in Tacoma, Washington at the same location for over fifteen years.

4.   Testimony was given of personal knowledge that Petitioner did indeed travel to Europe on a regular basis to conduct business.

5.   Testimony was given that Medium Term Notes are traded around the world daily and that they are a legitimate business investment.

Petitioner was in business for fifteen years, actively pursuing the best returns possible for his clients, not in hiding but always available to them. With the above evidence and the evidence that was withheld, it is not reasonable to claim that RDI was a fake. Lastly, a fake company does not stop taking new clients, or bother to waste time and money investing in Europe, nor would they give control of the money to someone else. The three omissions that were brought up at trial were proven irrelevant, not omitted and a lie by the prosecution. The issue of Dennel was irrelevant, the commissions were not omitted, and the fact that RDI was a fake, were all lies of, and unproven by, the prosecution.

"The prosecution bears the burden of proving all elements of the offense (508 U.S. 278) charged, see e.g. *Patterson v. New York,* 432 U.S. 197, 210 (1977)." *Sullivan v. Louisiana,* 508 U.S. 275 (1993)

The prosecution was unable to prove beyond a reasonable doubt any of the alleged omissions of material facts. Petitioner is innocent of violating CCC § 25401. Petitioner was never in California in order to commit first degree burglary. This Court must vacate the judgment with prejudice.

## ADDITIONAL AUTHORITIES:

"Schulp's claim is accompanied by an assertion of constitutional error at trial: ...and the withholding of evidence by the prosecution. As such, his conviction may not be entitled to the same degree of respect as one that is the product of an **error-free trial**, and his evidence of innocence need carry less of a burden." *Schulp v. Delo,* 513 U.S. 298 (1995) (Bold emphasis added.)

Also in *Schulp:*

at 321 - "In Kuhlman, for example, Justice Powell concluded that a prisoner retains an overriding 'interest in obtaining his release from custody if he is innocent of the charge for which he was incarcerated'."

at 324 - "We conclude that Carrier, rather than Sawyer, properly strikes that balance when the claimed injustice is that constitutional error has resulted in the conviction of one who is actually innocent of the crime."

at 325 - "Indeed, concern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system. That concern is reflected, for example, in the "fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free. *In re Winship,* 397 U.S. 358, 372 (1970) (Harlan J., concurring)."

"The overriding importance of this greater individual interest merits protection by imposing a somewhat less exacting standard of proof on a habeas petitioner alleging a fundamental miscarriage of justice than on one alleging that his sentence is too severe."

at 328 - "The habeas court must make its determination concerning the petitioner's innocence in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded to have become available **only after trial**." (Bold emphasis added.)

*Berger v. United States,* 295 U.S. 78 (1935) - "the true inquiry, therefore is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused. The general rule that allegations and proof must correspond is based upon the obvious requirements (1) that the accused shall be definitely informed as to the charges against

him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at trial; and...". *Bennet v. United States,* 227 U.S. 333, 338, *Hagner v. United States,* 285 U.S. 427, 431-433.

"The prosecuting attorney's argument to the jury was undignified and intemperate, containing improper insinuation and assertions calculated to mislead the jury." *United States v. Williams,* 504 U.S. 36 (1992)

"In these circumstances prejudice to the cause of the accused is so highly probable that we are not justified in assuming its nonexistence." *Berger v. United States,* 295 U.S. 78 (1935)

**CLAIM FIVE:**

Petitioner's right to a warrant for search & seizure as guaranteed by the United States Constitution and the Fourth Amendment was violated.

**SUPPORTING FACTS:**

Petitioner is aware of the United States Supreme Court's decision in *Stone v. Powell,* 428 U.S. 465 (1976), where it was decided that Fourth Amendment claims are not recognized in federal writs of habeas corpus if the defendant was "provided an opportunity for full and fair litigation" by the State court. Petitioner raised a Motion to Suppress Evidence during his Motions in Limine before the start of the trial. Petitioner was not afforded a rebuttal after the court heard from the prosecutor therefore was not provided a full and fair litigation. More importantly, Petitioner has since that date, September 30, 2004, discovered many other legal arguments in support of Petitioner's claim that the receiver in the federal civil case, Lawrence J. Warfield, entered, searched and seized property of Petitioner which was used to prosecute Petitioner, outside of the law.

Lawrence J. Warfield, a court approved expert witness for the prosecution, testified based on evidence he had seized from Petitioner's office on March 25, 2002, without a search warrant – a Constitutional violation of Petitioner's rights. Petitioner believes it is possible and probable the jury would have reached a different verdict if not for the fabricated testimony Mr. Warfield put together from Petitioner's business records. If in fact the evidence presented by Mr. Warfield was "fruit of the poisoned tree" because Petitioner's Fourth Amendment right was violated in the course of gaining such evidence then this would be grounds for reversal of Petitioner's judgment.

On March 25, 2002, the SEC filed a federal civil suit against Petitioner and others in the United States District Court for the Northern District of Texas. Outside the presence of Petitioner on the same date as the filing of the lawsuit, a receiver was appointed by the court – Lawrence J. Warfield. Within two hours of the filing of the complaint and his court appointment Mr. Warfield, who was already present in Washington state, forced entry into the home and office of Petitioner, absent a search warrant, prior to service of process on any defendant in the civil case in Washington State, prior to filing a bond as ordered by the court and required by 28 U.S.C. § 754 and prior to filing the paperwork required also by § 754 in a foreign district.

> 28 U.S.C. § 754:
> "A receiver appointed in any civil action or proceeding involving property, real, personal or mixed, situated in different districts shall, **upon giving bond as required by the court,** be vested with complete jurisdiction and control of all such property with the right to take possession thereof."
>
> "Congress has extended the territorial jurisdiction of a receivership court to any district where property of the receivership estate may be located, as long as the receiver complies with all statutory prerequisites to jurisdiction.... Section 754 divest a receiver of jurisdiction over receivership property located in different districts if the receiver **fails to post bond** or comply with other obligations imposed by the

statute." *Warfield v. Arpe,* 2007 WL 549467, *10-11 (N.D. Tex 2007) (Bold emphasis added.)

*Warfield v. Arpe* is an ancillary case to the federal civil case filed against Petitioner and was decided by the same judge who presided over Petitioner's federal civil case and therefore is the law of the case. See Certificate of Search, dated February 1, 2008, from the Clerk of the Court of the United States District Court for the Northern District of Texas which states no original bond is on file in the record of Case No. 3:02-CV-0605 attached hereto as Exhibit 17.

To this date Mr. Warfield has not filed or caused to be filed an original bond with the clerk of the court at the United States District Court for the Northern District of Texas and therefore has never acquired jurisdiction of any property of Petitioner in a district foreign to the Northern District of Texas.

Presenting as his authority to **force entry** into the home and office of Petitioner in Washington state was an Order Appointing Temporary Receiver. Within this order was a clause which stated entry must be without breaching the peace, in other words with permission, which Warfield did not have. U.S. Marshals and local law enforcement preceded Mr. Warfield into the office in a manner which required a search warrant or probable cause. See Order Appointing Temporary Receiver attached hereto as Exhibit 18.

"Fourth Amendment protections apply when district court's issue *ex parte* orders permitting entry into private premises." *Payton v. New York,* 445 U.S. 573, 585 100 S.Ct. 1371, 1379 (1980)

Mr. Warfield not only lacked a search warrant and probable cause, he also lacked jurisdiction. As an officer of the court, in his capacity as appointed receiver, he can only be vested in the same jurisdiction as the court and the court had not yet acquired jurisdiction.

**"Service of process marks the start of court's jurisdiction** over the lawsuit." *Hunsinger v. Gateway Management,* 169 FRD 152 (1996) (Bold emphasis added.)

Petitioner was first served on March 27, 2002, two days after the forced entry by Mr. Warfield and the seizure of all of Petitioner's business records. See copy of court record of proof of service on Petitioner attached hereto as Exhibit 19.

The Northern District of Texas court and it's receiver, Mr. Warfield, did not have jurisdiction in Tacoma, Washington on March 25, 2002. Petitioner received no notice prior to Mr. Warfield's illegal entry and seizing his private papers, real and personal property and business records as Petitioner had not yet been served the federal civil lawsuit filed by the SEC against Petitioner and others.

"To invoke §1692 a receiver **first must** comply with 28 U.S.C. §754.... §754 is a 'stepping stone' on [the court's] way to exercising inpersonam jurisdiction over one

who holds receivership assets in a remote district." *SEC v. Bilzerian,* 378 F.3d. 1100, 1103 (DC 2004) (Bold emphasis added.)

Mr. Warfield admitted at trial he had no search warrant (See Exhibit 15). Mr. Warfield breached the peace. Mr. Warfield did not file a bond. Mr. Warfield entered, searched and seized private property prior to obtaining jurisdiction over said property. Mr. Warfield used the records he illegally seized to create his testimony against Petitioner in the instant criminal case. Because the records Mr. Warfield used to provide his testimony are fruit of the poisoned tree his testimony should have been stricken. Without Mr. Warfield's false testimony at trial stating Petitioner's business was a fake and the unlawfully obtained evidence, the jury may have returned a different verdict.

The Fourth Amendment requirement for a search warrant is one of Americans' most fundamental rights and it was, without question, violated. This court must reverse the judgment as all "evidence" presented by Lawrence J. Warfield at Petitioner's trial stems from the illegal search and seizure therefore is "fruit of the poisoned tree".

## ADDITIONAL AUTHORITIES:

"Its reasoning plainly violated the holding in *Payton v. New York,* 445 U.S. 573, 590 that the firm line at the entrance to a house may not be crossed without a warrant, absent exigent circumstances. Here, police had neither an arrest nor a search warrant." *Kirk v. Louisiana,* 536 U.S. 635 (2002)

"We held that because the Fourth Amendment has drawn a firm line at the entrance to the house.. {,a}bsent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Id. At 590. "And we noted that an arrest warrant founded on probable cause, as well as a search warrant, would suffice for entry. Id. At 603." *Payton v. New York,* 445 U.S. at 590, 603

"Specifically dealing with the use of the evidence unconstitutionally seized, the court concluded: 'If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution. The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land'. At page 393 of 232 U.S., at page 344 of 34 S.Ct." *Mapp v. Ohio,* 367 U.S. 643

**CLAIM SIX:**

Petitioner's Due Process rights as guaranteed by the United States Constitution and the Fifth and Fourteenth Amendments were violated by never being notified of his right to counsel.

**SUPPORTING FACTS:**

Petitioner was first arrested July 21, 2002, absent an arrest warrant – a Constitutional violation of Petitioner's rights – in Washington state by local law enforcement on a civil order signed by the judge assigned to Case No. 3:-02-CV-0605 from the United States District Court for the Northern District of Texas. At time of arrest Petitioner was never given notice of his rights pursuant to *Miranda*. An arrest warrant was demanded, however none was ever produced.

Petitioner was turned over to the United States Marshals Service, who within four days transported Petitioner to Texas, specifically Seagoville Federal Detention Center. Petitioner was never taken before a judge in Washington state and was not taken before the federal judge, Jerry Buchmeyer, assigned to the federal civil case until October 1, 2002! At no time was Petitioner notified of his right pursuant to *Miranda* even though his liberty was taken from him.

While in custody of the United States Marshal Service in Seagoville, Texas, California filed extradition paperwork. The federal judge then released Petitioner to the custody of the state of Texas and Petitioner was transferred to Dallas County jail. Eight days went by before Petitioner was brought before a judge or magistrate. At no time was Petitioner notified of his right to counsel. After unsuccessfully challenging extradition due to lack of California's jurisdiction over Petitioner's person and other challenges, Petitioner was transported to Santa Clara County. Petitioner was again not informed of his rights pursuant to *Miranda*. Petitioner can offer no proof for something that did not happen, instead let the Attorney General prove it did happen.

After arriving in California Petitioner was taken before the court where the complaint Petitioner was extradited on was dismissed and superceded by an indictment returned almost a year earlier. At that time Petitioner was not presented with an arrest warrant pursuant to the indictment, was not informed of his rights and did not receive a bail hearing, see Claim Eleven, infra.

In the very famous case of *Miranda v. Arizona,* 384 U.S. 436 (1966) the High Court required the accused to be righted, now known as Miranda rights. This never happened and this Court must vacate the judgment with prejudice.

## CLAIM SEVEN:

Petitioner's Due Process rights as guaranteed by the United States Constitution and the Fifth, Sixth and Fourteenth Amendments were violated by denying Petitioner a lawful arraignment and counsel at arraignment.

## SUPPORTING FACTS:

Petitioner on May 19, 2004 was still attempting to hire private counsel, when the SCC court entered a plea without asking Petitioner to plead, and against his objections. The SCC court did not read the accusations into the record or even make sure Petitioner was aware of the charges. Against the United States Constitution, the California Penal Code, and the California Rules of Court the judge entered a plea for the Petitioner without counsel present, without reading the charges, without asking Petitioner to plead, and against objections. See Transcripts of May 19, 2004 attached hereto as Exhibit 20.

Due to no lawful arraignment and counsel not present or provided Petitioner in violation of the Sixth Amendment right to counsel this Court must vacate the judgment with prejudice.

## ADDITIONAL AUTHORITIES:

"In *Powell v. State of Alabama,* 287 U.S. 45, '...requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.'"

"In this case, as in those, the degree of prejudice can never be known. Only the presence of counsel could have enabled this accused to know all the defenses available to him and to plead intelligently." *Hamilton v. State of Alabama,* 368 U.S. 52

"The Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent or prevented from assisting the accused during a critical stage of the of the proceeding." *United States v. Cronic,* 466 U.S. 648, at 659, fn. 25.

## California Penal Code §859a:

"(a) If the public offense charged is a felony not punishable with death, the magistrate shall immediately upon **the appearance of counsel for the defendant read the complaint** to the defendant and **ask** him or her whether he or she pleads guilty or not guilty to the offense charged therein and to a previous conviction or convictions of crime if charged. (Bold emphasis added.)

## California Penal Code 987:

"(a) In a noncapital case, if the defendant appears for arraignment without counsel, he or she shall be informed by the court that **it is his or her right to have counsel before being arraigned,** and shall be asked if he or she desires the assistance of counsel." (Bold emphasis added.)

**California Penal Code 988:**

"The arraignment must be made by the court, or by the clerk or prosecution attorney under it's direction, and **consists in reading the accusatory pleading** to the defendant and delivering to the defendant a true copy thereof, and of the endorsements thereon, if any, including the list of witnesses, and asking the defendant whether the defendant pleads guilty or not guilty to the accusatory pleading;..." (Bold emphasis added.)

**California Rules of Court, Rule 4.100(2):**

"A plea of not guilty shall be entered if a defendant **represented by counsel** fails to plead or demur." (Bold emphasis added.)

## CLAIM EIGHT:

Petitioner, not waiving time, was denied his right to a speedy trial as guaranteed by the United States Constitution and the Sixth and Fourteenth Amendments.

## SUPPORTING FACTS:

A Complaint No. 252891, filed on June 19, 2002, which Petitioner was extradited on, was superceded by Indictment No. 210807 which was filed on June 2, 2003. Petitioner went to trial in October 2004, one year and four months after filing of Indictment.

No preliminary hearing was afforded on Complaint No. 252891, and Complaint was not dropped when Indictment was filed as required by law (CA PC § 1382).

Petitioner was challenging extradition on Complaint No. 252891 at the time of filing Indictment No. 210807 and Petitioner was never properly arraigned (See Claim Seven, supra.).

Penal Code § 1382(a) mandates that "the court **shall order the action to be dismissed** when a defendant is not brought to trial within 60 days of the defendant's arraignment on an indictment." (Bold emphasis added.)

California Penal Code § 1382(c) was never discussed by the court to the Petitioner, who was not represented by counsel.

Petitioner was brought to California on the Complaint. At arrival in Santa Clara County, the Petitioner was brought to court and the Complaint was dropped. The Petitioner was not released but later handed a copy of an Indictment that was already a year old. The charges on the Indictment were changed from the Complaint, including the addition of a conspiracy charge.

Petitioner should have been extradited on the Indictment, however, if the Indictment was superceding the Complaint, according to California Penal Code § 1382, charges should have been the same and Petitioner should have been brought to trial within 60 days. Also, the Indictment and Complaint cannot both be in effect at the same time, yet they were for over a year.

Here is what the California Supreme Court says about its laws:

"Section 1382, Pen. Code, provides that the court, unless good cause is shown to the contrary, must order the prosecution to be dismissed in the following cases: (1) if an indictment or information has not been filed against him within 30 days after he was committed to answer; (2) when, if the trial has not been postponed upon his application, **he is not brought to trial within 60 days after filing the indictment** or information. The constitution (article 1, section 13) guarantees to every person charged with crime a speedy public trial." *In re Begerow,* 133, Cal. 349, 351, 65 P. 828. (Bold emphasis added.)

"In post-indictment delay, prejudice is presumed and under speedy trial right, there must be good cause for the delay otherwise the defendant has been denied his right to a speedy trial." *People v. Allen,* 96 Cal. App. 3d 268, 276 158 Cal. Rptr. 54, 59.

The Indictment was already one year old when: (1) the Petitioner was made aware of it and (2) the Complaint, that it allegedly superceded, was dropped. Petitioner never waived speedy trial. The prosecutor needed tolling and he needed to add a conspiracy charge, so he claimed the Indictment superceded the Complaint under California Penal Code § 1382. However, the prosecutor and the court violated the time limits proscribed by law and declared by the California Supreme Court.

Lastly, the court never discussed California Penal Code § 1382(c) with the Petitioner, who was not represented by counsel. Therefore, the law states that the Petitioner did not consent to waiving his speedy trial rights.

This Court must vacate the judgment with prejudice for violation of Petitioner's speedy trial rights.

## ADDITIONAL AUTHORITIES:

"We held that petitioner was entitled to be tried in accordance with the protection of the confrontation guarantee of the Sixth Amendment, and that guarantee, like the right against compelled self-incrimination, is 'to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against Federal encroachment.'" *Malloy v. Hogan,* supra, 378 U.S. (1) at 10, 84 S.Ct. (1489), at 1495 (12 L.Ed.2d 653).

"We hold here that the right to a speedy trial is a as fundamental as any of the rights secured by the Sixth Amendment." *Klopfer v. State of North Carolina,* 386 U.S. 213

"The history of the right to a speedy trial and its reception in this country clearly establish that it is one of the most basic rights preserved by our Constitution." *Klopfer v. State of North Carolina,* 386 U.S. 213

### California Penal Code 1382(c):
"If the defendant is not represented by counsel, the defendant shall not be deemed under this section to have consented to the date for defendant's trial unless the court has explained to the defendant his or her rights under this section and the effect of his or her consent."

## CLAIM NINE:

Petitioner was denied Due Process as guaranteed by the United States Constitution and the Fifth and Fourteenth Amendments by California practicing selective prosecution.

## SUPPORTING FACTS:

The Petitioner was prosecuted criminally for a violation of California Corporations Code (CCC) § 25401. All counts Petitioner was convicted of were due to a violation of CCC § 25401. Petitioner is not a citizen of California, nor does Petitioner operate a corporation in California, therefore he is not subject to the California Corporations laws in the first instance. Petitioner or his company never received notice via a desist and refrain from the California Department of Corporations, see Claim Two supra.

The prosecution presented as evidence at Petitioner's trial the case, *State of California v. Hapjack Marketing,* in which the defendants in this **civil case** were civilly sued for a violation of CCC § 25401 among others. Hapjack Marketing was a corporation operating in California and it's principals were citizens of California, however they were civilly sued and punished with a fine wherein Petitioner, a citizen of Washington state, was criminally charged and punished with a 27 years, 8 months prison sentence. This is a clear case of discrimination against a non California citizen and business in favor of a California citizen and business. Discrimination comes in many forms and is not solely based on race, religion or gender.

In fact several witnesses had invested with Hapjack Marketing and testified they lost more money with those investments than they did with Petitioner's company. Many testified to receiving nothing from their investment with Hapjack Marketing and losing their entire investment. All testified they did receive returns from Resource Development International (RDI), Petitioner's company.

According to the lawsuit against Hapjack Marketing (See copy of civil suit and judgment attached hereto as Exhibit 21.) a desist and refrain order was issued and an opportunity for hearing was afforded the principals. Ignoring both, Hapjack Marketing was then civilly sued by the State of California on a referral from the California Corporations Commissioner.

In complete denial of notice and due process, neither Petitioner, a citizen of Washington state, nor his company, based in Tacoma, Washington, was ever issued a desist and refrain order, was never given opportunity for hearing, and yet was criminally charged, convicted and sentenced for a violation of CCC § 25401.

In an obvious act of discrimination Petitioner, a Washington resident, was denied every administrative opportunity required by law, and criminally prosecuted, while Hapjack Marketing, California residents and business, were given every administrative opportunity as required by law and NOT PROSECUTED criminally, for violating the same regulatory statute, CCC § 25401!

Petitioner's rights to due process were violated as shown by the civil prosecution of Hapjack Marketing through an administrative process while denying Petitioner any administrative process

prior to criminally charging for a violation of the same regulatory statute. With the evidence before this Court of selective prosecution, this Court must vacate the judgment with prejudice.

## ADDITIONAL AUTHORITIES:

"In order to prove a selective-prosecution claim, the claimant must demonstrate that the prosecutorial policy had a discriminatory effect and was motivated by a discriminatory purpose." *United States v. Armstrong,* 517 U.S. 456.

## CLAIM TEN:

Petitioner's rights to a Fair Trial as guaranteed by the United States Constitution and the Fifth and Fourteenth Amendments were violated by Santa Clara County having a biased judge, and preventing Petitioner's right to present evidence and witness testimony in his defense.

## SUPPORTING FACTS:

The trial court judge is to be the umpire during the trial, maintaining justice. The judge is not to be "working" for either team. However in Petitioner's trial the judge was clearly biased to the point of **objecting for the prosecution**, preventing the Petitioner from putting on a defense and threatening the Petitioner.

The judge had denied Petitioner assistance of counsel for the purpose of advising Petitioner on the "rules of the game" and then proceeded during the trial to remind the Petitioner and the jury of the fact Petitioner was not trained in law. Petitioner requested finding of fact several times during the course of the trial and was told - "I don't have to give you that" or "It's not my job to explain the law to you." It was clear Petitioner was being punished for defending himself.

The judge denied 98% of all Petitioner's objections and sustained 98% of all the prosecution's objections. Requiring the defense to always give a lawful explanation for the objection, but the prosecution merely had to say the word "objection" to get it sustained. At one point in the trial, the defense stopped, looked at the prosecutor, and asked, "And what was your reason for that objection". This happened one of the times the judge immediately sustained the prosecution without any explanation. The jury and the audience burst out laughing because this process had become such a joke. The fact is that the Santa Clara County court held the defense to **a higher standard** than the prosecution. If this is not bias by a judge then nothing is.

The defense's motions were summarily denied without finding of fact and law. When the Petitioner demanded that the judge uphold his oath of office and uphold the laws as written, by stating on the record how Santa Clara County has personal jurisdiction over the Petitioner, the judge said nothing.

The trial judge allowed irrelevant witnesses to testify on behalf of the prosecution specifically Mark Drysdale, count 2 of the indictment, and Leanne Berrocosa, count 3 of the indictment, when Petitioner was not charged in these counts, yet denied defense the ability to call certain witnesses. Specifically the judge barred Petitioner from taking the steps necessary to require a representative from the Department of Corporations to testify about whether or not a desist and refrain order was issued.

The trial judge gave expert status to Mr. Warfield even in the face of testimony that he did not have a search warrant for the evidence obtained and so admitted at trial. Petitioner strongly objected to this as Mr. Warfield had a huge financial incentive to convict Petitioner. Then the trial judge confirmed this financial incentive by awarding Mr. Warfield 2.5 million dollars at sentencing, (see Exhibit 10), how absurd can this get?! The trial judge also gave expert status to a Mr. Herbert Biern, an attorney for a private corporation known as the Federal Reserve, who knew nothing about

real world investments or the Petitioner's business. When Mr. Biern could answer no questions about Petitioner's business or actual investment practices in the world, Petitioner demanded his "expert" status be stricken, and again the judge denied without a finding in fact or law.

The trial judge allowed Petitioner to be convicted on counts of the Indictment where Petitioner was denied his Fourteenth Amendment guarantee of Due Process of law to cross-examine the witnesses against him.

> "There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, we have expressly declared that to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law." *Pointer v. State of Texas,* 380 U.S. 400.

The trial judge denied the right of the defense to bring in witnesses and to cross-examine witnesses named in several of the charged counts. The judge also made the Petitioner put on his defense in the middle of the prosecution's case for the convenience of the PAID witnesses, while the Petitioner was facing a 27 year sentence! The judge also denied the Petitioner the right to submit evidence regarding the prosecution's key witness, Warfield.

> "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process." *Chambers v. State of Mississippi,* 410 U.S. 284.

> "Mr. Justice Black, writing for the Court, in *In re Oliver,* 333 U.S. 257, 273, 69 S.Ct. 499, 507, 92 L.Ed. 682 (1948), identified these rights as among the minimum essential of a fair trial: 'A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense - a right to his day in court - are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel.'" *Chambers v. State of Mississippi,* supra.

The judge's bias just exacerbated the challenge Petitioner was faced with at trial by defending what he believed to be the charges against him. The Indictment was vague as to the charge of CCC § 25401. Only quoting the statute and not stating specifics of the crime. The only way this Court can "see" the bias of the judge is to read the entire record and transcripts, a daunting task to be sure. However, for the Petitioner to point to these few examples is sufficient when the entire record bears out the truth of this matter.

Petitioner has shown in these examples that the trial judge was biased, unfairly holding Petitioner to a higher standard, preventing testimony, evidence, witnesses for the defense, allowing just the opposite for the prosecution, this judgment must therefore be reversed.

## ADDITIONAL AUTHORITIES:

"...the Court in *Chapman* recognized that some constitutional errors require reversal without regard to the evidence in the particular case.  386 U.S., at 23, n. 8, 87 S.Ct., at 828, n.8, citing... *Turney v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (adjudication by biased judge)."

*Rose v. Clark,* 478 U.S. 570 - "This limitation recognizes that some errors necessarily render a trial fundamentally unfair.  The State of course must provide a trial before an impartial judge, *Turney v. Ohio,* supra."

"Although most constitutional errors have been held amenable to harmless error analysis,...some will always invalidate the conviction....*Turney v. Ohio,* 273 U.S. 510 (1927)(**trial by a biased judge**)." *Sullivan v. Louisiana,* 508 U.S. 274 (1993) (Bold emphasis added.)

## CLAIM ELEVEN:

Petitioner's rights as guaranteed by the United States Constitution and the Eighth and Fourteenth Amendments were violated by not offering or denying Petitioner bail.

## SUPPORTING FACTS:

Upon arrival in California through extradition from Texas while in federal custody, Petitioner was taken before the SCC court for the sole purpose of having the court drop the complaint in favor of a superceding indictment. Petitioner was neither presented an arrest warrant on the indictment nor given a bail hearing on the indictment in order to rebut the unreasonableness of the amount of the bail.

Petitioner was denied – a legal and lawful search of his private property (See Claim 5, supra.), being informed of his right to counsel, pursuant to *Miranda* at time of arrest (See Claim Six, supra.), a lawful arraignment and counsel when court forced a plea upon him (See Claim Seven, supra.), a speedy trial (See Claim Eight, supra.), a right to due process free from selective prosecution (See Claim Nine, supra.) and a judge free from bias (See Claim Ten, supra.). These are all rights Petitioner is guaranteed by the United States Constitution and none can be considered harmless.

In *Chapman v. California,* 386 U.S. 18, 23-24, 17 L.Ed. 2d 705, 87 S.Ct. 824 (a967) it was determined that "harmless" plain error does not exist, all plain errors are harmful. Therefore, Petitioner does not have to show prejudice, it is assumed.

The California Supreme Court said this, "The beyond-a-reasonable doubt standard of *Chapman* require[s] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *People v. Neal,* (2003) 31 Cal.4th 63, 86.

Who is the **beneficiary** of all these Constitutional errors? The PROSECUTION! They have the burden of proof that it was harmless error the Petitioner was denied counsel at arraignment, that Petitioner was denied a search warrant, that Petitioner was denied a speedy trial, and lastly that **NO bail was offered or denied**.

There was no bail hearing, there is no record that bail was offered or denied on Indictment No. 210807. Due to this flagrant violation of Petitioner's most basic Constitutional rights, this Court must vacate the judgment with prejudice.

## ADDITIONAL AUTHORITIES:

"A person charged with a felony by complaint subscribed under penalty of perjury and on file in a court in the county where the felony is triable shall be taken without unnecessary delay before a magistrate of that court." California Constitution Article I, §14.

The requirement is generally recognized, in both state and federal practice, as having several objectives: (1) to enable the accused to obtain bail, and (2) to have the issue of probable cause for the arrest determined by a judicial officer. (See Am.Jur.2d (1995 ed.). Article 1 § 12 of the Constitution of the State of California and Amendment Eight of the Constitution of the United States guarantees right to bail and bail not to be excessive.

### California Penal Code §821:

"If the defendant is arrested in another county, the officer must, without unnecessary delay, inform the defendant in writing of his right to be taken before a magistrate in the county, note on the warrant that he has so informed defendant, and, upon being required by defendant, take him before a magistrate in that county, who must admit him to bail in the amount specified in the endorsement referred to in Section 815a, and direct the defendant to appear before the court or magistrate by whom the warrant was issued on or before a day certain which shall in no case be more than 25 days after such admittance to bail."

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2  are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3  of these cases:

4  See attached Page 6 - Claims, pages 1- 35 where all citations are listed with each of eleven claims.

5  _____

6  _____

7  Do you have an attorney for this petition?                    Yes____    No__✓

8  If you do, give the name and address of your attorney:

9  _____

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on _June 4, 2008_____                    _Ernest Edwards_

14                Date                                      Signature of Petitioner

15

16

17

18

19

20  (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 7 -

**TABLE OF
CONTENTS**

## TABLE OF CONTENTS OF EXHIBITS
## PETITION FOR WRIT OF HABEAS CORPUS
### James E. Edwards - V68959

Exhibit 1:    Opinion of Santa Clara County Superior Court denying Petitioner's Petition for
Writ of Habeas Corpus, dated October 23, 2007.

Exhibit 2:    Reporter's trial transcript, Volume Fifteen, Page 2382, Lines 14-17. Reported by
. Jacqueline V. Barron, CST #8049. Prosecution's closing argument statement it is
no defense Petitioner was not in the home or California.

Exhibit 3:    Reporter trial transcript, Volume Fourteen, Page 1976, Lines24-28. Reported by
Jacqueline V. Barron, CST #8049. Prosecution's investigator, Dalton Rolen.
stating he had no knowledge of Petitioner's physical presence in California.

Exhibit 4:    California Governor Gray Davis' extradition warrant.

Exhibit 5:    Letters between Petitioner's court appointed investigator and the Department. of
Corporations regarding obtaining a copy of desist and refrain order issued to
Petitioner or his company.

Exhibit 6:    Reporter's trial transcript, Volume Fourteen, Pages 1992-1994. Reported by
Jacqueline V. Barron, CST #8049. Mr. Rolen testifying to the meeting with
Lawrence Warfield in Arizona in January or February 2002.

Exhibit 7:    Reporter's trial transcript, Volume Fourteen, Page 1974, Lines 2-22, Page 2130,
Line 30 - Page 2132 and Pages 2129, Line 21 - Page 2130, Line 8 . Reported by
Jacqueline V. Barron, CST #8049. Mr. Rolen testifying he signed original
complaint under oath, Count 42 of complaint did not happen and no offer made
pursuant to Count 11 of the indictment.

Exhibit 8:    Application for Requisition to the Governor of the State of California, signed and
sworn to by Deputy District Attorney for the County of Santa Clara, Paul Colin.

Exhibit 9:    Deposition transcript of Mr. Edward Harris, former employee of Petitioner and
copy of a business contract used by Petitioner.

Exhibit 10:   Sentencing report showing award for Warfield.

Exhibit 11:   Reporter's trial transcript, Volume Twelve, Page 1631, Lines 5 - 22. Reported by
Jacqueline V. Barron, CST #8049. William Whelan testifying he traveled to
Washington state to meet Petitioner.

Exhibit 12:   Copy of Indictment No. 210807.

Exhibit 13:   Copy of letter from Petitioner's company to his clients dated, May 20, 2000, stating no new clients will be accepted after June 30, 2000.

Exhibit 14:   Copy of Petitioner's Client Consulting Agreement.

Exhibit 15:   Reporter's trial transcript, Volume Nine, Page 1034, Lines 13 - 21. Reported by Jacqueline V. Barron, CST #8049. Mr. Warfield's admission he did not have a search warrant to enter Petitioner's home and office and seize property.

Exhibit 16:   Reporter's trial transcript, Volume Seventeen, Pages 2847, Line 6 - Page 2851, Line 23. Reported by Jacqueline V. Barron, CST #8049. Petitioner presentation to the court of Motion for New Trial due to new evidence acquired after trial proving Mr. Warfield new Petitioner's company was involved in business investments.

Exhibit 17:   Certificate of Search signed by Leigh Lyon, Deputy Clerk for the United States District Court for the Northern District of Texas dated February 1, 2008.

Exhibit 18:   Order Appointing Temporary Receiver in Case No. 3-02-CV-0605, United States District Court for the Northern District of Texas.

Exhibit 19:   Process Receipt and Return filed in Case No. 3-02-CV-0605, United States District Court for the Northern District of Texas by the United States Marshals Service.

Exhibit 20:   Reporter's transcript of proceedings held on May 19, 2004.

Exhibit 21:   People v. Hapjack Marketing, Inc, et al, Case No 00AS00776, Complaint for Injunctive and Ancillary Relief (Violation of Corporate Securities Law) Corporations Code § 25110 (Qualification Requirement); Corporations Code § 25401 (Disclosure Requirement) and Statement of Decision.

1

ENDORSED

# FILED

OCT 2 3 2007

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY _____ DEPUTY

KATHLEEN FOSTER

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SANTA CLARA

| | |
|---|---|
| In re | Case No.    CC 210807 |
|      David Eugene Edwards and | |
|      James Eugene Edwards, | Order re:    Petition for Writ of Habeas Corpus |
|      Petitioners, | |
|      On Habeas Corpus. | |

Petitioners David Eugene Edwards and James Eugene Edwards filed identical petitions for a writ of habeas corpus on the grounds that: (1) the State of California and specifically Santa Clara County lacked personal and subject matter jurisdiction when Petitioners were charged, tried, and convicted; (2) the trial judge was biased and prevented them from presenting evidence; (3) they are actually innocent of all charges they were tried for and convicted of; (4) they were searched without a warrant, they were not read their *Miranda* rights, they were not formally arraigned, they were denied the right to a speedy trial, they were denied the opportunity for bail for a period of more than two years, and they were selectively prosecuted.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Petitioners were charged with conspiring to sell fraudulent investments in Resources Development International (RDI). At the time of trial, Michael Keller and William Whelan had

Order re: Petition for Writ of Habeas Corpus

Page 1

1  pleaded no contest or guilty and testified to entering the homes of their clients to sell the
2  investments in RDI. Many of the investors testified to the circumstances under which they had
3  invested in RDI, the assurances that they had been given about this investment, and what had not
4  been disclosed to them about RDI. An investigator from the District Attorney's Office, an
5  official from the Federal Reserve Board, and a forensic accountant also testified. Other
6  witnesses testified pursuant to Evidence Code § 1101 concerning a prior fraudulent investment
7  scheme in which Petitioners had been involved.

8      A jury convicted Petitioners of one count of conspiracy, six counts of residential
9  burglary, and 16 counts of securities fraud. (Pen. Code §§ 182, 459, Corp. Code § 25401.) The
10  jury also found true enhancements of excessive taking over $150,000 and aggravated white
11  collar crime. (Pen. Code §§ 12022.6(a)(2), 186.11(a)(1), & (a)(2).) The trial court sentenced
12  each Petitioner to a state prison term of 27 years, eight months.

13      On appeal, Petitioners argued that their waivers of counsel were invalid and that the trial
14  court abused its discretion by denying their request for the appointment of advisory counsel.
15  They also argued that the trial court made errors in instructing the jury, imposing sentence, and
16  in its restitution order. On July 11, 2007, the Court of Appeal affirmed the judgment.

17

18  **II.    DISCUSSION**

19  A.    Personal and Subject Matter Jurisdiction

20      Like most other states, California has addressed the problem of criminal activity that
21  spans more than one state by adopting statutes that provide our state with broader jurisdiction
22  over interstate crimes than existed at common law. Such laws generally are premised on the
23  belief that a state should have jurisdiction over those whose conduct affects persons in the state
24  or an interest of the state, provided that it is not unjust under the circumstances to subject the
25  defendant to the laws of the state. Penal Code § 27(a)(1) permits the punishment of a defendant
26  under California law for any crime committed "in whole or in part" in the state.    (See *People v.*
27  *Betts* (2005) 34 Cal.4th 1039, 1046-1047.)

28

Order re: Petition for Writ of Habeas Corpus

1        In California, in criminal actions, venue simply denotes the place or places appropriate
2    for a defendant's trial. Venue does not implicate the trial court's fundamental jurisdiction in the
3    sense of personal jurisdiction, which is the authority of the court to proceed against a particular
4    defendant in a criminal action. Neither does venue implicate the trial court's fundamental
5    jurisdiction in the sense of subject matter jurisdiction, which is the authority of the court to
6    consider and decide the criminal action itself. Venue is not a part or aspect of substantive
7    criminal law. Venue is a procedural issue involving the appropriateness of a place for the
8    conduct of the defendant's trial on a criminal charge and not a substantive issue relating to the
9    defendant's guilt or innocence of the crime charged. Venue implicates legislative policy, not
10   constitutional imperative. Penal Code § 781 provides that when a crime is committed partly in
11   one county and partly in another county, venue lies in each of the counties in question. (See
12   *People v. Posey* (2004 ) 32 Cal.4th 193, 208.)

13       In this case, all of the crimes for which Petitioners were charged, tried and convicted
14   were committed, in substantial part, within the State of California, County of Santa Clara, by
15   Petitioners' sales agents Michael Keller and William Whelan. Therefore, even assuming that
16   Petitioners signed and consummated all of the investor contracts in Tacoma, Washington, the
17   State of California nevertheless had personal jurisdiction over Petitioners and subject matter
18   jurisdiction over the charges. Further, Santa Clara County was a proper venue for Petitioners'
19   trial.

20       There is no merit to Petitioner's argument that the California Legislature intended for the
21   Commissioner of the Department of Corporations to be the only one authorized to decide
22   whether a Corp. Code § 25401 has been violated in the first instance. Corp. Code § 25533
23   expressly states that the district attorney of the county in which the violation occurred may
24   institute appropriate criminal proceedings with or without a reference from the Commissioner.
25   Corp. Code §§ 25533.5 and 25540 have no bearing on the district attorney's authority to institute
26   criminal proceedings. *People v. Simon* (1995) 9 Cal.4th 493, 522 simply establishes that
27   knowledge of the falsity or misleading nature of a statement or the materiality of an omission, or

28

Order re: Petition for Writ of Habeas Corpus

Page 3

1    criminal negligence in failing to investigate and discover them are elements of the criminal

2    offense described in Section 25401.

3          Petitioner's argument concerning fraud on the part of the prosecutor (Paul Colin), the

4    prosecution's investigator (Dalton Rolen), and the prosecution's expert witness (Lawrence J.

5    Warfield) is not supported by the record below or by any new evidence and, in any event, is

6    completely irrelevant to the issues of personal and subject matter jurisdiction and venue.

7          The petitions are denied as to the claim that the trial court lacked personal and subject

8    matter jurisdiction over Petitioners.

9

10   B.    Judicial Bias

11         Petitioners assert that the trial judge was biased and prevented them presenting evidence

12   and witness testimony in their defense. However, Petitioners did not include pertinent portions

13   of the trial transcripts. The "facts" they rely upon consist of nothing more than their hearsay

14   recollection and characterization of the trial judge's rulings on certain evidentiary matters. Such

15   allegations are insufficient to overcome the presumption favoring the truth, accuracy, and

16   fairness of the conviction and sentence. (See *People v. Duvall* (1995) 9 Cal.4th 464, 474.)

17         To the extent Petitioners are seeking to review the admissibility of certain evidence, these

18   questions could and should have been raised on appeal. Petitioners have not established any

19   special circumstances excusing their failure to raise these questions on appeal and therefore are

20   precluded from raising them on habeas corpus. (See *In re Harris* (1993) 5 Cal.4th 813, 826-829.)

21         Even assuming that the trial judge excluded evidence that Petitioners were not notified by

22   the Commissioner of Corporations of any violation of the California Corporations Code, the

23   ruling was correct because the evidence was irrelevant. As previously explained, such

24   notification is not a jurisdictional prerequisite to a prosecution for violations of Corp. Code §

25   25401. The district attorney of the county in which the violation occurred may institute

26   appropriate criminal proceedings with or without a reference from the Commissioner.

27         Even assuming that some of the other evidentiary rulings questioned by Petitioners were

28   erroneous, Petitioners have not demonstrated that such errors so fatally infected the regularity of

Order re: Petition for Writ of Habeas Corpus

1  the trial and conviction as to violate the fundamental aspects of fairness and result in a

2  miscarriage of justice.  (See id. at 826.)

3     The petitions are denied as to the claim that the trial judge was biased and prevented

4  Petitioners from presenting evidence and witness testimony in their defense

5

6  C.    Factual Innocence

7     Habeas corpus will lie to vindicate a claim that newly discovered evidence demonstrates

8  a prisoner is actually innocent.  A criminal judgment may be collaterally attacked on habeas

9  corpus on the basis of newly discovered evidence if such evidence casts fundamental doubt on

10  the accuracy of the proceedings and points unerringly to innocence or reduced culpability.  (See

11  *In re Hardy* (2007) 41 Cal.4th 977, 1016.)  The newly discovered evidence must undermine the

12  prosecution's entire case.  It is not sufficient that the evidence might have weakened the

13  prosecution case or presented a more difficult question for the judge or jury.  (See id. at 1017.)

14  The high standard for newly discovered evidence claims presupposes that all the essential

15  elements of a presumptively accurate and fair proceeding were present in the proceeding whose

16  result is challenged.  (See *People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1322.)

17     Petitioners have not introduced any evidence, newly discovered or otherwise, to support

18  their claim of actual innocence.  The "facts" they rely upon consist of their hearsay recollection

19  and characterization of some of the evidence presented at trial and at sentencing, arguments that

20  Warfield's testimony lacked credibility because of his financial interest in the outcome of the

21  criminal trial, and bald assertions that Petitioners proved their innocence on all of the charges.

22  Such allegations are insufficient to overcome the presumption favoring the truth, accuracy, and

23  fairness of the conviction and sentence.  (See *People v. Duvall* (1995) 9 Cal.4th 464, 474.)

24     The petitions are denied as to the claim that Petitioners are actually innocent of all of the

25  charges for which they were tried and convicted.

26

27  / / / / /

28  / / / / /

Order re:  Petition for Writ of Habeas Corpus

1 | D.    Violation of Constitutional Rights

2 | 1.    Fourth Amendment Right to Freedom From Warrantless Search and Seizure

3 | Petitioners assert that the prosecution's expert witness, Warfield, forcibly entered, with

4 | the assistance of United States Marshals and local law enforcement, their office and home for the

5 | purpose of searching and seizing records without first obtaining a search warrant of any kind.

6 | The records Warfield stole were used to form the basis of his testimony against Petitioners at

7 | trial and therefore are "fruit of the poisoned tree."

8 | Aside from the fact that Petitioners introduced no evidence of any kind to support this

9 | argument, all fourth amendment issues could and should have been raised at trial and on appeal.

10 | The question whether evidence was admitted at trial in violation of the Fourth Amendment is not

11 | cognizable on habeas corpus. (See *In re Harris*, *supra*, 5 Cal.4th at 830.)

12 |

13 | 2.    Violation of *Miranda* Rights

14 | Petitioners assert that they were never read their *Miranda* rights when they were in

15 | custody. However, they did not present any evidence that they were ever interrogated in

16 | violation of their *Miranda* rights. Further, although *Miranda* claims are cognizable on habeas

17 | corpus, they are subject to denial on procedural grounds where, as here, they could have been

18 | raised on appeal but were not. (See *In re Sakarias* (2005) 35 Cal.4th 140, 144.)

19 |

20 | 3.    Denial of Formal Arraignment

21 | Petitioners assert that they were never afforded a formal arraignment and complain that a

22 | judge entered a plea of not guilty on their behalf without asking them for a plea and against their

23 | objections while they were still seeking counsel. However, in affirming Petitioners' convictions,

24 | the Court of Appeal stated that Petitioners refused to enter a plea, refused to waive time, failed to

25 | retain counsel after being given several continuances to do so, refused to accept counsel that the

26 | court appointed for them, and then announced that they would represent themselves. In these

27 | circumstances, there was no denial of a formal arraignment, there was no denial of counsel at

28 | arraignment, and the trial court was justified in entering a plea of not guilty on their behalf.

Order re: Petition for Writ of Habeas Corpus

1   4.    Denial of Right to Speedy Trial

2          Petitioners assert that they were denied the right to a speedy trial. However, they did not

3   present any evidence to support this claim. Further, Petitioners' gamesmanship in failing to

4   retain counsel after being given several continuances to do so and refusing to accept court

5   appointed counsel constituted good cause to continue the trial date beyond the 60 day period set

6   forth in Penal Code § 1382. Further, this claim could and should have been raised on appeal and

7   cannot be raised for the first time on habeas corpus. (See *In re Harris*, *supra*, 5 Cal.4th at 826;

8   *People v. Blanchard* (1996) 42 Cal.App.4th 1842, 1849.)

9

10  5.    Denial of Right to Bail

11         Petitioners assert that they were never afforded a bail hearing at any time. However,

12  Petitioner's did not present any evidence to support this claim. If Petitioners were not afforded a

13  bail hearing, their remedy was to file a petition for writ of habeas corpus or other extraordinary

14  writ during the pretrial detention. (See *People v. Standish* (2006) 38 Cal.4th 858, 887.) The

15  alleged denial of a bail hearing has no bearing on Petitioners' guilt or punishment and therefore

16  does not warrant any habeas corpus relief from conviction or sentence.

17

18  6.    Selective Prosecution

19         Petitioners assert that they were selectively prosecuted because they were not citizens of

20  California. In support of this argument, they assert that the prosecution presented as evidence a

21  case entitled State of California v. Hapjack Marketing in which the principals of a corporation

22  operating in California were issued a desist and refrain order, given an opportunity for a hearing,

23  and then sued in a civil action for a violation of Corp. Code § 25401. In Petitioners' view, the

24  conduct of the principals of Hapjack Marketing was even more egregious than Petitioners'

25  conduct because their victims received nothing from their investment with Hapjack Marketing

26  whereas Petitioners' victims received returns. Petitioners argue that this is a clear case of

27  discrimination against a non-California citizen in favor of a California citizen.

28  / / / / /

Order re: Petition for Writ of Habeas Corpus

1          The record in this case shows that investors invested over $73 million in RDI and none of
2   the money was placed in any legitimate investment vehicle. RDI was a Ponzi scheme and $2.2
3   million of the money was paid for or to the benefit of Petitioners. Although some of the victims
4   initially received some returns on their investments, the returns quickly stopped and the victims
5   lost their entire investments.

6          Petitioners did not include pertinent portions of the trial transcript, court records or any
7   evidence whatsoever to support their selective prosecution claim. The "facts" they rely upon
8   consist of nothing more than their hearsay recollection and characterization of a portion of the
9   trial proceedings. The Court of Appeal opinion does not mention anything about Hapjack
10  Marketing. There is no published or unpublished appellate court opinion concerning a civil
11  action against Hapjack Marketing. Petitioners completely failed to show that they were
12  deliberately singled out for criminal prosecution on the basis of some invidious criterion and that
13  the criminal prosecution would not have been pursued except for the discriminatory design of the
14  prosecuting authorities. (See *Baluyut v. Superior Court* (1996) 12 Cal.4th 826, 832.) The
15  petitions are denied as to the claim that Petitioners were selectively prosecuted.

16

17  **III.    CONCLUSION**

18         The petitions for writ of habeas corpus are denied in their entirety.

19

20  Date:  /0 - 19 - 07

21

22                      Judge of the Superior Court

23

24

25

26

27

28

Order re:  Petition for Writ of Habeas Corpus

Page 8

# THE SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SANTA CLARA

| | |
|---|---|
| Plaintiff:<br>   PEOPLE OF THE STATE OF CALIFORNIA<br><br>Defendant:<br><br>   DAVID EUGENE EDWARDS<br>   CDC/ID # V68885<br><br><br>   JAMES EUGENE EDWARDS<br>   CDC/ID # V68959 | **ENDORSED**<br>**FILED**<br><br>OCT 2 3 2007<br><br>KIRI TORRE<br>Chief Executive Officer/Clerk<br>Superior Court of CA County of Santa Clara<br>BY _____ DEPUTY<br>KATHLEEN FOSTER |
| PROOF OF SERVICE BY MAIL OF: Petition for Writ of Habeas Corpus | CASE NUMBER:  210807 |

CLERK'S CERTIFICATE OF MAILING: I certify that I am not a party to this case and that a true copy of this document was mailed first class postage fully prepaid in a sealed envelope addressed as shown below and the document was mailed at SAN JOSE, CALIFORNIA on October 23, 2007. I declare under penalty of perjury that the foregoing is true and correct.



KIRI TORRE, Chief Executive Officer/Clerk

By:  _Kathleen Foster_

Kathleen Foster, Courtroom Clerk

District Attorney's Office
70 West Hedding Street
San Jose, CA  95121
by County Pony Mail

Research Attorney
Superior Court
Criminal Division
190 West Hedding Street
San Jose, CA  95110

CJIC
Superior Court
Criminal Division
190 West Hedding Street
San Jose, CA  95110

David Eugene Edwards
CDC/ID # V68885
CSP Solano – Bldg. 1; #108
P.O. Box 4000
Vacaville, CA  95696-4000

James Eugene Edwards
CDC/ID # V68959
CSP Solano – Bldg. 1; #108
P.O. Box 4000
Vacaville, CA  95696-4000

2

1

2          TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

3                      SIXTH APPELLATE DISTRICT

4                            ---oOo---

5    PEOPLE OF THE STATE OF CALIFORNIA    )
                                          ) COURT OF APPEAL
6           PLAINTIFF,                     ) CASE NO.
                                          ) H028746
7           VS.                            )
                                          )
8    JAMES EUGENE EDWARDS AND              )
     DAVID EUGENE EDWARDS,                 )
9                                          )
            DEFENDANTS.                    ) SUPERIOR CASE
10   _____) NO.: 210807

11                            ---oOo---

12

13             REPORTER'S TRANSCRIPT ON APPEAL

14         FROM THE JUDGMENT OF THE SUPERIOR COURT

15           OF THE STATE OF CALIFORNIA, IN AND FOR

16                 THE COUNTY OF SANTA CLARA

17              HONORABLE RENE NAVARRO, JUDGE

18          NOVEMBER 9, 2004 AND NOVEMBER 15, 2004

19       VOLUME FIFTEEN PAGES 2159 - 2386 (2387 - 2549)

20

21   APPEARANCES:

22   FOR THE RESPONDENT:    OFFICE OF THE ATTORNEY GENERAL
                            455 GOLDEN GATE AVENUE, ROOM 11000
23                          SAN FRANCISCO, CALIFORNIA  94102

24   FOR THE APPELLANT:     SIXTH DISTRICT APPELLATE PROGRAM
                            100 NORTH WINCHESTER BLVD., SUITE 310
25                          SANTA CLARA, CALIFORNIA  95050

26   REPORTED BY:           JACQUELINE V. BARRON, CSR #8049

27                            ---oOo---

28

1

2          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

3              IN AND FOR THE COUNTY OF SANTA CLARA

4                 BEFORE HONORABLE RENE NAVARRO

5                       DEPARTMENT NO. 39

6

7   PEOPLE OF THE STATE OF CALIFORNIA    )
                                          ) COURT OF APPEAL
8          PLAINTIFF,                      ) CASE NO.
                                          ) H028746
9          VS.                            )
                                          )
10  JAMES EUGENE EDWARDS AND              )
    DAVID EUGENE EDWARDS,                 )
11                                        )
           DEFENDANTS.                    ) SUPERIOR CASE
12  _____) NO.: 210807

13                        ---0O0---

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS HELD ON

15            NOVEMBER 9, 2004 AND NOVEMBER 15, 2004

16                        ---0O0---

17

18  A P P E A R A N C E S:

19
    FOR THE PLAINTIFF:          PAUL COLIN,
20                              DEPUTY DISTRICT ATTORNEY

21  FOR DEFENDANT JAMES EDWARDS:  IN PROPIA PERSONA

22  FOR DEFENDANT DAVID EDWARDS:  IN PROPIA PERSONA

23  OFFICIAL COURT REPORTER:     JACQUELINE VILLEGAS BARRON
                                 CERTIFICATE NUMBER 8049
24

25

26

27

28
                                                            2160

1   YOU RESPONSIBLE.  AND YOU CAN BE DARN SURE IF YOU'RE THE
2   HEAD OF THE CONSPIRACY THAT IT WAS ALL FOR ONE, ONE FOR
3   ALL.

4           BUT YOU'RE ALSO RESPONSIBLE FOR THE NATURAL AND
5   PROBABLE CONSEQUENCES OF ANY CRIME OF A CO-CONSPIRATOR WHEN
6   THE CO-CONSPIRATOR IS TRYING TO FURTHER THE GOAL.  YOU DON'T
7   HAVE TO KNOW EVERYTHING THAT THEY'RE DOING.  YOU'VE HAD AN
8   IMPLIED AGREEMENT TO BE PART OF THE TEAM THAT SELLS
9   INVESTMENTS BUT ARE NOT BEING HONEST AND FAIR, ARE THERE
10  NATURAL AND PROBABLE CRIMES THAT COULD OCCUR, LIKE VISITING
11  OLD PEOPLE IN THEIR HOMES COULD DO IT.  BECAUSE IF THERE IS,
12  YOU'RE GOOD FOR IT, EVEN IF IT WASN'T INTENDED AND EVEN IF
13  IT WASN'T PART OF THE ORIGINAL AGREEMENT.

14          YOU NEED TO KNOW.  YOU WEREN'T THERE.  IT IS NOT A
15  DEFENSE THAT DAVID EDWARDS NEVER WALKED INTO JOHN BOWES'
16  HOME, NEVER SET FOOT IN CALIFORNIA, DOESN'T KNOW WHERE SANTA
17  CLARA COUNTY IS.  IF IT'S A NATURAL AND PROBABLE CONSEQUENCE
18  THAT DAVID AND JAMES EDWARDS' SALES FORCE IS GOING TO GO
19  VISIT OLD PEOPLE IN THEIR HOMES TO MAKE THESE SALES AND THE
20  OTHER ELEMENTS ARE PROVEN, THEY'RE GUILTY.  THAT'S THE LAW.
21  IT'S PROTECTING PEOPLE.

22          NATURAL AND PROBABLE, WHAT A REASONABLE PERSON
23  WOULD HAVE EXPECTED.

24          NOW, THEY'RE TRYING TO CLOSE 73 MILLION BUCKS
25  WORTH OF BUSINESS AND I DON'T SEE EVIDENCE ANYWHERE OF THEM
26  TURNING DOWN CONTRACTS.  IS IT NATURAL AND PROBABLE THAT
27  THEIR SALES FORCE ARE GOING TO GO VISIT THEM TO DELIVER
28  THESE TRUSTS TO MAKE THE DEALS AND TO CLOSE THE DEALS?  IS
                                                        2382

3

1

2          TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

3                      SIXTH APPELLATE DISTRICT

4                            ---000---

5    PEOPLE OF THE STATE OF CALIFORNIA   )
                                         )  COURT OF APPEAL
6          PLAINTIFF,                     )  CASE NO.
                                         )  H028746
7          VS.                            )
                                         )
8    JAMES EUGENE EDWARDS AND             )
     DAVID EUGENE EDWARDS,                )
9                                         )
           DEFENDANTS.                    )  SUPERIOR CASE
10   _____)  NO.: 210807

11                           ---000---

12

13            REPORTER'S TRANSCRIPT ON APPEAL

14         FROM THE JUDGMENT OF THE SUPERIOR COURT

15           OF THE STATE OF CALIFORNIA, IN AND FOR

16                 THE COUNTY OF SANTA CLARA

17            HONORABLE RENE NAVARRO, JUDGE

18         NOVEMBER 3, 2004 AND NOVEMBER 8, 2004

19              VOLUME FOURTEEN (1934 - 2158)

20

21   APPEARANCES:

22   FOR THE RESPONDENT:    OFFICE OF THE ATTORNEY GENERAL
                            455 GOLDEN GATE AVENUE, ROOM 11000
23                          SAN FRANCISCO, CALIFORNIA  94102

24   FOR THE APPELLANT:     SIXTH DISTRICT APPELLATE PROGRAM
                            100 NORTH WINCHESTER BLVD., SUITE 310
25                          SANTA CLARA, CALIFORNIA  95050

26   REPORTED BY:           JACQUELINE V. BARRON, CSR #8049

27                           ---000---

28

1

2          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

3               IN AND FOR THE COUNTY OF SANTA CLARA

4                  BEFORE HONORABLE RENE NAVARRO

5                       DEPARTMENT NO. 39

6

7    PEOPLE OF THE STATE OF CALIFORNIA    )
                                          )   COURT OF APPEAL
8              PLAINTIFF,                  )   CASE NO.
                                          )   H028746
9          VS.                            )
                                          )
10   JAMES EUGENE EDWARDS AND             )
     DAVID EUGENE EDWARDS,                )
11                                        )
               DEFENDANTS.                )   SUPERIOR CASE
12   _____)   NO.: 210807

13                        ---000---

14         REPORTER'S TRANSCRIPT OF PROCEEDINGS HELD ON

15            NOVEMBER 3, 2004 AND NOVEMBER 8, 2004

16                        ---000---

17

18   A P P E A R A N C E S:

19
     FOR THE PLAINTIFF:          PAUL COLIN,
20                               DEPUTY DISTRICT ATTORNEY

21   FOR DEFENDANT JAMES EDWARDS:  IN PROPIA PERSONA

22   FOR DEFENDANT DAVID EDWARDS:  IN PROPIA PERSONA

23   OFFICIAL COURT REPORTER:     JACQUELINE VILLEGAS BARRON
                                  CERTIFICATE NUMBER 8049
24

25

26

27

28
                                                        1935

1

2                   INDEX OF EXAMINATION (CHRONOLOGICAL)

3                                                        VOIR
     PEOPLE'S     DIRECT    CROSS    REDIRECT  RECROSS   DIRE    VOLUME
4
     MARTINDALE, LLOYD
5       (CONT)                        1940      1943              14

6    DALTON, ROLEN
        (CONT)              1969     2004      2009              14
7
                              ---oOo---
8

9                   INDEX OF EXAMINATION (CHRONOLOGICAL)

10                                                       VOIR
     DEFENSE'S     DIRECT    CROSS   REDIRECT  RECROSS   DIRE    VOLUME
11
     MARTINDALE, LLOYD
12                  1948     1962                                14

13   WHELAN, WILLIAM
                    2042                                         14
14
     STEPHENS, TED 2089     2097     2111      2116              14
15      (FURTHER)                    2119

16   ROLEN, DALTON 2122                                          14

17
                              ---oOo---
18

19

20

21

22

23

24

25

26

27

28
                                                                1936

1    COUNT.

2         MR. DAVID EDWARDS:  OKAY.  SURE.

3    Q    BY MR. DAVID EDWARDS:  ON COUNT 25, WHICH IS DIFFERENT

4    THAN COUNT 20, YOU LIST, THERE ARE FOUR NAMES LISTED THERE,

5    CORRECT?

6    A    YES.

7    Q    AND THE DATE OF THAT IS OCTOBER 4, 1999; IS THAT

8    CORRECT?

9    A    YES.

10   Q    AND THE CHARGES OF COUNT 25 IS ENTERING AN INHABITED

11   DWELLING HOUSE LOCATED AT MR. AND MRS. BOWES' HOME WITH THE

12   INTENT TO COMMIT THEFT, FELONIES, OR SECURITIES FRAUD?

13   A    YES.

14   Q    AND DID MR. AND MRS. BOWES -- WHAT INFORMATION DID YOU

15   HAVE THAT DAVID EUGENE EDWARDS OR JAMES EUGENE EDWARDS HAD

16   BEEN IN THEIR HOME ON OCTOBER 4, 1999, TO SWEAR THAT UNDER

17   OATH?

18   A    THAT DAVID AND EUGENE EDWARDS HAD FORMED THE

19   CORPORATION THAT WAS RESPONSIBLE FOR THE FRAUD.

20   Q    BUT WE WERE --

21   A    AND WERE DISTRIBUTING MATERIALS, CONTRACTS, ENTERING

22   INTO CONTRACTS.  WHELAN AND KELLER WERE ACTING AS YOUR

23   AGENTS.

24   Q    BUT, IN ESSENCE, IT'S A LIE.  WE WEREN'T THERE, WERE

25   WE?

26   A    IN PHYSICAL BODY PRESENCE?

27   'Q    RIGHT.

28   A    NOT TO MY KNOWLEDGE, YOU WEREN'T.

1976

4



GOVERNOR GRAY DAVIS

**EXECUTIVE DEPARTMENT**

STATE OF CALIFORNIA

## TO HIS EXCELLENCY THE GOVERNOR OF THE STATE OF TEXAS:

**WHEREAS,** it appears by the annexed application for requisition and copies of **First Amended Complaint for Extradition with Finding of Probable Cause by a Judge** and supporting papers which I certify are authentic and duly authenticated in accordance with the laws of the State of California, that under the laws of this state **James Eugene Edwards** stands charged with the crimes of **Burglary-Entering with Intent to Commit Theft, Theft or Embezzlement of More Than $400 by a Person Not a Caretaker from an Elder or Dependent Adult, Communications Containing Untrue Statements and Omissions of Material Facts, Offer to Sell and Sale of Unqualified Security-Issuer Transaction, and Theft or Embezzlement of More Than $400 by a Caretaker from an Elder or Dependent Adult** by intentionally committing an act or acts while outside the State of California resulting in said crimes in this State, and it has been represented and is satisfactorily shown to me that she is now to be found in the State of **Texas;**

**NOW, THEREFORE,** pursuant to the laws of the State of **Texas** and the laws of the State of California, in such case made and provided, I do hereby respectfully demand that **James Eugene Edwards** be arrested and secured and delivered to **Sheriff Laurie Smith and/or agents of Santa Clara County** hereby authorized to receive, convey and transport the accused to this state, here to be dealt with according to law.

**IN WITNESS WHEREOF,** I have hereunto set my hand and caused the Great Seal of the State to be affixed this 13th day of November, 2002.

_Gray Davis_

Governor

By the Governor _Bill Jones_

Secretary of State

_Durie Harriet_

Deputy

4

5

**Anderson Detective Agency**
— Private Investigators —
5542 Monterey Rd., No. 175
San Jose, CA 95138

(408) 365-7071                                                                fax (408) 227-3134

August 31, 2004

Honorable William P. Wood
Commissioner, California Department of Corporations
1515 K Street
Suite 200
Sacramento, CA        95814-4052

Dear Commissioner Wood,

My office has been appointed by the Santa Clara County Superior Court to provide investigative support to pro per criminal defendants James Eugene Edwards and David Eugene Edwards. Msrs. Edwards are in custody as a result of allegations specified in a Grand Jury indictment, #210807. Acting as their own attorneys, they have tasked my office with ascertaining whether or not certain records exist within your department.

Please take note of the enclosed California Public Records Act request.

Please have someone from your staff respond within the statutory time. Thank you for your consideration.

Sincerely,

Edwin E. Anderson Jr.
Licensed Private Investigator

cc:    James Edwards, w/enclosure
       David Edwards, w/enclosure

## CONFIDENTIAL

### AUTHORITY

The following request is made pursuant to the California Public Records Act (CPRA) and the decisions in KNSD Channels 7/39 v. Superior Court (Vasquez) (1998) 63 Cal.App.4[th] 1200, 74 Cal.Rptr.2d 595 [No. D029949, Fourth Dist., Div. One, May 13, 1998.], Copley Press, Inc. v. Superior Court (M.P.R.) (1998) 63 Cal.App.4[th] 367, 74 Cal.Rptr.2d 69 [No. D029986, Fourth Dist. Div. One, Apr 20, 1998.], and Copley Press, Inc. v. Superior Court (Adams) (1992) 6 Cal.App.4[th] 106, 7 Cal.Rptr.2d 841 [No. D016546, Fourth Dist. Div. One May 7, 1992.] which govern the common law and constitutional right to public access to government and judicial records.

Government Code Section 6252(e) states in part that "public records" includes any writing containing information relating to the conduct of the public's business prepared, owned, used or retained by any state or local agency regardless of physical form or characteristics. "Public Records" in the custody of, or maintained by, the Governor's office means any writing prepared on or after January 6, 1975.

Government Code Section 6252(f) states that "writing" means any handwriting, typewriting, printing, photostatting, photographing, photocopying, transmitting by electronic mail or facsimile, and every other means of recording upon any tangible thing any form of pictures, sounds, or symbols, or combinations thereof, and any records thereby created, regardless of the manner in which the record has been stored.

I am requesting copies of the below described writings as defined in California Public Records Act Section 6252(f) and Evidence Code Section 250.

Under Section 6253 of the Government Code you have ten (10) days to comply with this request.

If you believe that I am not entitled to the records I am requesting, you must justify your refusal within ten (10) days in writing under Section 6255 of the Government Code. You may only refuse to give me these records if there is an express law prohibiting you from giving them to me. In the case of California State University, Fresno Assn. Inc. v. Supe-

## CONFIDENTIAL

rior Court (McClatchy Co.) (2001) 90 Cal.App.4th 810, 108 Cal.Rptr.2d 870 [No. F037383, Fifth Dist. Jul. 16, 2001.] the court held that "The burden of proof is on the proponent of nondisclosure, who must demonstrate a 'clear overbalance' on the side of confidentially [Citations.]. The purpose of the requesting party in seeking disclosure cannot be considered ... "

Specifically regarding police reports, Government Code Section 6254(f)(3) states that: Subject to the restrictions of Section 841.5 of the Penal Code and its subdivision, the current address of every individual arrested by the agency and the current address of the victim of a crime, where the requester declares under penalty of perjury that the request is made for a scholarly, journalistic, political, or governmental purpose, or that the request is made for investigation purposes by a licensed private investigator as described in Chapter 11.3 (commencing with Section 7512) of Division 3 of the Business and Professions Code, except that the address of the victim of any crime defined by Section 220, 261, 261.5, 262, 264, 264.1, 273a, 273d, 273.5, 286, 288a, 289, 422.6, 422.7, 422.75 or 646.9 of the Penal Code shall remain confidential. Address information obtained pursuant to this paragraph shall not be used directly or indirectly to sell a product or service to any individual or group of individuals, and the requester shall execute a declaration to that effect under penalty of perjury.

If you fail to comply with this request, I have a legal right to bring suit to force you to comply under Section 6259 of the Government Code and if I prevail, it is mandatory that the court award me reasonable attorney fees and costs.

## RECORDS REQUEST

### Background

The office of Licensed Private Investigator Edwin E. Anderson Jr., (license PI13529, 5542 Monterey Rd., #175, San Jose, CA 95138; (408) 365-7071) has been appointed by the Santa Clara County Superior Court to provide investigative support to pro per criminal defendants David and James Edwards (Indictment #210807). For purposes of this re-

## CONFIDENTIAL

quest for information, the following identifying information is provided for David and James Edwards.

EDWARDS, David Eugene
DOB 10-8-1957

EDWARDS, James Eugene
DOB 11-22-1931

Acting as their own attorneys, David and James Edwards have requested of the court appointed defense investigator that he learn what information the California Department of Corporations has, related to any investigation of an entity called Resource Development International or of James and David Edwards.

Request for Records and / or Writings

Per the authority granted by the CPRA and related court decisions, the State of California is hereby requested to provide clear, legible, un-redacted and complete records and writings related to this matter, described as:

1) Any **investigation** the California Department of Corporations has conducted or is conducting, related to Resource Development International.

2) Any **investigation** the California Department of Corporations has conducted or is conducting, related to James and David Edwards.

3) Any **desist and refrain action** issued on Resource Development International, or on James Edwards and David Edwards.

//

STATE OF CALIFORNIA – BUSINESS, TRANSPORTATION AND HOUSING AGENCY    ARNOLD SCHWARZENEGGER, *Governor*

# DEPARTMENT OF CORPORATIONS
*California's Investment and Financing Authority*

**WILLIAM P. WOOD**
**California Corporations Commissioner**
**Sacramento, California**

IN REPLY REFER TO:
FILE NO:  **PRA 04-33**

RECEIVED
SEP 0 9 2004

Anderson Detective Agency
5542 Monterey Rd 175
San Jose, CA 95138

September 8, 2004

Edwin E. Anderson Jr.
Anderson Detective Agency
Private Investigators
5542 Monterey Rd., No. 175
San Jose, CA 95138

RE:  Your California Public Records Act Request Dated August 31, 2004

Dear Mr. Anderson:

On September 2, 2004, the Department of Corporations (Department) received your request for documents pursuant to the California Public Records Act (Government Code Section 6250, et seq.). You request documents related to the following:

1)  Any investigation the Department has conducted or is conducting, related to Resource Development International;

2)  Any investigation the Department has conducted or is conducting, related to James and David Edwards; and

3)  Any desist and refrain action issued for Resource Development International, James Edwards or David Edwards.

We must decline your request for records of investigations conducted by the Department, as these records are exempt from public disclosure pursuant to Government Code sections 6254(d)(4), 6254(f), and 6254(k).

◆ Securities ◆ Franchises ◆ Off-Exchange Commodities ◆ Investment and Financial Services ◆
◆ Independent Escrows ◆ Consumer and Commercial Finance Lending ◆ Residential Mortgage Lending ◆

SACRAMENTO 95814-4052       SAN FRANCISCO 94105-2980       LOS ANGELES 90013-2344       SAN DIEGO 92101-3697
1515 K STREET, SUITE 200    71 STEVENSON STREET, SUITE 2100   320 WEST 4TH STREET, SUITE 750   1350 FRONT STREET, ROOM 2034

Edwin E. Anderson Jr.
September 8, 2004
Page 2

However, desist and refrain orders are public records, and therefore subject to disclosure under the
California Public Records Act.  We have reviewed our records, and we do not have any orders for the
company or the individuals you have identified.

Very truly yours,

WILLIAM P. WOOD
California Corporations Commissioner

By _____
COLLEEN E. MONAHAN
Senior Corporations Counsel
Office of Law and Legislation
(916) 322-3553

CEM:gh

6

1

2              TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

3                          SIXTH APPELLATE DISTRICT

4                                ---oOo---

5    PEOPLE OF THE STATE OF CALIFORNIA    )
                                          ) COURT OF APPEAL
6              PLAINTIFF,                  ) CASE NO.
                                          ) H028746
7              VS.                         )
                                          )
8    JAMES EUGENE EDWARDS AND             )
     DAVID EUGENE EDWARDS,                )
9                                         )
               DEFENDANTS.                ) SUPERIOR CASE
10   _____) NO.: 210807

11                                ---oOo---

12

13                   REPORTER'S TRANSCRIPT ON APPEAL

14              FROM THE JUDGMENT OF THE SUPERIOR COURT

15                OF THE STATE OF CALIFORNIA, IN AND FOR

16                    THE COUNTY OF SANTA CLARA

17                  HONORABLE RENE NAVARRO, JUDGE

18            NOVEMBER 3, 2004 AND NOVEMBER 8, 2004

19                  VOLUME FOURTEEN (1934 - 2158)

20

21   APPEARANCES:

22   FOR THE RESPONDENT:     OFFICE OF THE ATTORNEY GENERAL
                             455 GOLDEN GATE AVENUE, ROOM 11000
23                           SAN FRANCISCO, CALIFORNIA  94102

24   FOR THE APPELLANT:      SIXTH DISTRICT APPELLATE PROGRAM
                             100 NORTH WINCHESTER BLVD., SUITE 310
25                           SANTA CLARA, CALIFORNIA  95050

26   REPORTED BY:            JACQUELINE V. BARRON, CSR #8049

27                                ---oOo---

28

```
 1
 2            IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
 3                 IN AND FOR THE COUNTY OF SANTA CLARA
 4                    BEFORE HONORABLE RENE NAVARRO
 5                         DEPARTMENT NO. 39
 6
 7   PEOPLE OF THE STATE OF CALIFORNIA   )
                                         )  COURT OF APPEAL
 8        PLAINTIFF,                      )  CASE NO.
                                         )  H028746
 9        VS.                            )
                                         )
10   JAMES EUGENE EDWARDS AND            )
     DAVID EUGENE EDWARDS,               )
11                                       )
          DEFENDANTS.                    )  SUPERIOR CASE
12   _____)  NO.: 210807
13                         ---000---
14        REPORTER'S TRANSCRIPT OF PROCEEDINGS HELD ON
15          NOVEMBER 3, 2004 AND NOVEMBER 8, 2004
16                         ---000---
17
18   A P P E A R A N C E S:
19
     FOR THE PLAINTIFF:          PAUL COLIN,
20                               DEPUTY DISTRICT ATTORNEY
21   FOR DEFENDANT JAMES EDWARDS:  IN PROPIA PERSONA
22   FOR DEFENDANT DAVID EDWARDS:  IN PROPIA PERSONA
23   OFFICIAL COURT REPORTER:     JACQUELINE VILLEGAS BARRON
                                  CERTIFICATE NUMBER 8049
24
25
26
27
28
                                                            1935
```

1

2          INDEX OF EXAMINATION (CHRONOLOGICAL)

3                                                          VOIR
    PEOPLE'S      DIRECT   CROSS   REDIRECT  RECROSS   DIRE    VOLUME
4
    MARTINDALE, LLOYD
5     (CONT)                        1940      1943             14

6   DALTON, ROLEN
      (CONT)             1969   2004      2009             14
7
                           ---oOo---
8

9          INDEX OF EXAMINATION (CHRONOLOGICAL)

10                                                         VOIR
    DEFENSE'S     DIRECT   CROSS   REDIRECT  RECROSS   DIRE    VOLUME
11
    MARTINDALE, LLOYD
12              1948   1962                               14

13  WHELAN, WILLIAM
              2042                                        14
14
    STEPHENS, TED 2089   2097   2111    2116             14
15    (FURTHER)                  2119

16  ROLEN, DALTON 2122                                    14

17
                           ---oOo---
18

19

20

21

22

23

24

25

26

27

28
                                                            1936

| | |
|---|---|
| 1 | Q    SO HAVE YOU SPOKEN WITH HER ABOUT MYSELF OR MY FATHER? |
| 2 | MR. COLIN:   OBJECTION.   RELEVANCE. |
| 3 | THE COURT:   SUSTAINED. |
| 4 | Q    BY MR. DAVID EDWARDS:   NOW, YOU TESTIFIED YOU TRAVELED |
| 5 | TO ARIZONA IN JANUARY OF 2002 WITH MR. COLIN AND ANOTHER |
| 6 | INVESTIGATOR? |
| 7 | A    YES, INVESTIGATOR GLEN MC GOVERN. |
| 8 | Q    WHO DID YOU MEET WITH? |
| 9 | MR. COLIN:   EXCUSE ME ONE SECOND.   M-C |
| 10 | G-O-V-E-R-N, MC GOVERN. |
| 11 | Q    BY MR. DAVID EDWARDS:   AND WHO DID YOU MEET WITH IN |
| 12 | ARIZONA? |
| 13 | A    IN APPROXIMATELY FEBRUARY OF 2002, MYSELF, MR. COLIN, |
| 14 | INVESTIGATOR MC GOVERN WENT TO SCOTTSDALE, ARIZONA, AND MET |
| 15 | WITH THE RECEIVER LARRY WARFIELD AND HIS INVESTIGATOR LEE |
| 16 | ATWOOD. |
| 17 | Q    BUT HE WASN'T RECEIVER AT THAT TIME, WAS HE? |
| 18 | MR. COLIN:   OBJECTION.   RELEVANCE. |
| 19 | THE COURT:   SUSTAINED. |
| 20 | Q    BY MR. DAVID EDWARDS:   AND DID YOU SHARE INFORMATION |
| 21 | WITH MR. WARFIELD REGARDING MYSELF AND MY FATHER? |
| 22 | A    THERE WAS AN EXCHANGE OF INFORMATION BOTH WAYS. |
| 23 | Q    NOW, WHY WOULD YOU GIVE INVESTIGATIVE INFORMATION TO A |
| 24 | CPA? |
| 25 | A    TO SEE IF THERE WAS ANY CONNECTION WITH MY |
| 26 | INVESTIGATION. |
| 27 | Q    HE WASN'T APPOINTED RECEIVER OF RDI AT THAT TIME, |
| 28 | CORRECT? |

1992

1   A    I DON'T BELIEVE HE WAS AN APPOINTED RECEIVER, NO.

2   Q    YET YOU SHARED INVESTIGATIVE INFORMATION WITH SOMEBODY

3   NOT FROM THE SEC AND WHO RUNS A CPA FIRM; IS THAT CORRECT?

4            MR. COLIN:  OBJECTION.  ARGUMENTATIVE.

5            THE COURT:  AND RELEVANCE.  SUSTAINED.

6   Q    BY MR. DAVID EDWARDS:  WHAT DID YOU SHARE WITH HIM?

7            MR. COLIN:  OBJECTION.  RELEVANCE.

8            THE COURT:  OVERRULED.

9            YOU MAY ANSWER.

10           THE WITNESS:  I WOULD HAVE TO LOOK AT MY REPORT TO

11  BE EXACT.  JUST REMEMBERING OFF THE TOP OF MY HEAD, I

12  BELIEVE WE SHARED THE RECORDED PHONE CALLS WITH YOU AND YOUR

13  FATHER.

14  Q    BY MR. DAVID EDWARDS:  DID YOU HAVE A COURT ORDER AT

15  THAT TIME TO RECORD THOSE PHONE CALLS WITHOUT OUR KNOWLEDGE?

16           MR. COLIN:  OBJECTION.  IRRELEVANT.  MISSTATES THE

17  LAW.

18           THE COURT:  SUSTAINED.

19           LADIES AND GENTLEMEN OF THE JURY, LET ME REPHRASE

20  THAT.  UNDER LAW ENFORCEMENT, THE PENAL CODE, LAW

21  ENFORCEMENT, WHEN THEY'RE CONDUCTING INVESTIGATIONS NEED NOT

22  INFORM THE PEOPLE THAT THEY'RE INVESTIGATING OF THE FACT

23  THAT THEY'RE BEING TAPED AS LONG AS IT'S A PROPER

24  INVESTIGATION.  SO THAT IS MOOT.  IT'S IRRELEVANT.

25           SO PLEASE PROCEED, NOTWITHSTANDING THE FACT THAT

26  MR. EDWARDS DOESN'T THINK THAT'S PROPER.

27  Q    BY MR. DAVID EDWARDS:  AND DID YOU HAVE ANY OTHER

28  MEETINGS, PHONE CALLS AND CORRESPONDENCE WITH MR. WARFIELD?

1993

1  A    YES.

2  Q    CAN YOU TELL ME ABOUT THOSE?

3        MR. COLIN:  OBJECTION, YOUR HONOR.  IRRELEVANT.

4  CALLS FOR HEARSAY.

5        THE COURT:  CALLS FOR A NARRATIVE.  THAT WOULD BE

6  SUSTAINED ON THAT GROUND.

7  Q    BY MR. DAVID EDWARDS:  OKAY.  DID MR. WARFIELD SHARE

8  INFORMATION REGARDING RDI AND MYSELF AND MY FATHER WITH YOU,

9  AND MY FATHER WITH YOU AND YOUR OFFICE AT THAT MEETING IN

10  FEBRUARY?

11  A    YES.

12  Q    AND WHAT DID HE SHARE?

13  A    THIS WILL BE A VERY BRIEF ANSWER, BUT HE SHARED

14  INFORMATION ABOUT DENNEL CORPORATION AND THAT INVESTIGATION

15  AND THE CRIMINAL PROSECUTION THAT ARIZONA WAS DOING, AND

16  ALSO WITH CONCERNING RESOURCE DEVELOPMENT INVESTORS.

17  Q    AND DID YOU HAVE OCCASION TO MEET WITH OR SPEAK WITH

18  ANYONE FROM THE SEC?

19  A    I'M SORRY, I DIDN'T GET THAT.

20  Q    DID YOU HAVE OCCASION TO MEET WITH OR SPEAK WITH ANYONE

21  FROM THE SEC?

22  A    YES.

23  Q    WHO WAS THAT?

24  A    I'VE SPOKEN WITH AN ATTORNEY BY THE NAME OF JEFFREY

25  NORRIS AND, AND I'VE SPOKEN TO A LADY NAMED VICTORIA LEVIN

26  FROM SOUTHERN CALIFORNIA WHO, SHE IS SECURITY -- SHE IS A

27  U.S. ATTORNEY.

28        WOULD YOU REPEAT YOUR QUESTION?  MAYBE I

**7**

```
 1
 2            TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
 3                      SIXTH APPELLATE DISTRICT
 4                             ---0O0---
 5   PEOPLE OF THE STATE OF CALIFORNIA    )
                                          ) COURT OF APPEAL
 6         PLAINTIFF,                      ) CASE NO.
                                          ) H028746
 7         VS.                            )
                                          )
 8   JAMES EUGENE EDWARDS AND             )
     DAVID EUGENE EDWARDS,                )
 9                                        )
           DEFENDANTS.                    ) SUPERIOR CASE
10   _____) NO.: 210807
11                             ---0O0---
12
13               REPORTER'S TRANSCRIPT ON APPEAL
14            FROM THE JUDGMENT OF THE SUPERIOR COURT
15              OF THE STATE OF CALIFORNIA, IN AND FOR
16                   THE COUNTY OF SANTA CLARA
17                 HONORABLE RENE NAVARRO, JUDGE
18            NOVEMBER 3, 2004 AND NOVEMBER 8, 2004
19               VOLUME FOURTEEN (1934 - 2158)
20
21   APPEARANCES:
22   FOR THE RESPONDENT:      OFFICE OF THE ATTORNEY GENERAL
                              455 GOLDEN GATE AVENUE, ROOM 11000
23                            SAN FRANCISCO, CALIFORNIA  94102
24   FOR THE APPELLANT:       SIXTH DISTRICT APPELLATE PROGRAM
                              100 NORTH WINCHESTER BLVD., SUITE 310
25                            SANTA CLARA, CALIFORNIA  95050
26   REPORTED BY:             JACQUELINE V. BARRON, CSR #8049
27                             ---0O0---
28
```

1

2           IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

3              IN AND FOR THE COUNTY OF SANTA CLARA

4                 BEFORE HONORABLE RENE NAVARRO

5                      DEPARTMENT NO. 39

6

7   PEOPLE OF THE STATE OF CALIFORNIA    )
                                         ) COURT OF APPEAL
8           PLAINTIFF,                    ) CASE NO.
                                         ) H028746
9           VS.                           )
                                         )
10  JAMES EUGENE EDWARDS AND              )
    DAVID EUGENE EDWARDS,                 )
11                                        )
            DEFENDANTS.                   ) SUPERIOR CASE
12  _____ ) NO.: 210807

13                      ---oOo---

14       REPORTER'S TRANSCRIPT OF PROCEEDINGS HELD ON

15          NOVEMBER 3, 2004 AND NOVEMBER 8, 2004

16                      ---oOo---

17

18  A P P E A R A N C E S:

19
    FOR THE PLAINTIFF:           PAUL COLIN,
20                               DEPUTY DISTRICT ATTORNEY

21  FOR DEFENDANT JAMES EDWARDS:  IN PROPIA PERSONA

22  FOR DEFENDANT DAVID EDWARDS:  IN PROPIA PERSONA

23  OFFICIAL COURT REPORTER:     JACQUELINE VILLEGAS BARRON
                                 CERTIFICATE NUMBER 8049
24

25

26

27

28
                                                        1935

1

2          INDEX OF EXAMINATION (CHRONOLOGICAL)

3                                                          VOIR

  PEOPLE'S      DIRECT   CROSS   REDIRECT  RECROSS   DIRE   VOLUME
4

  MARTINDALE, LLOYD
5   (CONT)                        1940      1943             14

6 DALTON, ROLEN
    (CONT)                1969    2004      2009             14
7
                          ---oOo---
8

9          INDEX OF EXAMINATION (CHRONOLOGICAL)

10                                                         VOIR

  DEFENSE'S     DIRECT   CROSS   REDIRECT  RECROSS   DIRE   VOLUME
11

  MARTINDALE, LLOYD
12            1948    1962                                   14

13 WHELAN, WILLIAM
              2042                                           14
14

  STEPHENS, TED 2089   2097     2111      2116              14
15   (FURTHER)                  2119

16 ROLEN, DALTON 2122                                        14

17
                          ---oOo---
18

19

20

21

22

23

24

25

26

27

28
                                                          1936

1   Q    OKAY.

2   A    I DID A -- WHEN I DID THE COMPLAINT, OR SIGNED THE

3   COMPLAINT, THAT'S ONE OF MY DUTIES.  THE COMPLAINT IS DRAWN

4   UP BY THE DISTRICT ATTORNEY.  AND I BELIEVE IN THAT

5   COMPLAINT, I HAVEN'T READ IT IN A LONG TIME, THAT I MAY HAVE

6   STATED UNDER OATH THAT, UNDER THE THEORY OF BURGLARY, THAT

7   YOU DID ENTER THEIR HOME.  AND I DON'T UNDERSTAND THE

8   TECHNICALITIES OF THAT MYSELF.  IT'S NOT MY JOB TO

9   UNDERSTAND ALL THE TECHNICALITIES.

10  Q    I SEE.

11  A    BUT I MAY HAVE, IN THAT COMPLAINT, OR PERHAPS EVEN IN

12  THE SEARCH WARRANT AFFIDAVITS, WHICH I HAVEN'T READ FOR A

13  LONG TIME, STATED THAT YOU AND YOUR FATHER ENTERED THAT HOME

14  THROUGH THE CONSPIRACY.

15  Q    THIS IS DEFENSE EXHIBIT T.  AS LONG AS YOU WANT, TAKE A

16  LOOK AT IT.  IS THAT THE ORIGINAL COMPLAINT YOU WERE

17  REFERRING TO?

18  A    THIS IS A COMPLAINT THAT I SIGNED ON JUNE 20, 2002,

19  AGAINST OR FOR THE ARREST WARRANT FOR YOU, YOUR FATHER,

20  MICHAEL KELLER AND BILL WHELAN.

21  Q    AND YOU DID SIGN THAT UNDER OATH, CORRECT?

22  A    I DID.

23  Q    AND LET'S JUST LOOK AT SOME OF THESE HERE.  LET'S GO TO

24  COUNT NUMBER 13.

25  A    YES.

26  Q    OKAY.  SO YOU DID SWEAR UNDER OATH THAT COUNT NUMBER

27  13, YOU CAN LOOK AT THERE, THAT MY FATHER AND I ON JANUARY

28  31ST, DID IN FACT ENTER, WHICH SAYS DID ENTER INHABITED

1974

| | |
|---|---|
| 1 | A     COULD I CLARIFY JUST A LITTLE BIT? |
| 2 | Q     SURE. |
| 3 | A     OKAY.  MY QUESTION TO HIM WAS, JUST SAY THAT MONEY DID |
| 4 | COME IN AND SOMETHING HAPPENED TO HER AND WE'RE GETTING THAT |
| 5 | GOOD INTEREST AND EVERYTHING LIKE THAT.  AND IF I GOT PART |
| 6 | OF THAT, MONEY WAS COMING, COULD I REINVEST SOME OF THAT? |
| 7 | AND JIM EDWARDS:  NO.  WE CAN'T TAKE ANY NEW INVESTMENTS. |
| 8 | Q     OKAY. |
| 9 | A     SO WE'RE SPEAKING ABOUT REINVESTING FROM THE MONEY THAT |
| 10 | I GOT FROM HER. |
| 11 | Q     RIGHT.  BECAUSE YOU WOULD BE A NEW INVESTOR, CORRECT? |
| 12 | A     YES. |
| 13 | Q     NOW THAT WAS, I BELIEVE YOU ALSO TESTIFIED ALREADY THAT |
| 14 | THAT WAS THE LAST CONVERSATION THAT YOU HAD WITH MY FATHER, |
| 15 | CORRECT? |
| 16 | A     THAT WAS THE LAST TAPE, YES. |
| 17 | Q     OKAY. |
| 18 | A     THERE WAS MORE PAGES TO THE TAPE. |
| 19 | Q     COULD YOU TAKE A LOOK AT DEFENSE EXHIBIT T AGAIN, WHICH |
| 20 | IS THE COMPLAINT THAT YOU FILED ON JUNE 19, 2002?  WOULD YOU |
| 21 | TAKE A LOOK AT COUNT 42?  WHAT'S THE DATE OF THAT COUNT? |
| 22 | MR. COLIN:  OBJECTION.  RELEVANCE. |
| 23 | THE COURT:  SUSTAINED. |
| 24 | MR. DAVID EDWARDS:  IT'S VERY RELEVANT, YOUR |
| 25 | HONOR. |
| 26 | THE COURT:  I UNDERSTAND THAT.  I'VE MADE MY |
| 27 | RULING. |
| 28 | Q     BY MR. DAVID EDWARDS:  NOW, YOU'VE ALREADY TESTIFIED |

1  THAT YOU SWORE UNDER OATH ON THIS DOCUMENT, CORRECT?

2  A    YES.

3          MR. COLIN:  OBJECTION.  RELEVANCE.  PARDON ME.

4          THE COURT:  SUSTAINED AS TO ARGUMENTATIVE.

5  Q    BY MR. DAVID EDWARDS:  AND DID YOU NOT SWEAR ON COUNT

6  42 THAT MY FATHER AND I MADE AN OFFER TO YOU ON APRIL 29,

7  2002?

8          MR. COLIN:  OBJECTION.  RELEVANCE.

9          THE COURT:  SUSTAINED.

10 Q    BY MR. DAVID EDWARDS:  THAT WOULD BE A LIE, WOULDN'T

11 IT?

12         MR. COLIN:  OBJECTION.  ARGUMENTATIVE.

13         THE COURT:  SUSTAINED.

14 Q    BY MR. DAVID EDWARDS:  DO YOU KNOW WHAT DAY -- DO YOU

15 RECALL WHAT DAY MY OFFICE WAS SHUT DOWN?

16         MR. COLIN:  OBJECTION.  RELEVANCE.

17         THE COURT:  OVERRULED.

18         YOU MAY ANSWER.

19         THE WITNESS:  I'M HAVING JUST A LITTLE BIT OF A

20 PROBLEM.  COULD YOU REPEAT IT, PLEASE?

21 Q    BY MR. DAVID EDWARDS:  THAT'S FINE.

22         DO YOU RECALL WHAT DAY MY OFFICE WAS SHUT DOWN BY

23 THE SEC?

24 A    I BELIEVE I DO.

25 Q    OKAY.  WHAT DAY WAS THAT?

26 A    MARCH 25, 2002.

27 Q    YET YOU TESTIFIED A MONTH LATER THAT WE MADE YOU AN

28 OFFER UNDER OATH.  BUT YET YOU TESTIFIED THAT A MONTH LATER,

2131

1  UNDER OATH, THAT WE MADE YOU AN OFFER?

2      MR. COLIN:  IF THAT'S A QUESTION, I OBJECT BECAUSE

3  IT'S ARGUMENTATIVE AND LEADING.

4      THE COURT:  SUSTAINED.  YOU MAY REPHRASE IT.

5  Q    BY MR. DAVID EDWARDS:  YET ON APRIL 29TH, A MONTH

6  LATER, YOU TESTIFIED -- DID YOU NOT TESTIFY UNDER OATH THAT

7  MY FATHER AND I MADE YOU AN OFFER?

8      MR. COLIN:  SAME OBJECTION, YOUR HONOR.  IT'S THE

9  SAME QUESTION.

10      THE COURT:  NO.  HE CHANGED IT.  WHEN HE HAD THE

11  WORD IN THERE YET IT SORT OF WAS INDICATIVE OF AN

12  ARGUMENTATIVE QUESTION.  BUT HE REPHRASED IT AND TOOK OUT

13  THE WORD YET AND HE CHANGED IT, DID YOU.

14      SO YOU MAY PROCEED.

15      THE WITNESS:  YES.

16  Q    BY MR. DAVID EDWARDS:  BUT THAT'S NOT TRUE BECAUSE YOU

17  DIDN'T HAVE A CONVERSATION WITH MYSELF OR MY FATHER ON APRIL

18  29TH?

19      MR. COLIN:  OBJECTION.  ARGUMENTATIVE AND LEADING.

20  Q    BY MR. DAVID EDWARDS:  DID YOU HAVE A CONVERSATION WITH

21  MY FATHER AND I --

22      THE COURT:  EXCUSE ME.  THE OBJECTION WILL BE

23  SUSTAINED AS TO THE FORM OF THE QUESTION.  YOU MAY REPHRASE.

24  Q    BY MR. DAVID EDWARDS:  ALL RIGHT.  DID YOU HAVE A

25  CONVERSATION WITH MY FATHER AND I ON APRIL 29, 2002?

26  A    NO.

27  Q    IS PERJURY AGAINST THE LAW IN THE STATE OF CALIFORNIA,

28  MR. ROLEN?

2132

```
 1   Q    BY MR. DAVID EDWARDS:  DO YOU RECALL A CONVERSATION
 2   WITH MY FATHER --
 3   Q    BY MR. DAVID EDWARDS:  I BELIEVE IT WAS THE LAST
 4   CONVERSATION, YOUR HONOR, I BELIEVE IT WAS SEPTEMBER 24TH.
 5            THE COURT:  TAPE NUMBER FIVE, LADIES AND
 6   GENTLEMEN.  IT'S THE VERY FIRST ONE IN YOUR NOTEBOOKS.
 7            SEPTEMBER 24, 2001, IS THAT THE TAPE YOU'RE
 8   REFERRING TO?
 9            MR. DAVID EDWARDS:  LET ME SEE.  I MAY HAVE MY
10   DATES WRONG, YOUR HONOR.  THAT'S THE FIRST ONE.  THAT'S WITH
11   BILL CUMMINGS.
12            THE COURT:  YOU SAID THE DATE.  COULD IT BE
13   JANUARY 18, 2002?
14            MR. DAVID EDWARDS:  IT WOULD BE FEBRUARY 12, 2002,
15   THE LAST CONVERSATION.
16            THE WITNESS:  YES, THAT'S CORRECT, JANUARY.
17   Q    BY MR. DAVID EDWARDS:  LET ME BRING YOU A BOOK.  TURN
18   TO PAGE 10.  THAT WOULD BE ON FEBRUARY 12, PEOPLE'S, I
19   BELIEVE IT'S EXHIBIT 7 WOULD BE FOR THE RECORD?
20   A    YOU SAID PAGE 10 OR --
21   Q    YES.  THAT'S WHERE YOU HAD THE CONVERSATION WITH MY
22   FATHER.  YOU WERE ASKING IF IT WOULD BE ALL RIGHT TO
23   REINVEST, TO INVEST; ISN'T THAT CORRECT?
24   A    YES.
25   Q    AND WHAT WAS MY FATHER'S ANSWER?
26   A    HE STATED BRIEFLY HE'S NOT TAKING ANY NEW MONEY.  MAY I
27   CLARIFY JUST A LITTLE BIT?
28   Q    I'M SORRY?
```

1   A    COULD I CLARIFY JUST A LITTLE BIT?

2   Q    SURE.

3   A    OKAY.  MY QUESTION TO HIM WAS, JUST SAY THAT MONEY DID

4   COME IN AND SOMETHING HAPPENED TO HER AND WE'RE GETTING THAT

5   GOOD INTEREST AND EVERYTHING LIKE THAT.  AND IF I GOT PART

6   OF THAT, MONEY WAS COMING, COULD I REINVEST SOME OF THAT?

7   AND JIM EDWARDS:  NO.  WE CAN'T TAKE ANY NEW INVESTMENTS.

8   Q    OKAY.

9   A    SO WE'RE SPEAKING ABOUT REINVESTING FROM THE MONEY THAT

10  I GOT FROM HER.

11  Q    RIGHT.  BECAUSE YOU WOULD BE A NEW INVESTOR, CORRECT?

12  A    YES.

13  Q    NOW THAT WAS, I BELIEVE YOU ALSO TESTIFIED ALREADY THAT

14  THAT WAS THE LAST CONVERSATION THAT YOU HAD WITH MY FATHER,

15  CORRECT?

16  A    THAT WAS THE LAST TAPE, YES.

17  Q    OKAY.

18  A    THERE WAS MORE PAGES TO THE TAPE.

19  Q    COULD YOU TAKE A LOOK AT DEFENSE EXHIBIT T AGAIN, WHICH

20  IS THE COMPLAINT THAT YOU FILED ON JUNE 19, 2002?  WOULD YOU

21  TAKE A LOOK AT COUNT 42?  WHAT'S THE DATE OF THAT COUNT?

22          MR. COLIN:  OBJECTION.  RELEVANCE.

23          THE COURT:  SUSTAINED.

24          MR. DAVID EDWARDS:  IT'S VERY RELEVANT, YOUR

25  HONOR.

26          THE COURT:  I UNDERSTAND THAT.  I'VE MADE MY

27  RULING.

28  Q    BY MR. DAVID EDWARDS:  NOW, YOU'VE ALREADY TESTIFIED

2130

8

APPROVED AS TO FORM

Attorney General of the
State of California

By _____
Deputy Attorney General

Dated: 1/7/c 2

*Name of Accused:* James Eugene Edwards
*State of refuge:* Texas

## APPLICATION FOR REQUISITION

To the Governor of the State of California:

I HAVE THE HONOR HEREWITH TO MAKE APPLICATION for a requisition upon the Governor of the State of Texas for the arrest and rendition of JAMES EUGENE EDWARDS who is charged in a complaint in this county with felony crimes, to wit: seven counts of Penal Code section 459-460(a) (First Degree Burglary - Entering with Intent to Commit Theft and a Felony); one count of Penal Code section 368(d) (Theft or Embezzlement of more than $400 by a Person not a Caretaker from an Elder or Dependent Adult); nine counts of Corporations Code section 25401(Communications Containing Untrue Statements and Omissions of Material Facts); eight counts of Corporations Code section 25110 (Offer to Sell and Sale of Unqualified Security - Issuer Transaction); and one count of Penal Code section 368(c) (Theft or Embezzlement of more than $400 by a Caretaker from an Elder or Dependent Adult), and who, as appears from the accompanying proof, and particularly the annexed affidavit of Paul O. Colin (a responsible person and entitled to credit) taken refuge in the State of Texas.

I HEREBY CERTIFY:

a.   That the full name of the person for whom requisition is asked is JAMES EUGENE EDWARDS.

b.   That I have carefully examined the case, and verily believe that the facts stated in the accompanying proof are true and that the accused is guilty of the crimes charged; that the ends of public justice require that the accused be brought back to this State at the public expense; that I have as I believe sufficient evidence to secure his conviction; that the charges were preferred and this application is made in good faith and not for the purpose of the collection of a debt or for any private purpose, and that if the accused is returned to this State the criminal proceedings will not be used for any of such purposes, but that it is my intention to diligently prosecute the accused for the crimes with which he is charged.

c.   That no other application has been made for a requisition for the accused growing out of the transaction from which the charges herein originated.

d.   That the accused is properly charged, in due form, in accordance with the laws of this State with the felony crimes of: seven counts of Penal Code section 459-460(a) (First Degree Burglary - Entering with Intent to Commit Theft and a Felony); one count of Penal Code section 368(d) (Theft or Embezzlement of more than $400 by a Person not a Caretaker from an Elder or Dependent Adult); nine

1

counts of Corporations Code section 25401(Communications Containing Untrue Statements and Omissions of Material Facts); eight counts of Corporations Code section 25110 (Offer to Sell and Sale of Unqualified Security - Issuer Transaction); and one count of Penal Code section 368(c) (Theft or Embezzlement of more than $400 by a Caretaker from an Elder or Dependent Adult), committed in the county of Santa Clara, State of California, on and between February 25, 1998 through April 29, 2002, and; that the definition of the aforesaid crimes of which the accused is charged, and the punishment therefor, as prescribed by the laws of this State, are as follows:

SEE ATTACHED COPIES OF APPLICABLE STATUTE

FACTUAL SUMMARY: In Santa Clara County, California, between February 1998 and April 2002, James Eugene Edwards conspired with local sales agents William Whelan and Michael Keller, to convince seven victims to invest various amounts, between $25,000 and $195,000, in fraudulent "International Prime Bank Notes." These seven victims invested a combined total of $365,000. Local sales agents Whelan and Keller have been in custody in Santa Clara County, California since late June, 2002, and, like the Edwards, each defendant's bail is $10 million.

From 1999 through 2002, David Eugene Edwards was the president of Resource Development International, headquartered in Tacoma, Washington. His father, James Eugene Edwards, helped run the enterprise, including serving as an officer of at least one related company. Resource Development International sold phony "investments" called "International Prime Bank Notes." There is no such investment and federal agencies have published warnings about such schemes since 1993. The investments are described to victims ("investors") as financial instruments that are backed by the World Bank and provide seed money for projects in developing nations. Prime Bank Note schemes are marketed as investments in "International Limited Partnerships" and victims ("investors") are told that only a select group of private individuals are allowed to join, and they must keep the investment details confidential

Prior to 1999, the two Edwards were associated with Dennel Finance, a company that preceded Resource Development and sold exactly the same fraudulent securities via the same mechanism.

Sales agents, primarily insurance agents, located around the country, conducted the sales. In a civil enforcement action currently being brought, the U.S. Securities and Exchange Commission has estimated that nationwide, Resource Development obtained $98.7 million dollars from over 1,300 victims since January 1999. The SEC has already obtained emergency orders in Federal court against Resource Development and the Edwards. In a previous SEC action against Dennel Finance, similar emergency orders were obtained.

2

Their joint actions constitute Securities Fraud and conspiracy to commit Security Fraud, specifically, the Sale of Securities by False Statements or Material Omissions, in violation of California Corporations Code § 25401, and the Sale or Offer of an Unqualified Security, in violation of California Corporations Code § 25110. Because the victims were contacted in their homes in order to be deceived, the suspects' joint actions also constitute first degree burglary, in violation of California Penal Code § 459.

    e. That the accused is now under arrest in the State of Texas.

    f. That in support of this application, the following papers, all of which are authentic and properly authenticated in accordance with the laws of this State are hereto annexed:

    APPLICATION FOR REQUISITION
    COMPLAINT
    ARREST WARRANT
    CERTIFICATION
    SUSPECT IDENTIFICATION INFORMATION

that I have carefully examined said papers; that all papers purporting to be copies are true and correct copies, together with all endorsements and filing marks to be found on the originals thereof; that the annexed papers include all the proofs upon which the Complaint against the accused is based, and that the duplicate copy of the petition submitted herewith, together with all papers thereto attached and all endorsements therein and certifications thereof are exact counterparts of this petition and attachments.

    I nominate and propose the name of SHERIFF LAURIE SMITH, SANTA CLARA COUNTY SHERIFF'S OFFICE OR HER AUTHORIZED AGENT for designation as agent of the State to return the accused and represent that she is a proper person for such designation; that she is a public officer, to wit: SHERIFF OR HER AUTHORIZED AGENT, that she has no private interest in the arrest of the accused other than in the discharge of her duty as such officer, and that she has not been supplied with private funds for the purpose of defraying her expenses, or otherwise, in connection with the extradition of the accused.

Respectfully submitted,

_Paul Cole_

PAUL O. COLIN
Deputy District Attorney
County of Santa Clara, State of California.

Dated at San Jose, California
this / 5̲ day of November 2002.

\*\*\*\*\*\*\*

3

STATE OF CALIFORNIA       )
                                 ) ss.
COUNTY OF SANTA CLARA   )

      Paul O. Colin, being first duly sworn, deposes and says:  I am a Deputy District Attorney of the County of Santa Clara, State of California.  That I have read the foregoing application for requisition and know the contents thereof; and I am informed and believe, and on such information and belief allege that the statements made therein are true.

                                        PAUL O. COLIN
                                      Deputy District Attorney

POC/D336/dm

Subscribed and sworn to before me this
/_5t_ day of November 2002.

JULIAN P. ARMOUR

JULIAN P. ARMOUR
COMM. #1366877
Notary Public-California
SANTA CLARA COUNTY
My Comm. Exp. July 27, 2006

4

9

 1  remember what the circumstances were that we had a

 2  Huntington Bank Account of Florida, but something didn't

 3  go right and so he gave the money back.

 4      Q.   To the Goodwins?

 5      A.   Yeah.  Well, to whomever that he -- this one

 6  right here is for the Loucks, and -- same thing.  I'm

 7  pretty sure that that money got given back because --

 8  Huntington Bank something.  I don't know.  That name

 9  rings -- you know, it comes up.  Florida.  It was a

10  million dollars exactly.  Hum.  I don't know what Dave

11  was doing here.

12              (Reporter's Note: Harris Exhibit 15 skipped.)

13                   (Harris Exhibit 16 marked.)

14      Q.   Let me hand you what's been marked Exhibit 16,

15  which is a letter from David Edwards from Aiman,

16  A-i-m-a-n, and ask that you review that.

17      A.   (Witness complies.)  Hum.  Who is this guy?  Oh.

18  All right.  This is the guy -- on the front -- I mean, on

19  the second page here were -- he's the guy that had a

20  billion dollar CD.

21      Q.   Who is that?

22      A.   This -- this outfit had a billion dollar CD, and

23  that's what this whole conversation was about.  I

24  remember Dave being excited about it and said, You know

25  what?  Everything's going to be okay.  But that's about

 1  all I remember about the whole thing.  I don't know how

 2  that turned out.  Maybe that's why I keep hoping that

 3  this is all going to be good to go.  So that's who this

 4  guy is.  And now I see where Richard -- that's where

 5  Richard -- and that must be part of what was going on, is

 6  something to do with those three.

 7      Q.   Richard Wagner?

 8      A.   It has to be.  I mean, his name is on here, and

 9  Dave, and this Aiman or whoever, Aiman.

10      Q.   Do you ever recall --

11      A.   I don't remember --

12      Q.   -- meeting Richard Wagner or Aiman Hamouie in

13  person?

14      A.   No, no.  They've never -- never been to the

15  office that I know of.  This even shows RDI has another

16  account somewhere.  I don't know.

17      Q.   Were you ever a signatory on the RDI account at

18  the First Union Bank?

19      A.   I don't believe so.  If I was, it was something

20  Dave just slipped in front of me and said, Sign here.

21  But I don't -- I don't think so.  After this, I don't

22  even remember this transaction.  I remember something

23  about a billion dollar CD, and now I don't know.

24      Q.   There's a letter that's addressed to a Dennis,

25  and it says, "These are the coordinates to pay Richard

 1  Wagner and myself on the $200,000,000 case with Willie
 2  Lenz."  What does that refer to?
 3      A.   I don't know.  That's where that name comes up.
 4  Huh.  Hum.  So he was definitely trying to work something
 5  out, by the looks of this.  Whatever -- what happened to
 6  this stuff?  Whatever came about it?  This is in 2000,
 7  so...
 8                  (Harris Exhibit 17 marked.)
 9      Q.   Let me hand you what's been marked as Harris
10  Exhibit 17 entitled Sound Financial Services, Inc. Profit
11  and Loss Statement For 1999.  Have you ever seen this?
12      A.   This does look familiar to me.
13      Q.   There's an entry on the profit and loss
14  statement that says, "Restitution to Clients for previous
15  bad investment through us," where it shows that three
16  million dollars was paid out, and then it has attached to
17  it a list of restitution clients for bad investments.
18  There's a chart.  Do you know who prepared that chart?
19      A.   Who what?
20      Q.   Who prepared the chart?
21      A.   It would have had to have been Dave.  James was
22  not up to speed on that, and I've never -- I don't
23  remember ever seeing this.
24                  (Harris Exhibit 18 marked.)
25      Q.   Let me hand you what's been marked as Exhibit




Dear Aiman,

It's a real pleasure doing business with such an honest and open businessman as you. If you want to bring any more CD's forward to Noir Intertrade, please let me know ahead of time, and I will negotiate so that Richard and I are direct and not through Mr. Dos Fisher and his group. I don't want to cut anyone out, but I like to deal with the actual trade group and not brokers. It appears that Mr. Fisher, like your trader in Germany, had to broker this to Noir. I have no problem with that, but when I find out that he is trying to make more than he should, well I don't want to do future business with him. With all the money being made I do not understand the greed, even after giving most of it away, there is still a lot for personal comfort.

Here is the bank coordinates for here in the US. We will pay Dr. Kumar his 2% from what you pay us. Again, it's a pleasure to have met you Aiman, and I hope we can continue working together in the future.

Please wire funds to:

      **US Bank ABA# 125000105**
      870 S. 38th St.
      Tacoma, WA 98408


      ACCOUNT OF:
          Resource Development International
          Capital  Account
          4301 S. Pine St., Suite 32, Tacoma, WA, USA 98409
          **Account # 153591298200**


Sincerely,

David Edwards



1

**FOR SERVICES RENDERED**
**Between**

## Resource Development International

Represented by David Edwards and Richard Wagner
**4301 South Pine Street, Suite 32, Tacoma, WA 98409**
**Phone : (800) 827 2598 or (253) 472-1728      Fax : (253) 473 6509**
**E-Mail Address : sfinancial@qwest.net**

· **And**

## HAMCO TRADING GROUP, LTD

**Represented by Aiman Hamouie**
**719 Almondwood Way,  San Jose, CA 95120**
**Office Telephone: (408) 997-6047 Office Fax: (408) 268-2569**

**Dated:**              **August 30, 2001**

**Re:**        **Hamco Trading Group, Inversora Klosen S.A., Travesul, S.A.**
              **Chase Manhattan CD's for $1,000,000,000.00 and $450,000,000.00**

Based on the successful entry into a Private Placement of Hamco Trading
Group, Iversora, S.A., Travesul, S.A., or any other entity represented by Mr.
Aiman Hamouie to and through contacts provided by Mr. David Edwards and
Mr. Richard Wagner, it is hereby agreed and understood that **THREE
PERCENT (3%)** of the actual net payments made to the depositor/client will
be forwarded to Resource Development International, for services rendered,
to the following banking coordinates or to said assigns.  It is hereby also
agreed that this agreement shall cover all subsequent placements through this
same source and or any associated or referred entities.  This is a full recourse
agreement, and will be in accordance with the laws of the United States and
the state of California.   Fax signatures shall be considered legal signatures.

Initials: _____       Initials: _____       Initials: _____
Richard N. Wagner       Dave Edwards           Aiman Hamouie

Page 1 of 2

*Banking Coordinates for Resource Development International:*

| | |
|---|---|
| **Account Name:** | **Resource Development International** |
| **Account Number:** | **2000011035842** |
| **Bank Name:** | **First Union** |
| **Bank Address:** | **201 South College St.,  Charlotte, NC 28288** |
| **ABA // SWIFT Number** | **053000219** |
| **Bank Contact Person:** | **Mr. Henry Earnhardt** |
| **Bank Telephone Number:** | **(704) 715-2463** |

**All disbursements will be made on the same frequency as to the client.**

*Richard N. Wagner* _____    __/__/2001

**David Edwards**        _____    __/__/2001

*Aiman Hamouie* _____    __/__/2001

Page 2 of 2

**10**

CR-110

| Name of Victim on Whose Behalf Restitution is Ordered **Resource Development International Receivership C/o Lawrence Warfield, C.P.A., Warfield & Assoc.** | For Court Use Only |
|---|---|

**SUPERIOR COURT OF CALIFORNIA
COUNTY OF SANTA CLARA
HALL OF JUSTICE
190-200 WEST HEDDING STREET
SAN JOSE, CALIFORNIA 95110**

THE PEOPLE OF THE STATE OF CALIFORNIA

vs.

**Defendant: DAVID EUGENE EDWARDS**

**FILED**

FEB 1 7 2005

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court, County of Santa Clara
By _____ Deputy

| **ORDER FOR RESTITUTION TO CRIME VICTIM (Penal Code sections 1202.4(f), 1214** | CASE NUMBER **210807** |
|---|---|

1. On June 25, 2004, Defendant was convicted of a crime that entitles the above-named victim to restitution.

2. Evidence was presented that the victim named above suffered losses as a result of the defendant's conduct. Defendant was informed of his or her right to a judicial determination of the amount of restitution and
   a. ___X___ a hearing was conducted.
   b. _____ stipulated to the amount of restitution to be ordered.
   c. _____ waived a hearing.

3. **THE COURT ORDERS** defendant to pay restitution to
   a. __XX__ the victim (name) : **Resource Development International Receivership, C/o Lawrence Warfield, C.P.A., Warfield & Assoc.**

   **in the amount of : $2,500,000.00 (Two million, five hundred dollars)**

4. The amount of restitution includes *
   a. _____ value of property stolen or damaged
   b. _____ medical expenses
   c. _____ lost wages or profits
   d. _____ non-economic losses (felony violations of Penal Code section 288 only)
   e. _____ interest at 10% per year from the date of __XXX__ sentencing. * Interest to start accruing on unpaid balance
   f. __XX__ attorney fees and collection costs
   g. _____ other (specify):

Date: February 17, 2005

The Honorable Rene Navarro
Judge of the Superior Court, Santa Clara County, CA

**NOTICE TO VICTIMS**

PENAL CODE SECTION 1214 PROVIDES THAT THIS ORDER IS ENFORCEABLE AS IF IT WERE A CIVIL JUDGMENT. YOU ARE ENTITLED TO ALL RESOURCES AVAILABLE UNDER THE LAW TO OBTAIN INFORMATION TO ASSIST YOU IN ENFORCING THE ORDER. TO ENFORCE THIS ORDER AS IF IT WERE A CIVIL JUDGMENT, CONTACT THE CLERK OF THE COURT FOR INFORMATION.

THE VICTIM AND THE STATE BOARD OF CONTROL SHALL INFORM THE COURT WHENEVER AN ORDER TO PAY RESTITUTION IS SATISFIED. THIS ORDER IS NOT SUBJECT TO EXPIRATION, PURSUANT TO PENAL CODE SECTION 1214 (c).

11

1

2          TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

3                      SIXTH APPELLATE DISTRICT

4                            ---oOo---

5    PEOPLE OF THE STATE OF CALIFORNIA    )
                                          ) COURT OF APPEAL
6          PLAINTIFF,                      ) CASE NO.
                                          ) H028746
7          VS.                            )
                                          )
8    JAMES EUGENE EDWARDS AND             )
     DAVID EUGENE EDWARDS,                )
9                                         )
          DEFENDANTS.                     ) SUPERIOR CASE
10   _____) NO.: 210807

11                           ---oOo---

12

13              REPORTER'S TRANSCRIPT ON APPEAL

14         FROM THE JUDGMENT OF THE SUPERIOR COURT

15            OF THE STATE OF CALIFORNIA, IN AND FOR

16                 THE COUNTY OF SANTA CLARA

17             HONORABLE RENE NAVARRO, JUDGE

18                      NOVEMBER 1, 2004

19            VOLUME TWELVE (PAGES 1611 - 1765)

20

21   APPEARANCES:

22   FOR THE RESPONDENT:     OFFICE OF THE ATTORNEY GENERAL
                             455 GOLDEN GATE AVENUE, ROOM 11000
23                           SAN FRANCISCO, CALIFORNIA   94102

24   FOR THE APPELLANT:      SIXTH DISTRICT APPELLATE PROGRAM
                             100 NORTH WINCHESTER BLVD., SUITE 310
25                           SANTA CLARA, CALIFORNIA   95050

26   REPORTED BY:            JACQUELINE V. BARRON, CSR #8049

27                           ---oOo---

28

1

2          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

3               IN AND FOR THE COUNTY OF SANTA CLARA

4                 BEFORE HONORABLE RENE NAVARRO

5                        DEPARTMENT NO. 39

6

7   PEOPLE OF THE STATE OF CALIFORNIA    )
                                         ) COURT OF APPEAL
8            PLAINTIFF,                   ) CASE NO.
                                         ) H028746
9            VS.                          )
                                         )
10  JAMES EUGENE EDWARDS AND             )
    DAVID EUGENE EDWARDS,                )
11                                       )
             DEFENDANTS.                 ) SUPERIOR CASE
12  _____)    NO.: 210807

13                        ---0O0---

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS HELD ON

15                      NOVEMBER 1, 2004

16                        ---0O0---

17

18  A P P E A R A N C E S:

19
    FOR THE PLAINTIFF:            PAUL COLIN,
20                                DEPUTY DISTRICT ATTORNEY

21  FOR DEFENDANT JAMES EDWARDS:  IN PROPIA PERSONA

22  FOR DEFENDANT DAVID EDWARDS:  IN PROPIA PERSONA

23  OFFICIAL COURT REPORTER:      JACQUELINE VILLEGAS BARRON
                                  CERTIFICATE NUMBER 8049
24

25

26

27

28
                                                          1612

1

2                     INDEX OF EXAMINATION (CHRONOLOGICAL)

3                                                         VOIR
      PEOPLE'S      DIRECT   CROSS   REDIRECT  RECROSS   DIRE   VOLUME
4
     WHELAN, WILLIAM
5      (CONT)       1616     1630    1668      1707             12

6    MARTINDALE, LLOYD
                     1715                                       12
7

8
                             ---o0o---
9

10                    INDEX OF EXAMINATION - ALPHABETICAL

11                                                        VOIR
      PEOPLE'S      DIRECT   CROSS   REDIRECT  RECROSS   DIRE   VOLUME
12
     MARTINDALE, LLOYD
13                   1715                                       12

14   WHELAN, WILLIAM
       (CONT)       1616     1630    1668      1707             12
15

16                           ---o0o---

17

18

19

20

21

22

23

24

25

26

27

28
                                                              1613

| | |
|---|---|
| 1 | A    I'M UNDER THE IMPRESSION IT IS, YES. |
| 2 | Q    OKAY.  AND YOU ARE AWARE YOU MUST ANSWER TRUTHFULLY |
| 3 | BECAUSE YOU CAN BE CHARGED WITH PERJURY OTHERWISE, CORRECT? |
| 4 | A    CORRECT. |
| 5 | Q    YOU'VE TESTIFIED THAT BEFORE THIS TRIAL YOU'VE ONLY MET |
| 6 | MY FATHER AND I IN PERSON ONE TIME, CORRECT? |
| 7 | A    CORRECT. |
| 8 | Q    AND FOR THAT MEETING, DID YOU TESTIFY THAT YOU |
| 9 | CONTACTED US? |
| 10 | A    I BELIEVE I DID CONTACT YOU GUYS. |
| 11 | Q    DO YOU RECALL THE REASON YOU WANTED TO REFER PEOPLE TO |
| 12 | RDI AND THE ONLY REASON THAT WE LET YOU? |
| 13 | A    DO I RECALL THE ONLY REASON?  I'M NOT REAL -- I'M NOT |
| 14 | REAL SURE WHAT YOU'RE ASKING FOR.  THE ONLY REASON, THE |
| 15 | REASON I WAS INVITED IN IS YOU INVITED ME UP THERE, THOUGHT |
| 16 | MY CHARACTER WAS GOOD AS COULD BE.  AND ALSO I REMEMBER ONE |
| 17 | OF YOU STATING THE FACT THAT WE WAS GOING TO BE ABLE TO PAY |
| 18 | OUR DENNEL INVESTORS OFF ALSO. |
| 19 | Q    SO YOU DO RECALL THE PURPOSE OF COMING TO TACOMA WAS SO |
| 20 | THAT MY FATHER AND I COULD GET TO KNOW YOUR CHARACTER AND |
| 21 | GET TO SEE YOU? |
| 22 | A    YES, PERSONALLY MEET ME. |
| 23 | Q    AND YOU DO RECALL THAT WE SPOKE ABOUT WANTING TO HELP |
| 24 | YOU MAKE YOUR CLIENTS WHOLE? |
| 25 | A    EXACTLY. |
| 26 | Q    DID YOU HOPE TO BE ABLE TO DO THAT BY RECEIVING |
| 27 | REFERRAL FEES FROM RDI? |
| 28 | A    COULD YOU SAY THAT AGAIN, PLEASE? |

1631

**12**

**F I L E D**

JUN - 5 2003

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY _____
DEPUTY

1  GEORGE W. KENNEDY, SBN 052527
2  DISTRICT ATTORNEY
3  PAUL COLIN, SBN 160316, DEP. D.A.
4  Santa Clara County District Attorney's Office
5  70 West Hedding Street, West Wing
6  San Jose, CA 95110
7  408-299-7400
8  Attorneys for the People
9
10
11        SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
12
13

PEOPLE OF THE STATE OF CALIFORNIA,          NO. 210807
                                Plaintiff,          **INDICTMENT**

           **vs.**
: **DAVID EUGENE EDWARDS,**
**JAMES EUGENE EDWARDS,**
**WILLIAM LEE WHELAN, &**
**MICHAEL EDWARD KELLER**

                        **Defendants**
_____/

14

15                        <u>**COUNT ONE**</u>

16

17        The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**

18  **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, AND**

19  **MICHAEL EDWARD KELLER** of a felony, to wit: a violation of **PENAL CODE SECTION**

20  **182(a)(1) (CONSPIRACY TO COMMIT A CRIME)**, in that on or about and between **APRIL**

21  **1, 1999 AND MARCH 25, 2002**, in the County of Santa Clara, State of California, the said

22  defendants did conspire together, and with others, to commit a crime, to wit: a violation of

23  **CALIFORNIA CORPORATIONS CODE SECTION 25401 (SECURITIES FRAUD)**, a felony.

24        That thereafter, at and in the County of Santa Clara, State of California, and in the

25  furtherance of the conspiracy and to effect its object, the following overt acts were committed:

26

27

1    **OVERT ACT NO. 1**

2    On or about October 4, 1999, Michael Keller, after developing a position of trust with John

3    and Sheila Bowes, passed on information to William Whelan about Mr. Bowes's retirement funds

4    so that Whelan could sell to Mr. Bowes an investment in Resource Development International.

5

6    **OVERT ACT NO. 2**

7    On or about November 11, 1999, Michael Keller, after developing a position of trust with

8    Regina Richard, provided information to William Whelan about Ms. Richard's investment funds

9    so that Whelan could sell to Ms. Richard an investment in Resource Development International.

10

11    **OVERT ACT NO. 3**

12    On or about November 29, 1999, Michael Keller provided information to William Whelan

13    about potential investor Bertha Cummings so that Whelan could sell to Ms. Cummings an

14    investment in Resource Development International.

15

16    **OVERT ACT NO. 4**

17    On or about December 10, 1999, Michael Keller, after developing a position of trust with

18    Magdalena Parungao, provided information to William Whelan about Mrs. Parungao so that

19    Whelan could sell to Ms. Parungao an investment in Resource Development International.

20

21    **OVERT ACT NO. 5**

22    On or about January 31, 2000, Michael Keller, developing a position of trust with Declan

23    and Karen Hannan, provided information to William Whelan about Ms. Hannan so that Whelan

24    could sell to Ms. Hannan an investment in Resource Development International.

25

26

1    **OVERT ACT NO. 6**

2        On or about February 15, 2000, Michael Keller, after developing a position of trust with

3    Robert Pugsley, provided information to William Whelan about Mr. Pugsley's investment funds so

4    that Whelan could sell to Mr. Pugsley an investment in Resource Development International.

5

6    **OVERT ACT NO. 7**

7        On or about February 29, 2000, Michael Keller, after developing a position of trust with

8    Luigi Scrivani, provided information to William Whelan about Mr. Scrivani's investment funds so

9    that Whelan could sell to Mr. Scrivani an investment in Resource Development International.

10

11    **OVERT ACT NO. 8**

12        On or about February 29, 2000, Michael Keller, after developing a position of trust with

13    Wilfred Wood, provided information to William Whelan about Mr. Wood's investment funds so

14    that Whelan could sell to Mr. Wood an investment in Resource Development International.

15

16    **OVERT ACT NO. 9**

17        On or about May 26, 2000, Michael Keller, after developing a position of trust with Charles

18    Long, provided information to William Whelan about Mr. Long's investment funds so that Whelan

19    could sell to Mr. Long an investment in Resource Development International.

20

21    **OVERT ACT NO. 10**

22        On or about and between February 1, 2000 and June 30, 2000, William Whelan paid

23    Michael Keller fees for referring investors to whom Whelan sold an investment in Resource

24    Development International.

25

26    **OVERT ACT NO. 11**

27        On or about and between November 1, 1999 and February 28, 2001, David Edwards paid

28    William Whelan for selling investors investments in Resource Development International.

1    **OVERT ACT NO. 12**

2    On or about August 22, 2000, William Whelan lied under oath to hide his involvement with

3    Resource Development International.

4

5    **OVERT ACT NO. 13**

6    On or about March 7, 2000, David Edwards, acting through Don Atkins and Ron Berglund,

7    provided information about the Resource Development International investment to Thomas Nava.

8

9    **OVERT ACT NO. 14**

10    On or about and between March 20, 2001 and September 30, 2001, David Edwards sent to

11    investors letters that contained lies about the status of each investor's money in Resource

12    Development International.

13                                                                                                  °

14    **OVERT ACT NO. 15**

15    On or about and between October 12, 2001 and February 15, 2002, David Edwards spoke to

16    Investigator Dalton Rolen, who was posing as an investor's son, and lied about Resource

17    Development International.

18

19    **OVERT ACT NO. 16**

20    On or about and between October 12, 2001 and February 15, 2002, James Edwards spoke to

21    Investigator Dalton Rolen, who was posing as an investor's son, and time about Resource

22    Development International.

23

24    **OVERT ACT NO. 17**

25    On or about and between January 14, 1999 and May 18, 2000, David Edwards and James

26    Edwards controlled bank accounts for Resource Development International in a manner that had an

27    effect on Santa Clara County residents who had invested money in Resource Development

28    International.

1    ~~International:~~ $\mathcal{ZRS}$.

2

3    **OVERT ACT NO. 18**

4         On or about and between August 3, 1999 and October 2, 2000, William Whelan participated

5    in the sales of investments in Resource Development International to the following persons on or

6    about the following dates: Walter Callahan 4/14/00; Sidney James Carrell 5/25/00 and **10/2/00**;

7    Richard H. Deitz 9/21/99, 2/9/00 and 9/27/00; Barbara Holloway **8/3/99**; Peter A. Jones 12/10/99

8    and 12/15/99; Douglas Norman 5/10/00; James and Joan Russell 6/20/00 and 10/1/00; Donald and

9    Helena Wilson 5/31/00; Christine Henkel Williams 12/15/99; Linda Worrell 10/6/99.

10

11                                    **COUNT TWO**

12

13         The Grand Jury of the County of Santa Clara, State of California, hereby accuses

14    **WILLIAM LEE WHELAN, AND MICHAEL EDWARD KELLER** of a felony, to wit: a

15    violation of **CALIFORNIA CORPORATIONS CODE SECTION 25110 (OFFER OR SALE**

16    **OF AN UNQUALIFIED SECURITY)** in that on or about **NOVEMBER 12, 1998**, in the County

17    of Santa Clara, State of California, the said defendants did willfully offer and sell in this state a

18    security in an issuer transaction, to wit: an investment contract, evidence of indebtedness, and note

19    in Dennel Finance and Samuel Limited Partnership ($195,000.00), to **E. DOUGLAS DRYSDALE**

20    **and MARK DRYSDALE**, without having first qualified the offer and sale with the Commissioner

21    of Corporations of the State of California.

22         It is further alleged that from June 19, 2002 through the filing of this Indictment a

23    prosecution of **WILLIAM LEE WHELAN** for the same conduct alleged in this count was pending

24    in a court of this state.

25         It is further alleged that from June 19, 2002 through the filing of this Indictment a

26    prosecution of **MICHAEL EDWARD KELLER** for the same conduct alleged in this count was

27    pending in a court of this state.

28

1                                   **COUNT THREE**

2

3          The Grand Jury of the County of Santa Clara, State of California, hereby accuses

4    **WILLIAM LEE WHELAN, AND MICHAEL EDWARD KELLER** of a felony, to wit: a

5    violation of **CALIFORNIA CORPORATIONS CODE SECTION 25110 (OFFER OR SALE**

6    **OF AN UNQUALIFIED SECURITY)** in that on or about **DECEMBER 13, 1998,** in the County

7    of Santa Clara, State of California, the said defendants did willfully offer and sell in this state a

8    security in an issuer transaction, to wit: an investment contract, evidence of indebtedness, and note

9    in Dennel Finance and Samuel Limited Partnership ($30,000), to **LEANNE BERROCOSO,**

10   without having first qualified the offer and sale with the Commissioner of Corporations of the State

11   of California.

12         It is further alleged that from June 19, 2002 through the filing of this Indictment a

13   prosecution of **WILLIAM LEE WHELAN** for the same conduct alleged in this count was pending

14   in a court of this state.

15         It is further alleged that from June 19, 2002 through the filing of this Indictment a

16   prosecution of **MICHAEL EDWARD KELLER** for the same conduct alleged in this count was

17   pending in a court of this state.

18

19                                  **COUNT FOUR**

20

21         The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**

22   **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, AND**

23   **MICHAEL EDWARD KELLER** of a felony, to wit: a violation of **CALIFORNIA PENAL**

24   **CODE SECTION 459-460(a) (FIRST DEGREE BURGLARY)** in that, on or about **OCTOBER**

25   **4, 1999,** in the County of Santa Clara, State of California, the said defendants did enter an inhabited

26   dwelling house, the **BOWES' HOME** in Lodi, California, with the intent to commit a felony, to

27   wit: a violation of **CALIFORNIA CORPORATIONS CODE SECTION 25401 (SECURITIES**

28   **FRAUD)**.

1    It is further alleged that from June 19, 2002 through the filing of this Indictment a
2    prosecution of **DAVID EUGENE EDWARDS** for the same conduct alleged in this count was
3    pending in a court of this state.

4    It is further alleged that from June 19, 2002 through the filing of this Indictment a
5    prosecution of **JAMES EUGENE EDWARDS** for the same conduct alleged in this count was
6    pending in a court of this state.

7    It is further alleged that from June 19, 2002 through the filing of this Indictment a
8    prosecution of **WILLIAM LEE WHELAN** for the same conduct alleged in this count was pending
9    in a court of this state.

10    It is further alleged that from June 19, 2002 through the filing of this Indictment a
11    prosecution of **MICHAEL EDWARD KELLER** for the same conduct alleged in this count was
12    pending in a court of this state.

13

14                                    <u>COUNT FIVE</u>

15

16    The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**
17    **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, and**
18    **MICHAEL EDWARD KELLER** of a felony: to wit: a violation of **CALIFORNIA**
19    **CORPORATIONS CODE SECTION 25401 (SECURITIES FRAUD)**, in that, on or about
20    **OCTOBER 4, 1999**, in the County of Santa Clara, State of California, the said defendants did
21    willfully offer and sell a security, to wit: an investment contract, evidence of indebtedness, and note
22    in Resource Development International to **JOHN BOWES** by means of a communication which
23    included an untrue statement of material fact and omitted to state a material fact necessary in order
24    to make the statements made, in the light of the circumstances under which they were made, not
25    misleading.

26

27

28

1       ## COUNT SIX

2

3       The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**

4       **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, AND**

5       **MICHAEL EDWARD KELLER** of a felony, to wit: a violation of **CALIFORNIA PENAL**

6       **CODE SECTION 459-460(a) (FIRST DEGREE BURGLARY)** in that, on or about **MARCH**

7       **29, 2000,** in the County of Santa Clara, State of California, the said defendants did enter an

8       inhabited dwelling house, the **BOWES' HOME** in Stockton, California, with the intent to commit

9       a felony, to wit: a violation of **CALIFORNIA CORPORATIONS CODE SECTION 25401**

10      **(SECURITIES FRAUD).**

11

12      It is further alleged that, at the time of the commission of the crime alleged in this count,

13      there was present in the residence a person other than an accomplice.

14

15      It is further alleged that from June 19, 2002 through the filing of this Indictment a

16      prosecution of **DAVID EUGENE EDWARDS** for the same conduct alleged in this count was

17      pending in a court of this state.

18      It is further alleged that from June 19, 2002 through the filing of this Indictment a

19      prosecution of **JAMES EUGENE EDWARDS** for the same conduct alleged in this count was

20      pending in a court of this state.

21      It is further alleged that from June 19, 2002 through the filing of this Indictment a

22      prosecution of **WILLIAM LEE WHELAN** for the same conduct alleged in this count was pending

23      in a court of this state.

24      It is further alleged that from June 19, 2002 through the filing of this Indictment a

25      prosecution of **MICHAEL EDWARD KELLER** for the same conduct alleged in this count was

26      pending in a court of this state.

27

28

1                                    **COUNT SEVEN**

2

3          The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**

4    **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, and**

5    **MICHAEL EDWARD KELLER** of a felony: to wit: a violation of **CALIFORNIA**

6    **CORPORATIONS CODE SECTION 25401 (SECURITIES FRAUD)**, in that, on or about

7    **MARCH 29, 2000**, in the County of Santa Clara, State of California, the said defendants did

8    willfully offer and sell a security, to wit: an investment contract, evidence of indebtedness, and note

9    in Resource Development International to **JOHN BOWES** by means of a communication which

10   included an untrue statement of material fact and omitted to state a material fact necessary in order

11   to make the statements made, in the light of the circumstances under which they were made, not

12   misleading.

13

14                                   **COUNT EIGHT**

15

16         The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**

17   **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, and**

18   **MICHAEL EDWARD KELLER** of a felony: to wit: a violation of **CALIFORNIA**

19   **CORPORATIONS CODE SECTION 25401 (SECURITIES FRAUD)**, in that, on or about

20   **NOVEMBER 11, 1999**, in the County of Santa Clara, State of California, the said defendants did

21   willfully offer and sell a security, to wit: an investment contract, evidence of indebtedness, and note

22   in Resource Development International to **REGINA RICHARD** by means of a communication

23   which included an untrue statement of material fact and omitted to state a material fact necessary

24   in order to make the statements made, in the light of the circumstances under which they were made,

25   not misleading.

26

27

28

1
<h2 style="text-align:center"><u>COUNT NINE</u></h2>

2

3   The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**

4 **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, and**

5 **MICHAEL EDWARD KELLER** of a felony: to wit: a violation of **CALIFORNIA**

6 **CORPORATIONS CODE SECTION 25401 (SECURITIES FRAUD)**, in that, on or about

7 **APRIL 4, 2000**, in the County of Santa Clara, State of California, the said defendants did willfully

8 offer and sell a security, to wit: an investment contract, evidence of indebtedness, and note in

9 Resource Development International to **REGINA RICHARD** by means of a communication which

10 included an untrue statement of material fact and omitted to state a material fact necessary in order

11 to make the statements made, in the light of the circumstances under which they were made, not

12 misleading.

13

14
<h2 style="text-align:center"><u>COUNT TEN</u></h2>

15

16   The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**

17 **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, and**

18 **MICHAEL EDWARD KELLER** of a felony: to wit: a violation of **CALIFORNIA**

19 **CORPORATIONS CODE SECTION 25401 (SECURITIES FRAUD)**, in that, on or about

20 **NOVEMBER 29, 1999**, in the County of Santa Clara, State of California, the said defendants did

21 willfully offer and sell a security, to wit: an investment contract, evidence of indebtedness, and note

22 in Resource Development International to **BERTHA CUMMINGS** by means of a communication

23 which included an untrue statement of material fact and omitted to state a material fact necessary

24 in order to make the statements made, in the light of the circumstances under which they were made,

25 not misleading.

26

27

28

1    <u>**COUNT ELEVEN**</u>

2

3        The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**

4    **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, and**

5    **MICHAEL EDWARD KELLER** of a felony: to wit: a violation of **CALIFORNIA**

6    **CORPORATIONS CODE SECTION 25401 (SECURITIES FRAUD)**, in that, on or about and

7    between **SEPTEMBER 24, 2001 AND FEBRUARY 12, 2002**, in the County of Santa Clara, State

8    of California, the said defendants did willfully offer and sell a security, to wit: an investment

9    contract, evidence of indebtedness, and note in Resource Development International to **BERTHA**

10   **CUMMINGS** by means of a communication which included an untrue statement of material fact

11   and omitted to state a material fact necessary in order to make the statements made, in the light of

12   the circumstances under which they were made, not misleading.

13

14   <u>**COUNT TWELVE**</u>

15

16       The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**

17   **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, and**

18   **MICHAEL EDWARD KELLER** of a felony: to wit: a violation of **CALIFORNIA**

19   **CORPORATIONS CODE SECTION 25401 (SECURITIES FRAUD)**, in that, on or about

20   **DECEMBER 10, 1999**, in the County of Santa Clara, State of California, the said defendants did

21   willfully offer and sell a security, to wit: an investment contract, evidence of indebtedness, and note

22   in Resource Development International to **MAGDALENA PARUNGAO** by means of a

23   communication which included an untrue statement of material fact and omitted to state a material

24   fact necessary in order to make the statements made, in the light of the circumstances under which

25   they were made, not misleading.

26

27

28

1    <u>**COUNT THIRTEEN**</u>

2    The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**

3    **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, and**

4    **MICHAEL EDWARD KELLER** of a felony: to wit: a violation of **CALIFORNIA**

5    **CORPORATIONS CODE SECTION 25401 (SECURITIES FRAUD)**, in that, on or about

6    **JANUARY 15, 2001**, in the County of Santa Clara, State of California, the said defendants did

7    willfully offer and sell a security, to wit: an investment contract, evidence of indebtedness, and note

8    in Resource Development International to **MAGDALENA PARUNGAO** by means of a

9    communication which included an untrue statement of material fact and omitted to state a material

10    fact necessary in order to make the statements made, in the light of the circumstances under which

11    they were made, not misleading.

12

13    <u>**COUNT FOURTEEN**</u>

14

15    The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**

16    **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, AND**

17    **MICHAEL EDWARD KELLER** of a felony, to wit: a violation of **CALIFORNIA PENAL**

18    **CODE SECTION 459-460(a) (FIRST DEGREE BURGLARY)** in that, on or about **JANUARY**

19    **31, 2000**, in the County of Santa Clara, State of California, the said defendants did enter an

20    inhabited dwelling house, the **HANNANS'** home in San Jose, California, with the intent to commit

21    a felony, to wit: a violation of **CALIFORNIA CORPORATIONS CODE SECTION 25401**

22    **(SECURITIES FRAUD)**.

23    It is further alleged that from June 19, 2002 through the filing of this Indictment a

24    prosecution of **DAVID EUGENE EDWARDS** for the same conduct alleged in this count was

25    pending in a court of this state.

26    It is further alleged that from June 19, 2002 through the filing of this Indictment a

27    prosecution of **JAMES EUGENE EDWARDS** for the same conduct alleged in this count was

28    pending in a court of this state.

1    It is further alleged that from June 19, 2002 through the filing of this Indictment a
2    prosecution of **WILLIAM LEE WHELAN** for the same conduct alleged in this count was pending
3    in a court of this state.

4    It is further alleged that from June 19, 2002 through the filing of this Indictment a
5    prosecution of **MICHAEL EDWARD KELLER** for the same conduct alleged in this count was
6    pending in a court of this state.

7
8                                    **COUNT FIFTEEN**
9
10    The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**
11    **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, and**
12    **MICHAEL EDWARD KELLER** of a felony: to wit: a violation of **CALIFORNIA**
13    **CORPORATIONS CODE SECTION 25401 (SECURITIES FRAUD)**, in that, on or about
14    **FEBRUARY 15, 2001**, in the County of Santa Clara, State of California, the said defendants did
15    willfully offer and sell a security, to wit: an investment contract, evidence of indebtedness, and note
16    in Resource Development International to **KAREN HANNAN** by means of a communication which
17    included an untrue statement of material fact and omitted to state a material fact necessary in order
18    to make the statements made, in the light of the circumstances under which they were made, not
19    misleading.
20                                    **COUNT SIXTEEN**
21
22    The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**
23    **EUGENE EDWARDS; JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, and**
24    **MICHAEL EDWARD KELLER** of a felony: to wit: a violation of **CALIFORNIA**
25    **CORPORATIONS CODE SECTION 25401 (SECURITIES FRAUD)**, in that, on or about
26    **AUGUST 14, 2001**, in the County of Santa Clara, State of California, the said defendants did
27    willfully offer and sell a security, to wit: an investment contract, evidence of indebtedness, and note
28    in Resource Development International to **KAREN HANNAN** by means of a communication which

1   included an untrue statement of material fact and omitted to state a material fact necessary in order

2   to make the statements made, in the light of the circumstances under which they were made, not

3   misleading.

4

5                                    **COUNT SEVENTEEN**

6

7       The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**

8   **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, AND**

9   **MICHAEL EDWARD KELLER** of a felony, to wit: a violation of **CALIFORNIA PENAL**

10  **CODE SECTION 459-460(a) (FIRST DEGREE BURGLARY)** in that, on or about

11  **FEBRUARY 15, 2000,** in the County of Santa Clara, State of California, the said defendants did

12  enter an inhabited dwelling house, the **PUGSLEYS'** motor home in Santa Clara, California, with

13  the intent to commit a felony, to wit: a violation of **CALIFORNIA CORPORATIONS CODE**

14  **SECTION 25401 (SECURITIES FRAUD).**

15      It is further alleged that from January 17, 2003 through the filing of this Indictment a

16  prosecution of **DAVID EUGENE EDWARDS** for the same conduct alleged in this count was

17  pending in a court of this state.

18      It is further alleged that from January 17, 2003 through the filing of this Indictment a

19  prosecution of **JAMES EUGENE EDWARDS** for the same conduct alleged in this count was

20  pending in a court of this state.

21      It is further alleged that from January 17, 2003 through the filing of this Indictment a

22  prosecution of **WILLIAM LEE WHELAN** for the same conduct alleged in this count was pending

23  in a court of this state.

24      It is further alleged that from January 17, 2003 through the filing of this Indictment a

25  prosecution of **MICHAEL EDWARD KELLER** for the same conduct alleged in this count was

26  pending in a court of this state.

27

28

1

## COUNT EIGHTEEN

2

3    The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**

4    **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, AND**

5    **MICHAEL EDWARD KELLER** of a felony, to wit: a violation of **CALIFORNIA PENAL**

6    **CODE SECTION 459-460(a) (FIRST DEGREE BURGLARY)** in that, on or about **MAY 4,**

7    **2000,** in the County of Santa Clara, State of California, the said defendants did enter an inhabited

8    dwelling house, the **PUGSLEYS'** motor home in Santa Clara, California, with the intent to commit

9    a felony, to wit: a violation of **CALIFORNIA CORPORATIONS CODE SECTION 25401**

10    **(SECURITIES FRAUD).**

11    It is further alleged that, at the time of the commission of the crime alleged in this count,

12    there was present in the residence a person other than an accomplice.

13    It is further alleged that from January 17, 2003 through the filing of this Indictment a

14    prosecution of **DAVID EUGENE EDWARDS** for the same conduct alleged in this count was

15    pending in a court of this state.

16    It is further alleged that from January 17, 2003 through the filing of this Indictment a

17    prosecution of **JAMES EUGENE EDWARDS** for the same conduct alleged in this count was

18    pending in a court of this state.

19    It is further alleged that from January 17, 2003 through the filing of this Indictment a

20    prosecution of **WILLIAM LEE WHELAN** for the same conduct alleged in this count was pending

21    in a court of this state.

22    It is further alleged that from January 17, 2003 through the filing of this Indictment a

23    prosecution of **MICHAEL EDWARD KELLER** for the same conduct alleged in this count was

24    pending in a court of this state.

25

26

27

28

1        <u>**COUNT NINETEEN**</u>

2

3        The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**

4    **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, and**

5    **MICHAEL EDWARD KELLER** of a felony: to wit: a violation of **CALIFORNIA**

6    **CORPORATIONS CODE SECTION 25401 (SECURITIES FRAUD)**, in that, on or about

7    **MAY 4, 2000**, in the County of Santa Clara, State of California, the said defendants did willfully

8    offer and sell a security, to wit: an investment contract, evidence of indebtedness, and note in

9    Resource Development International to **ROBERT PUGSLEY** by means of a communication which

10    included an untrue statement of material fact and omitted to state a material fact necessary in order

11    to make the statements made, in the light of the circumstances under which they were made, not

12    misleading.

13

14        <u>**COUNT TWENTY**</u>

15

16        The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**

17    **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, AND**

18    **MICHAEL EDWARD KELLER** of a felony, to wit: a violation of **CALIFORNIA PENAL**

19    **CODE SECTION 459-460(a) (FIRST DEGREE BURGLARY)** in that, on or about

20    **FEBRUARY 29, 2000**, in the County of Santa Clara, State of California, the said defendants did

21    enter an inhabited dwelling house, **LUIGI SCRIVANI'S** home in South San Francisco, California,

22    with the intent to commit a felony, to wit: a violation of **CALIFORNIA CORPORATIONS**

23    **CODE SECTION 25401 (SECURITIES FRAUD)**.

24        It is further alleged that from January 17, 2003 through the filing of this Indictment a

25    prosecution of **DAVID EUGENE EDWARDS** for the same conduct alleged in this count was

26    pending in a court of this state.

27        It is further alleged that from January 17, 2003 through the filing of this Indictment a

28    prosecution of **JAMES EUGENE EDWARDS** for the same conduct alleged in this count was

1   pending in a court of this state.

2       It is further alleged that from January 17, 2003 through the filing of this Indictment a

3   prosecution of **WILLIAM LEE WHELAN** for the same conduct alleged in this count was pending

4   in a court of this state.

5       It is further alleged that from January 17, 2003 through the filing of this Indictment a

6   prosecution of **MICHAEL EDWARD KELLER** for the same conduct alleged in this count was

7   pending in a court of this state.

8

9   **COUNT TWENTY-ONE**

10

11       The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**

12   **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, and**

13   **MICHAEL EDWARD KELLER** of a felony: to wit: a violation of **CALIFORNIA**

14   **CORPORATIONS CODE SECTION 25401 (SECURITIES FRAUD)**, in that, on or about

15   **FEBRUARY 29, 2000**, in the County of Santa Clara, State of California, the said defendants did

16   willfully offer and sell a security, to wit: an investment contract, evidence of indebtedness, and note

17   in Resource Development International to **LUIGI SCRIVANI** by means of a communication which

18   included an untrue statement of material fact and omitted to state a material fact necessary in order

19   to make the statements made, in the light of the circumstances under which they were made, not

20   misleading.

21

22   **COUNT TWENTY-TWO**

23

24       The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**

25   **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, AND**

26   **MICHAEL EDWARD KELLER** of a felony, to wit: a violation of **CALIFORNIA PENAL**

27   **CODE SECTION 459-460(a) (FIRST DEGREE BURGLARY)** in that, on or about

28   **FEBRUARY 29, 2000**, in the County of Santa Clara, State of California, the said defendants did

1  enter an inhabited dwelling house, **WILFRED WOOD'S** home in San Jose, California, with the

2  intent to commit a felony, to wit: a violation of **CALIFORNIA CORPORATIONS CODE**

3  **SECTION 25401 (SECURITIES FRAUD)**.

4      It is further alleged that from January 17, 2003 through the filing of this Indictment a

5  prosecution of **DAVID EUGENE EDWARDS** for the same conduct alleged in this count was

6  pending in a court of this state.

7      It is further alleged that from January 17, 2003 through the filing of this Indictment a

8  prosecution of **JAMES EUGENE EDWARDS** for the same conduct alleged in this count was

9  pending in a court of this state.

10      It is further alleged that from January 17, 2003 through the filing of this Indictment a

11  prosecution of **WILLIAM LEE WHELAN** for the same conduct alleged in this count was pending

12  in a court of this state.

13      It is further alleged that from January 17, 2003 through the filing of this Indictment a

14  prosecution of **MICHAEL EDWARD KELLER** for the same conduct alleged in this count was

15  pending in a court of this state.

16

17                      **COUNT TWENTY-THREE**

18

19      The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**

20  **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, and**

21  **MICHAEL EDWARD KELLER** of a felony: to wit: a violation of **CALIFORNIA**

22  **CORPORATIONS CODE SECTION 25401 (SECURITIES FRAUD)**, in that, on or about

23  **FEBRUARY 29, 2000**, in the County of Santa Clara, State of California, the said defendants did

24  willfully offer and sell a security, to wit: an investment contract, evidence of indebtedness, and note

25  in Resource Development International to **WILFRED WOOD** by means of a communication

26  which included an untrue statement of material fact and omitted to state a material fact necessary

27  in order to make the statements made, in the light of the circumstances under which they were made,

28  not misleading.

1

2                              **COUNT TWENTY-FOUR**

3

4          The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**

5    **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, and**

6    **MICHAEL EDWARD KELLER** of a felony: to wit: a violation of **CALIFORNIA**

7    **CORPORATIONS CODE SECTION 25401 (SECURITIES FRAUD)**, in that, on or about

8    **MARCH 22, 2001**, in the County of Santa Clara, State of California, the said defendants did

9    willfully offer and sell a security, to wit: an investment contract, evidence of indebtedness, and note

10   in Resource Development International, to **WILFRED WOOD** by means of a communication

11   which included an untrue statement of material fact and omitted to state a material fact necessary

12   in order to make the statements made, in the light of the circumstances under which they were made,

13   not misleading.

14

15                              **COUNT TWENTY-FIVE**

16

17          The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**

18   **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, and**

19   **MICHAEL EDWARD KELLER** of a felony: to wit: a violation of **CALIFORNIA**

20   **CORPORATIONS CODE SECTION 25401 (SECURITIES FRAUD)**, in that, on or about

21   **MARCH 7, 2000**, in the County of Santa Clara, State of California, the said defendants did

22   willfully offer and sell a security, to wit: an investment contract, evidence of indebtedness, and note

23   in Resource Development International, to **THOMAS NAVA** by means of a communication which

24   included an untrue statement of material fact and omitted to state a material fact necessary in order

25   to make the statements made, in the light of the circumstances under which they were made, not

26   misleading.

27

28

1        **<u>COUNT TWENTY-SIX</u>**

2

3        The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**

4    **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, AND**

5    **MICHAEL EDWARD KELLER** of a felony, to wit: a violation of **CALIFORNIA PENAL**

6    **CODE SECTION 459-460(a) (FIRST DEGREE BURGLARY)** in that, on or about **MAY 26,**

7    **2000,** in the County of Santa Clara, State of California, the said defendants did enter an inhabited

8    dwelling house, the **LONGS'** home in South San Francisco, California, with the intent to commit

9    a felony, to wit: a violation of **CALIFORNIA CORPORATIONS CODE SECTION 25401**

10   **(SECURITIES FRAUD).**

11       It is further alleged that, at the time of the commission of the crime alleged in this count,

12   there was present in the residence a person other than an accomplice.

13       It is further alleged that from January 17, 2003 through the filing of this Indictment a

14   prosecution of **DAVID EUGENE EDWARDS** for the same conduct alleged in this count was

15   pending in a court of this state.

16       It is further alleged that from January 17, 2003 through the filing of this Indictment a

17   prosecution of **JAMES EUGENE EDWARDS** for the same conduct alleged in this count was

18   pending in a court of this state.

19       It is further alleged that from January 17, 2003 through the filing of this Indictment a

20   prosecution of **WILLIAM LEE WHELAN** for the same conduct alleged in this count was pending

21   in a court of this state.

22       It is further alleged that from January 17, 2003 through the filing of this Indictment a

23   prosecution of **MICHAEL EDWARD KELLER** for the same conduct alleged in this count was

24   pending in a court of this state.

25

26

27

28

1

## COUNT TWENTY-SEVEN

2

3        The Grand Jury of the County of Santa Clara, State of California, hereby accuses **DAVID**

4    **EUGENE EDWARDS, JAMES EUGENE EDWARDS, WILLIAM LEE WHELAN, and**

5    **MICHAEL EDWARD KELLER** of a felony: to wit: a violation of **CALIFORNIA**

6    **CORPORATIONS CODE SECTION 25401 (SECURITIES FRAUD)**, in that, on or about

7    **MAY 26, 2000**, in the County of Santa Clara, State of California, the said defendants did willfully

8    offer and sell a security, to wit: an investment contract, evidence of indebtedness, and note in

9    Resource Development International to **CHARLES LONG** by means of a communication which

10   included an untrue statement of material fact and omitted to state a material fact necessary in order

11   to make the statements made, in the light of the circumstances under which they were made, not

12   misleading.

13

14

15        ## EXCESSIVE TAKING ALLEGATION

16

17        It is alleged that in the commission and attempted commission of the offense(s) charged

18   above the defendant **DAVID EUGENE EDWARDS**, with the intent to do so, took, damaged, and

19   destroyed property of a value exceeding one hundred and fifty thousand dollars ($150,000), within

20   the meaning of Penal Code section 12022.6(a)(2).

21

22        It is alleged that in the commission and attempted commission of the offense(s) charged

23   above the defendant **JAMES EUGENE EDWARDS**, with the intent to do so, took, damaged, and

24   destroyed property of a value exceeding one hundred and fifty thousand dollars ($150,000), within

25   the meaning of Penal Code section 12022.6(a)(2).

26

27

28

1    It is alleged that in the commission and attempted commission of the offense(s) charged

2    above the defendant **WILLIAM LEE WHELAN**, with the intent to do so, took, damaged, and

3    destroyed property of a value exceeding one hundred and fifty thousand dollars ($150,000), within

4    the meaning of Penal Code section 12022.6(a)(2).

5

6    It is alleged that in the commission and attempted commission of the offense(s) charged

7    above the defendant **MICHAEL EDWARD KELLER**, with the intent to do so, took, damaged,

8    and destroyed property of a value exceeding one hundred and fifty thousand dollars ($150,000),

9    within the meaning of Penal Code section 12022.6(a)(2).

10

11

12                    <u>**AGGRAVATED WHITE COLLAR CRIME ALLEGATION**</u>

13

14    It is further alleged that the felony crimes charged in Counts 1 and Counts 4 through 27 are

15    related, that a material element of the crimes is fraud, that the crimes involve a pattern of related

16    felony conduct, and that the pattern of related felony conduct by the defendant **DAVID EUGENE**

17    **EDWARDS** involves the taking of more than five hundred thousand dollars ($500,000), within the

18    meaning of **PENAL CODE SECTIONS 186.11(A)(1) AND (A)(2).**

19

20    It is further alleged that the felony crimes charged in Counts 1 and Counts 4 through 27 are

21    related, that a material element of the crimes is fraud, that the crimes involve a pattern of related

22    felony conduct, and that the pattern of related felony conduct by the defendant **JAMES EUGENE**

23    **EDWARDS** involves the taking of more than five hundred thousand dollars ($500,000), within the

24    meaning of **PENAL CODE SECTIONS 186.11(A)(1) AND (A)(2).**

25

26    It is further alleged that the felony crimes charged in Counts 1 and Counts 4 through 22 are

27    related, that a material element of the crimes is fraud, that the crimes involve a pattern of related

28    felony conduct, and that the pattern of related felony conduct by the defendant **WILLIAM LEE**

1   **WHELAN** involves the taking of more than five hundred thousand dollars ($500,000), within the

2   meaning of **PENAL CODE SECTIONS 186.11(A)(1) AND (A)(2).**

3

4         It is further alleged that the felony crimes charged in Counts 1 and Counts 4 through 22 are

5   related, that a material element of the crimes is fraud, that the crimes involve a pattern of related

6   felony conduct, and that the pattern of related felony conduct by the defendant **MICHAEL**

7   **EDWARD KELLER** involves the taking of more than five hundred thousand dollars ($500,000),

8   within the meaning of **PENAL CODE SECTIONS 186.11(A)(1) AND (A)(2).**

9

10  ///

11

12

13

14  Paul Colin

15  Deputy District Attorney

16

17

18

19  **"A TRUE BILL"**

20

21

22

23

24                                      Dated: June _5_ , 2003

25  Leon R. Schmit

26  Foreperson of the Grand Jury

27

28  ///

29

1  NAMES OF THE WITNESSES EXAMINED BY THE GRAND JURY ON THE FINDING IN

2  THE FOREGOING INDICTMENT:

3

4       1.   Karen Hannan

5       2.   John Bowes

6       3.   Luigi Scrivani

7       4.   Robert Pugsley

8       5.   Leanne Berrocoso

9       6.   Dalton Rolen

10      7.   Joan Loher

11      8.   Magdalena Parungao

12      9.   Thomas Nava

13      10.  Regina Richard

14      11.  Mark Drysdale

15      12.  Charles Long

16      13.  Cindy Kay Harris

17      14.  Wilfred Wood

18      15.  Herbert Biern

19      16.  Lawrence Warfield

20      17.  Scott Radcliffe

21      18.  Jackie Kiel

22      19.  Glenn McGovern

23      20.  Ronald Berglund

24

25  ///

26  ///

27

28

**13**

# *Resource Development International, LLC*

251 Jeanell Dr. Suite 3   Carson City, NV 89703

Karen Hannan
████████████ Dr.
San Jose, CA █████

| Sent Via Federal Express |

M..y 20, 2000

Dear Karen ,

Enclosed is your payment for the month of April which represents the return on your invested monies for the time it was invested last month. Attached is a copy of your statement, should you have any questions please call.

# *YOU MUST READ THIS!!!*

*We are no longer accepting new clients as of June 30, 2000.* I know that many of you have close friends and family that you think would benefit from what we have to offer. However, we are not like most businesses that want to keep growing and growing, we have more than enough money and clients to manage. If we continued to take on new clients, at some point it is inevitable that we would be accused of making an offering to the general public, and as you all know and I have stressed every month, *we are not now nor have we ever been open to the public.* So, from this time forward <u>you are not allowed to share your knowledge and experiences of the program with anyone.</u> This includes family members, friends, co workers, etc.

As a client you may continue to maintain a maximum of four contracts. In other words, this change does not adversely effect you or any existing client. In fact, we are taking this action to protect the integrity of the program, so that all of you may enjoy it's benefits for a long time to come.

Thank you,

*David Edwards*

David Edwards

251 Jeanell Dr. Suite 3   Carson City, NV 89703    (800) 827-2598    (775) 888-6788    Fax (775) 882-5121

HANNON~RDI~0000034

**14**

# *Client Consulting Agreement*

This consulting agreement is made this __31__ day of __Jan__ __19__ 2008 ; by and between **Sound Financial Services, Inc.** its officers and subsidiary companies.(hereinafter known as "The Company")

And _____ KAREN E. NANNAN _____ .(hereinafter known as " The Client")

This agreement is a contract and *Establishes a Client-Consultant Relationship* between the COMPANY and the CLIENT for the following purposes.

1. The CLIENT may avail themselves of our Estate Planning or Asset Protection counsel. It is understood that we will assist them in their planning, but we will not draw up documents or give legal advice.

2. At the request of the CLIENT we will review their current portfolio of investments, make suggestions and help them determine their suitability for various investments.

3. The COMPANY, as a service to the CLIENT, researches various investments and at the CLIENTS request, in writing, we will make them aware of the details of the investments of their choice.

4. The COMPANY acknowledges the confidential nature of any information given to them by the CLIENT and agrees not to disclose it to any person or entity without permission. Even the fact that there is a client - consultant relationship cannot be disclosed without permission.

5. The CLIENT acknowledges the confidential nature of some of the investment opportunities suggested by the COMPANY and agrees not to disclose any details to any person or entity without permission.

6. The CLIENT acknowledges that there is an inherent risk in any investment and assumes the responsibility of performing their own due diligence on the investment, if any, they select.

7. The CLIENT may refer their friends, relatives and close associates to the COMPANY'S *Consulting Service*, but the CLIENT agrees, that under no circumstances will they divulge any information pertaining to investment opportunities brought to their attention by the COMPANY.

8. The COMPANY will charge a fee for some of their services, receive a commission on some products, and share in the profits of some investments. Fees will be agreed upon in advance, commissions and profits will remain confidential.

_Karen E. Hannan_
Client Signature                                    Client Signature

_Karen E. Hannan_
Print Client Name                                   Print Client Name

_David Edmund_          Bill Whelan
Company Officers Signature                          Referred From

HANNON–RDI–0000015

**15**

1

2          TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

3                      SIXTH APPELLATE DISTRICT

4                            ---oOo---

5   PEOPLE OF THE STATE OF CALIFORNIA     )
                                          ) COURT OF APPEAL
6            PLAINTIFF,                    ) CASE NO.
                                          ) H028746
7        VS.                              )
                                          )
8   JAMES EUGENE EDWARDS AND              )  COPY
    DAVID EUGENE EDWARDS,                 )
9                                         )
             DEFENDANTS.                  ) SUPERIOR CASE
10  _____) NO.: 210807

11                           ---oOo---

12

13             REPORTER'S TRANSCRIPT ON APPEAL

14          FROM THE JUDGMENT OF THE SUPERIOR COURT

15           OF THE STATE OF CALIFORNIA, IN AND FOR

16                 THE COUNTY OF SANTA CLARA

17              HONORABLE RENE NAVARRO, JUDGE

18          OCTOBER 19, 2004 AND OCTOBER 20, 2004

19              VOLUME NINE (PAGES 900 - 1082)

20

21  APPEARANCES:

22  FOR THE RESPONDENT:    OFFICE OF THE ATTORNEY GENERAL
                           455 GOLDEN GATE AVENUE, ROOM 11000
23                         SAN FRANCISCO, CALIFORNIA  94102

24  FOR THE APPELLANT:     SIXTH DISTRICT APPELLATE PROGRAM
                           100 NORTH WINCHESTER BLVD., SUITE 310
25                         SANTA CLARA, CALIFORNIA  95050

26  REPORTED BY:           JACQUELINE V. BARRON, CSR #8049

27                           ---oOo---

28

1

2          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

3              IN AND FOR THE COUNTY OF SANTA CLARA

4                 BEFORE HONORABLE RENE NAVARRO

5                     DEPARTMENT NO. 39

6

7    PEOPLE OF THE STATE OF CALIFORNIA   )
                                         )  COURT OF APPEAL
8          PLAINTIFF,                     )  CASE NO.
                                         )  H028746
9          VS.                            )
                                         )
10   JAMES EUGENE EDWARDS AND            )
     DAVID EUGENE EDWARDS,              )
11                                       )
           DEFENDANTS.                    )  SUPERIOR CASE
12   _____)  NO.: 210807

13                      ---0O0---

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS HELD ON

15          OCTOBER 19, 2004 AND OCTOBER 20, 2004

16                      ---0O0---

17

18   A P P E A R A N C E S:

19

     FOR THE PLAINTIFF:          PAUL COLIN,
20                               DEPUTY DISTRICT ATTORNEY

21   FOR DEFENDANT JAMES EDWARDS:  IN PROPIA PERSONA

22   FOR DEFENDANT DAVID EDWARDS:  IN PROPIA PERSONA

23   OFFICIAL COURT REPORTER:    JACQUELINE VILLEGAS BARRON
                                 CERTIFICATE NUMBER 8049
24

25

26

27

28

1

2              INDEX OF EXAMINATION (CHRONOLOGICAL)

3                                                        VOIR
     PEOPLE'S      DIRECT    CROSS   REDIRECT  RECROSS   DIRE   VOLUME
4
     WARFIELD, LAWRENCE
5      (CONT)        907     983                                 9

6    ROLEN, DALTON 1072                                          9

7

8
                          ---oOo---
9

10

11             INDEX OF EXAMINATION (CHRONOLOGICAL)

12                                                       VOIR
     DEFENSE'S     DIRECT    CROSS   REDIRECT  RECROSS   DIRE   VOLUME
13
     WARFIELD, LAWRENCE
14                 1028     1068    1071                          9

15
                          ---oOo---
16

17

18

19

20

21

22

23

24

25

26

27

28
                                                              902

```
 1   OBJECTION IS SUSTAINED TO THE FORM OF THE QUESTION.
 2   Q   BY MR. DAVID EDWARDS:  ALL RIGHT.  DID YOU STATE IN
 3   THIS DOCUMENT THAT YOU OBTAINED SEARCH WARRANTS?
 4           MR. COLIN:  YOUR HONOR, I'M SORRY.  IT'S THE SAME
 5   QUESTION OVER AND OVER AGAIN.
 6           THE COURT:  SUSTAINED.
 7   Q   BY MR. DAVID EDWARDS:  DO YOU SEE PARAGRAPH 5 THERE?
 8   A   I DO.
 9   Q   IS THAT AN ACCURATE STATEMENT, DO YOU RECALL FILLING
10   THAT OUT, SAYING THOSE THINGS?
11           MR. COLIN:  OBJECTION.  RELEVANCE AT THIS STAGE.
12           THE COURT:  SUSTAINED.
13   Q   BY MR. DAVID EDWARDS:  DID YOU OBTAIN SEARCH WARRANTS
14   TO ENTER RDI OFFICES AND MY HOME ON MARCH 25TH?
15   A   I HAD NO SEARCH WARRANT.
16   Q   WOULD YOU LOOK AGAIN AT PARAGRAPH 5?
17   A   I SEE IT.
18   Q   THIS DOCUMENT THAT YOU PUT UNDER OATH, DOES THAT
19   DOCUMENT SAY THAT YOU DID OBTAIN SEARCH WARRANTS?
20   A   IT DOES.
21   Q   SO YOU LIED ON THIS DOCUMENT?
22   A   NO.  LET'S READ THE PAGE.  I OBTAINED THROUGH SEARCH
23   WARRANTS AND SUBPOENAS, DOESN'T SAY THAT I HAD SEARCH
24   WARRANTS ISSUED.  IT SAYS I OBTAINED THROUGH SEARCH WARRANTS
25   AND SUBPOENAS.
26           OTHERS MAY HAVE OBTAINED DOCUMENTS THROUGH SEARCH
27   WARRANTS.  THOSE DOCUMENTS MAY HAVE FOUND THEIR WAY TO MY
28   OFFICES FOR WHICH I MAINTAIN CUSTODY AND CONTROL OF.  SO
```

**16**

1

2          TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

3                      SIXTH APPELLATE DISTRICT

4                            ---oOo---

5    PEOPLE OF THE STATE OF CALIFORNIA    )
                                          ) COURT OF APPEAL
6           PLAINTIFF,                     ) CASE NO.
                                          ) H028746
7           VS.                            )
                                          )
8    JAMES EUGENE EDWARDS AND              )
     DAVID EUGENE EDWARDS,                 )
9                                          )
            DEFENDANTS.                    ) SUPERIOR CASE
10   _____) NO.: 210807

11                            ---oOo---

12

13                 REPORTER'S TRANSCRIPT ON APPEAL

14            FROM THE JUDGMENT OF THE SUPERIOR COURT

15              OF THE STATE OF CALIFORNIA, IN AND FOR

16                  THE COUNTY OF SANTA CLARA

17               HONORABLE RENE NAVARRO, JUDGE

18             NOVEMBER 16, 2004, NOVEMBER 17, 2004

19          DECEMBER 20, 2004  AND FEBRUARY 17, 2005

20             VOLUME SEVENTEEN (PAGES 2700 - 2901)

21

22   APPEARANCES:

23   FOR THE RESPONDENT:    OFFICE OF THE ATTORNEY GENERAL
                            455 GOLDEN GATE AVENUE, ROOM 11000
24                          SAN FRANCISCO, CALIFORNIA  94102

25   FOR THE APPELLANT:     SIXTH DISTRICT APPELLATE PROGRAM
                            100 NORTH WINCHESTER BLVD., SUITE 310
26                          SANTA CLARA, CALIFORNIA  95050

27   REPORTED BY:           JACQUELINE V. BARRON, CSR #8049

28                            ---oOo---

1

2              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

3                 IN AND FOR THE COUNTY OF SANTA CLARA

4                    BEFORE HONORABLE RENE NAVARRO

5                          DEPARTMENT NO. 39

6

7   PEOPLE OF THE STATE OF CALIFORNIA    )
                                         ) COURT OF APPEAL
8          PLAINTIFF,                     ) CASE NO.
                                         ) H028746
9          VS.                            )
                                         )
10  JAMES EUGENE EDWARDS AND              )
    DAVID EUGENE EDWARDS,                 )
11                                        )
           DEFENDANTS.                    ) SUPERIOR CASE
12  _____) NO.: 210807

13                          ---0O0---

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS HELD ON

15              NOVEMBER 16, 2004, NOVEMBER 17, 2004

16            DECEMBER 20, 2004  AND FEBRUARY 17, 2005

17                          ---0O0---

18

19  A P P E A R A N C E S:

20
    FOR THE PLAINTIFF:          PAUL COLIN,
21                              DEPUTY DISTRICT ATTORNEY

22  FOR DEFENDANT JAMES EDWARDS: IN PROPIA PERSONA

23  FOR DEFENDANT DAVID EDWARDS: IN PROPIA PERSONA

24  OFFICIAL COURT REPORTER:    JACQUELINE VILLEGAS BARRON
                                CERTIFICATE NUMBER 8049
25

26

27

28
                                                            2701

1      MR. DAVID EDWARDS:  I WAS JUST GOING TO FINISH
2  WITH THE STATEMENT THAT SINCE THE DEFENDANTS HAVE PROVEN
3  THEY HAD NO KNOWLEDGE OF THE RULE OR ORDER, THIS COURT
4  CANNOT IMPOSE SENTENCE.

5      THE COURT:  OKAY.

6      MR. DAVID EDWARDS:  LASTLY WE OFFER AS PROOF A
7  DEPOSITION DONE BY MR. WARFIELD AND HIS ATTORNEYS ON
8  DECEMBER 15, 2004, THAT CLEARLY SHOWS THAT MR. WARFIELD LIED
9  AT TRIAL.

10      THIS COURT ALLOWED MR. WARFIELD'S TESTIMONY EVEN
11 THOUGH WE SHOW HE HAD ALREADY COMMITTED PERJURY IN THE
12 FEDERAL CIVIL CASE.  AND WE SHOWED HE HAS A TWO AND A HALF
13 MILLION DOLLAR INTEREST IN SEEING US CONVICTED.

14      THE PROSECUTION NEVER PROVED WE VIOLATED 25401.
15 THIS CASE WAS BASED INSTEAD, ON A CLAIM OF RUNNING A FRAUD
16 WITH NO REAL BUSINESS ACCOUNTS OR INVESTMENTS.  THIS THEORY
17 CAME FROM ONE SOURCE, MR. WARFIELD.

18      HE BURGLARIZED MY HOME AND OFFICE UNDER THE COLOR
19 OF LAW, MADE NO LIST OF WHAT WAS TAKEN.

20      THE DEPOSITION WHICH TOOK PLACE SHORTLY AFTER
21 TRIAL, SHOWS THAT MR. WARFIELD FOUND INVESTMENT CONTRACTS
22 AND NAMES OF BUSINESS CONTACTS FROM THAT ILLEGAL RAID.  YET
23 HE BOLDLY STATED TO THE JURY AT TRIAL HE FOUND NOTHING.  HE
24 LIED.  HE COMMITTED PERJURY.

25      HE IN FACT QUESTIONED MY EMPLOYEE ABOUT TWO
26 SEPARATE DEALS, ONE INVOLVING 200 MILLION DOLLARS AND
27 ANOTHER INVOLVING 1.5 BILLION, YET PURPOSEFULLY WITHHELD
28 THIS INFORMATION FROM THE JURY.

2847

1          JUST BECAUSE RDI HAS HAD PROBLEMS FULFILLING ITS

2     CONTRACTS DOES NOT MEAN CRIMINAL ACTIVITY.  MY FATHER AND I

3     HAVE NEVER LIED TO OUR CLIENTS, NOR WAS IT PROVEN AT TRIAL

4     THAT WE LIED.  THE ONLY PROOF OF LIES WAS, IN FACT, THAT

5     INVESTIGATOR MR. ROLEN ADMITTED TO COMMITTING PERJURY ON THE

6     ORIGINAL COMPLAINT AND MR. WARFIELD WHO HAS NOW PERJURED

7     HIMSELF TWICE.

8          THE LAW AND THE TRUTH IS BEFORE THIS COURT.  TO

9     NOT ARREST JUDGMENT ACCORDING TO THE FACTS AND LAW BEFORE

10    THIS COURT WOULD BE ACTING IN BAD FAITH AND EXTREME

11    PREJUDICE, NOT MERE DISCRETION.  SO I ASK THE COURT TO

12    ARREST THE JUDGMENT AND RELEASE THE PRISONERS.

13          THE COURT:  THANK YOU.

14          MR. DAVID EDWARDS:  OR AT THE LEAST, NEW TRIAL.

15          THE COURT:  THANK YOU.

16          MR. JAMES EDWARDS, DO YOU JOIN IN THE COMMENTS OF

17    MR. DAVID EDWARDS?

18          MR. JAMES EDWARDS:  YES, I DO.

19          THE COURT:  DO YOU HAVE ANY ADDITIONAL COMMENTS

20    THAT YOU WISH TO STATE?

21          MR. JAMES EDWARDS:  I MIGHT BUT I'M NOT, NO.  THE

22    ANSWER IS NO.

23          THE COURT:  THANK YOU.

24          MR. COLIN.

25          MR. COLIN:  WELL, YOUR HONOR, I HAVE NOT SEEN THIS

26    LATE BREAKING FILING TO YOU, AGAIN REGARDING YET ANOTHER

27    RIDICULOUS CHARGE OF PERJURY AGAINST MR. WARFIELD, BUT

28    YOUR HONOR, I DON'T NEED TO SEE IT.  THE COURT HAS ALREADY

1   STATED QUITE CLEARLY THAT THESE ARE SIMPLY RENEWALS OF

2   NUMEROUS GROUNDS.

3          MR. DAVID EDWARDS:  YOUR HONOR, I OBJECT TO HIM --

4   IT WAS SERVED ON HIM.  HE PUT NO RESPONSE IN WRITTEN

5   RESPONSE.  HE COULD HAVE RESPONDED.  IT WAS SERVED ON HIM ON

6   MONDAY.  HE HAS NO STANDING TO MAKE AN ORAL ARGUMENT.

7          THE COURT:  THANK YOU.

8          HE DOES HAVE STANDING TO MAKE ORAL ARGUMENT.  AND

9   I WOULD ASK THAT YOU HOLD YOUR COMMENTS, AS MR. COLIN HELD

10  HIS COMMENTS UNTIL YOU COMPLETED YOUR PRESENTATION AND I'LL

11  GIVE YOU THE OPPORTUNITY TO BE HEARD.

12         MR. DAVID EDWARDS:  THANK YOU.

13         THE COURT:  SO, MR. COLIN, YOU MAY CONTINUE.

14         MR. COLIN:  WELL, YOUR HONOR, I MISUNDERSTOOD WHAT

15  THE COURT WAS DESCRIBING.  I DID GET A SET OF PAPERS FROM

16  MR. EDWARDS AND I CAN SEE THAT IT HAS SOME REFERENCE TO THE

17  APPARENT ARGUMENT HE WAS MAKING.  IT DOESN'T CHANGE THE

18  MERITS OF THE ARGUMENT, WHICH IS, AS THE COURT STATED, THESE

19  ARE JUST RENEWALS OF ARGUMENTS THAT HAVE ABSOLUTELY NO BASIS

20  IN LAW.  THEY HAVE NO BASIS IN FACT.

21         AND THE COURT WAS BEING KIND TO THE EDWARDSES, IN

22  FACT THESE MOTIONS HAVE BEEN BROUGHT AND DENIED AT LEAST

23  FOUR OR FIVE TIMES, RATHER THAN THE TWO THE COURT HAD

24  SUGGESTED.

25         THERE'S NO NEW EVIDENCE.  THERE'S NO BASIS FOR A

26  NEW TRIAL.  I RESPECT THE COURT TREATING THIS AS A BASIS FOR

27  A NEW TRIAL, I THINK IT IS INDEED THE WAY THE COURT NEEDS TO

28  TREAT IT.  SO I WOULD ASK THAT IT BE DENIED.

```
 1              THE DEFENDANTS ARE NOT RAISING ANY LEGITIMATE
 2   BASIS.  THEY'RE REPEATING WHAT'S BEEN DONE BEFORE.  AND THE
 3   COURT HAS GIVEN THEM CONSIDERABLE THOUGHT AND DELIBERATION
 4   AND REJECTED EVERY ONE OF THEM FOR REASONS I'VE PROVIDED IN
 5   WRITING.
 6              THE COURT:  ALL RIGHT.  THANK YOU.
 7              MR. EDWARDS, DAVID EDWARDS, ANY ADDITIONAL
 8   COMMENTS THAT YOU WANT TO MAKE AT THIS POINT AS TO THESE
 9   ISSUES?
10              MR. DAVID EDWARDS:  WELL, AS TO MR. COLIN'S
11   COMMENTS, IT'S EASY TO JUST SAY SOMETHING WITH NO PROOF,
12   THERE IS NO EVIDENCE.  YOU HAVE IT BEFORE YOU, YOUR HONOR.
13              I DON'T HAVE COPIES OF THE TRANSCRIPTS FROM THE
14   TRIAL, OBVIOUSLY, THOSE HAVEN'T BEEN PRODUCED YET, BUT YOU
15   CAN HAVE JACKIE CHECK THE TRANSCRIPT AND SEE THAT HE, IN
16   FACT, DID LIE.  AND PERJURY OF THAT MAGNITUDE IS DEFINITELY
17   GROUNDS FOR A NEW TRIAL OR REVERSAL.
18              THE COURT:  THE JURY HEARD ALL OF THE EVIDENCE AND
19   HEARD THE SAME TESTIMONY THAT YOU'RE ALLUDING TO AND THEY
20   RETURNED THEIR VERDICTS.
21              AND THE JURY IS, BASICALLY, THE ULTIMATE FINDER OF
22   CREDIBILITY OF WITNESSES.  AND THEY TAKE INTO ACCOUNT, AS
23   YOU WELL KNOW, THE INSTRUCTIONS DEALING WITH THE FACTORS
24   THAT THEY CAN TAKE INTO ACCOUNT IN CONSIDERING THE
25   CREDIBILITY OF A WITNESS.
26              AND STATEMENTS THAT YOU'VE ALLUDED TO WERE
27   CONSIDERED BY THE JURY, THE INFERENCE IS THERE AND THEY
28   RENDERED A VERDICT.  WHAT THEY DON'T HAVE IS THIS NEW
```

```
1   MATERIAL THEY'VE PRESENTED TO THE COURT THAT YOU FILED ON
2   FEBRUARY 13TH, BECAUSE THEY WEREN'T PRIVY TO IT.
3           MR. DAVID EDWARDS:  YES, THAT'S CORRECT, YOUR
4   HONOR.  MR. WARFIELD WAS AND MR. WARFIELD WAS ASKED ABOUT IT
5   AND LIED.
6           THE COURT:  DURING THE COURSE OF THE TRIAL?
7           MR. DAVID EDWARDS:  DURING THE COURSE OF THE TRIAL
8   I DIDN'T HAVE ACCESS TO MY RECORDS, WARFIELD HAS THEM ALL.
9           THE COURT:  I UNDERSTAND.  ALL RIGHT.  ANYTHING
10  FURTHER, GENTLEMEN, ON THESE POINTS?
11          MR. COLIN:  NOT FOR THE PEOPLE.
12          THE COURT:  MR. EDWARDS?
13          MR. DAVID EDWARDS:  WHAT'S THAT?
14          THE COURT:  NOTHING FURTHER ON THIS POINT?
15          MR. DAVID EDWARDS:  NOT ON THIS POINT?
16          THE COURT:  THANK YOU.
17          THE COURT TAKING INTO CONSIDERATION THEN THE ORAL
18  ARGUMENTS OF COUNSEL, THE POINTS AND AUTHORITIES THAT HAVE
19  BEEN SUBMITTED BY MR. EDWARDS IN THIS MATTER, WITH RESPECT
20  TO THE MOTION TO ARREST JUDGMENT AND THE MOTION WHICH THE
21  COURT IS TREATING AS A MOTION FOR NEW TRIAL, BASED ON
22  ALLEGED NEW EVIDENCE OF PERJURY OF PROSECUTION KEY EXPERT
23  WITNESSES ARE HEREBY DENIED.
24          MR. DAVID EDWARDS:  YOUR HONOR, COULD I PLEASE
25  HAVE A FINDING OF FACT, CONCLUSION OF LAW WHY YOU'RE DENYING
26  THAT?
27          THE COURT:  FINDINGS OF FACT AND CONCLUSIONS OF
28  LAW ARE ONLY APPLICABLE IN CIVIL CASES.
```

**17**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
OFFICE OF THE CLERK

1100 Commerce Street, Room 1452
Dallas, Texas 75242-1003

## Certificate of Search

I, KAREN MITCHELL, Clerk of the United States District Court for the Northern District
of Texas, do hereby certify that after a diligent search of the records of case number 3:02cv605-O;
Securities and Exchange Commission v. Resource Development International LLC, et al., find no
original Receiver Bond 61BSBBL1834 on file.

Witness my official signature and the seal of said court, at Dallas, Texas in said district on
this day, February 1, 2008.

Karen Mitchell
Clerk of Court

By:    Leigh Lyon
Leigh Lyon
Deputy Clerk

Fee: $26.00; receipt: DS018871

18

**ORIGINAL**



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

**MAR 25 2002**

CLERK, U.S. DISTRICT COURT
By
Deputy

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

vs.

RESOURCE DEVELOPMENT INTERNATIONAL, LLC,
DAVID EDWARDS, JAMES EDWARDS, JADE
ASSET MANAGEMENT, LTD., SOUND FINANCIAL
SERVICES, INC., INTERCOASTAL GROUP, LLC,
INTERCOASTAL GROUP II, LLC, KEVIN LYNDS,
GERALD J. STOCK, BLACKWOLF HOLDINGS, LLC,
and WILLIAM WHELAN

Defendants,

and

PACIFIC INTERNATIONAL LIMITED
PARTNERSHIP, INTERNATIONAL EDUCATION
RESEARCH CORPORATION, GALAXY ASSET
MANAGEMENT, INC., and DAVID CLUFF, Individually
and d/b/a RIVERA TRUST 410

Defendant Solely for Purposes
of Equitable Relief.

Civil Action No.

**3 = 0 2 1 · V 6 0 5 H**

## ORDER APPOINTING TEMPORARY RECEIVER

This matter came on before me, the undersigned United States District Judge,

this **25** day of March 2002, on the application of Plaintiff Securities and Exchange

Commission ("Commission") for the appointment of a Temporary Receiver for

Defendants, David Edwards ("D. Edwards"), James Edwards ("J. Edwards"), Resource

Development International, LLC ("RDI"), Jade Asset Management, Ltd ("Jade"), Sound

Financial Services ("SFSI"), Intercoastal Group, LLC ("Intercoastal I") and Intercoastal

assure his conscientious performance of the duties and responsibilities imposed by this Order. The Receiver is hereby authorized to take and have possession of the Receivership Assets and Receivership Records. Until further order of this Court, the Receiver shall have complete and exclusive control, possession, and custody of all Receivership Assets and Receivership Records.

3.   All persons, including Defendants and Relief Defendant and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, and specifically including any bank or other financial or depository institution holding accounts for or on behalf of Defendants and Relief Defendant, shall promptly deliver to the Receiver all Receivership Assets in the possession or under the control of any one or more of them and shall promptly surrender all books and records of any kind pertaining or belonging to Defendants and Relief Defendant ("Receivership Records").

4.   The Receiver is authorized, without breaching the peace and if necessary with the assistance of local peace officers or US Marshals, to enter and secure any premises, wherever located or situated, in order to take possession, custody, or control of, or to identify the location or existence of Receivership Assets or Receivership Records, including without limitation, the following premises:

a.   Resource Development International, LLC (business)
     Sound Financial Services, Inc.

Receivership Assets and from filing or prosecuting any actions or proceedings which involve the Receiver or which affect the Receivership Assets, specifically including any proceeding initiated pursuant to the United States Bankruptcy Code, except with the prior permission of this Court. Any actions so authorized to determine disputes relating to Receivership Assets shall be filed in this Court.

6.     The Receiver is hereby authorized to make appropriate notification to the United States Postal Service to forward delivery of any mail addressed to Defendants Edwards, RDI, Jade, SFSI, Intercoastal I, Intercoastal II, Lynds, Stock, Blackwolf and Whelan, or Relief Defendants PILP, IERC, Galaxy and Cluff, any company or entity under the direction or control of any of these Defendants and Relief Defendant, to any Post Office box or other mail depository, to himself.   Further, the Receiver is hereby authorized to open and inspect all such mail, to determine the location or identity of assets or the existence and amount of claims.

7.     The Receiver is hereby authorized to make such ordinary and necessary payments, distributions, and disbursements as he deems advisable or proper for the marshaling, maintenance or preservation of the Receivership Assets. From and after the date of entry of this Order, the Receiver shall have the authority to conduct the business operations of Defendants and Relief Defendants and the entities they control, including the collection of rents or continuation and termination or any employment arrangement and the terms thereof. The Receiver shall have the authority

9. This Order does not prohibit the prosecution of any civil action or other proceeding against Defendants or Relief Defendants, including non-dischargeability proceedings and enforcement of any judgments obtained in such actions or proceedings, or effect the release of any claim asserted therein. However, to the extent judgment creditors or other claimants seek to prosecute an action or proceeding against the Defendants or Relief Defendants, or to satisfy a judgment or claim from Receivership Assets, they will do so only with the prior permission of this Court or the United States Bankruptcy Court, and in accordance with an order of priority established by a plan of liquidation and distribution, or any automatic or other stay provided under the Bankruptcy Code.

10. The Receiver is hereby authorized to employ such employees, accountants, and attorneys as are necessary and proper for the collection, preservation, maintenance and operation of the Receivership Assets.

11. The Receiver is hereby authorized to receive and collect any and all sums of money due or owning to Defendants Edwards, RDI, Jade, SFSI, Intercoastal I, Intercoastal II, Lynds, Stock, Blackwolf and Whelan, and Relief Defendant PILP, IERC, Galaxy and Cluff, whether the same are now due or shall hereafter become due and payable, and is authorized to incur such expenses and make such disbursements as are necessary and proper for the collection, preservation, maintenance and operation of the Receivership Assets.

*Re: SEC v. Resource Development International, et al.*
Order to Appoint Receiver
Page 7

provide to the Commission upon request any documents under the control of the Receiver.

16.    The Receiver shall seek and obtain the approval of this Court prior to disbursement of professional fees and expenses to himself or counsel, by presentation of a written application therefor and after consultation with the Commission. All costs incurred by the Receiver shall be paid from the Receivership Assets.

II.

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this action for all purposes. The Receiver is hereby authorized, empowered and directed to apply to this Court, with notice to the Commission and Defendants Edwards, RDI, Jade, Sound, Intercoastal I, Intercoastal II, Lynds, Stock, Blackwolf and Whelan, and Relief Defendants PILP, IERC, Galaxy and Cluff, for issuance of such other orders as may be necessary and appropriate in order to carry out the mandate of this Court.

III.

**IT IS FURTHER ORDERED** that this Order will remain in effect until modified by further order of this Court.

Dated this __25__ day of ____MARCH____, 2002.

_____
UNITED STATES DISTRICT JUDGE

*Re: SEC v. Resource Development International, et al.*
Order to Appoint Receiver
Page 9

**19**

Case 3:02-cv-00605     Document 22     Filed 04/03/2002     Page 1 of 1

U.S. Department of Justice
United States Marshals Service

**PROCESS RECEIPT AND RETURN**
See Instructions for "Service of Process by the U.S. Marshal"
on the reverse of this form.

| PLAINTIFF | COURT CASE NUMBER |
|---|---|
| Securities and Exchange Commission | 3-02CV-0605R |

| DEFENDANT | TYPE OF PROCESS |
|---|---|
| James Edwards | Show Cause Order |

| SERVE | NAME OF INDIVIDUAL, COMPANY, CORPORATION, ETC., TO SERVE OR DESCRIPTION OF PROPERTY TO SEIZE OR CONDEMN |
|---|---|
| | James Edwards |
| | ADDRESS (Street or RFD, Apartment No., City, State and ZIP Code) |
| AT | 1538 N. Juniper Tacoma, Wash 98406 |

SEND NOTICE OF SERVICE COPY TO REQUESTER AT NAME AND ADDRESS BELOW:

U.S. Securities and Exchange Com.
Jeffrey B. Norris
801 Cherry St. Unit #18
Fort Worth, TX 76102-6882

| Number of process to be served with this Form - 285 |
|---|
| Number of parties to be served in this case |
| Check for service on U.S.A. |

SPECIAL INSTRUCTIONS OR OTHER INFORMATION THAT WILL ASSIST IN EXPEDITING SERVICE (*Include Business and Alternate Addresses, All Telephone Numbers, and Estimated Times Available For Service*):
Fold                                                                                                    Fold

| Signature of Attorney or other Originator requesting service on behalf of: | ☒ PLAINTIFF<br>☐ DEFENDANT | TELEPHONE NUMBER<br>817-978-6452 | DATE<br>3/26/02 |
|---|---|---|---|

**SPACE BELOW FOR USE OF U.S. MARSHAL ONLY — DO NOT WRITE BELOW THIS LINE**

| I acknowledge receipt for the total number of process indicated.<br>(*Sign only first USM 285 if more than one USM 285 is submitted*) | Total Process | District of Origin<br>No. | District to Serve<br>No. 86 | Signature of Authorized USMS Deputy or Clerk | Date<br>3/26/02 |
|---|---|---|---|---|---|

I hereby certify and return that I ☒ have personally served, ☐ have legal evidence of service, ☐ have executed as shown in "Remarks", the process described on the individual, company, corporation, etc., at the address shown above or on the individual, company, corporation, etc., shown at the address inserted below.

☐ I hereby certify and return that I am unable to locate the individual, company, corporation, etc., named above (*See remarks below*)

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**FILED**

APR - 3 2002

CLERK, U.S. DISTRICT COURT
By _____ Deputy

| Name and title of individual served (*if not shown above*) | | ☐ A person of suitable age and discretion then residing in the defendant's usual place of abode. |
|---|---|---|
| Address (*complete only if different than shown above*) | | Date of Service  Time  ☒ am<br>3/27/02  07/5  pm |
| | | Signature of U.S. Marshal or Deputy |

| Service Fee<br>45.00 | Total Mileage Charges<br>(*including endeavors*) | Forwarding Fee | Total Charges<br>45.00 | Advance Deposits | Amount owed to U.S. Marshal or | Amount of Refund |
|---|---|---|---|---|---|---|

REMARKS: mileage claimed on 1 original 285

PRIOR EDITIONS
MAY BE USED

**1. CLERK OF THE COURT**

FORM USM-285 (Rev. 12/15/80)

**20**

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

HONORABLE KEVIN MURPHY, JUDGE

DEPARTMENT 31

---oOo---

| THE PEOPLE OF THE STATE OF CALIFORNIA, | ) |
| Plaintiff, | ) |
| v. | ) Case No. CC210807 |
| DAVID EDWARDS and JAMES EDWARDS, Defendants. | ) |

Copy

REPORTER'S TRANSCRIPT OF PROCEEDINGS

HELD ON MAY 19, 2004

A P P E A R A N C E S:

For the People:                PAUL COLIN
                               Deputy District Attorney


Reported by:                   HELEN HOLT-SMITH, C.S.R.
                               California License No. 11927

```
 1    SAN JOSE, CALIFORNIA                          MAY 19, 2004
 2                       P R O C E E D I N G S
 3                            ---o0o---
 4
 5            THE COURT:  Line 22, A and B, People versus David
 6    Edwards, James Edwards.
 7            MR. COLIN:  Paul Colin appearing for the People,
 8    Your Honor.  I see James Edwards.  I think David --
 9            THE COURT:  Apparently both defendants are present.
10    The case appears on calendar.
11            MR. COLIN:  Last -- a couple of weeks ago when
12    James -- sorry, when David Edwards first appeared, it was on
13    the arraignment calendar Monday, May 10th.  His case was set
14    here for identification of counsel.  He indicated a desire to
15    hire his own attorney.
16            James Edwards is here making his first appearance
17    on this indictment.
18            THE COURT:  All right.  And as pertains to
19    Mr. James Edwards, is he representing himself?
20            MR. COLIN:  I don't know.
21            THE COURT:  All right.  Why don't I begin with
22    Mr. James Edwards.
23            Are you represented by counsel on this case?
24            THE DEFENDANT:  Not right now, sir.
25            THE COURT:  Did you wish me to refer you to the
26    Public Defender's Office for legal representation?
27            THE DEFENDANT:  No.
28            THE COURT:  What would you like me to do?
```

1          **THE DEFENDANT:**  I would like to find my own.

2          **THE COURT:**  All right.  Have you been actively

3    seeking counsel?  Have you been looking?

4          **THE DEFENDANT:**  I am.  I started yesterday, since I

5    been in court a couple days ago.  A judge gave me two weeks.

6          **THE COURT:**  I will give you more time to secure

7    counsel.

8          And then as pertains to David Edwards, what is your

9    representational situation?

10          **THE DEFENDANT:**  I've got a dozen letters out to

11    attorneys.  I'm doing all the diligence I can to find an

12    attorney; so far I haven't.

13          **THE COURT:**  So you need some more time to do

14    exactly that.

15          **MR. COLIN:**  I will just let the Court know, of

16    course, the defendants are requesting time to seek their own

17    counsel.  I understand the Court's obligations.

18          There are two other defendants in this case:

19    Michael Keller, who is represented by the Conflicts Office --

20    in fact, Mr. Avila himself, as well as Pat Kelly,

21    representing Mr. Keller.  His case is set for trial on

22    June 7th, as is his codefendant, William Whelan, W-h-e-l-a-n.

23    He is represented by Molly O'Neal of the Public Defender's

24    Office, and he's also set for trial on June 7th.

25          If memory serves me correctly, I believe we set

26    David Edwards' trial for June 7th.  It is, of course, my

27    desire -- I think the Court will probably recall this case

28    from other motions involving those defendants.  It is the

*Helen Holt-Smith, C.S.R., License No. 11927*

4

```
 1   People's desire to try his case together.
 2          So whatever the Court needs to do today for the two
 3   men before it, respectfully, I wonder if we should just come
 4   back in a week.  Ms. O'Neal is away all this week -- with all
 5   four defendants so that some thought can be given to whether
 6   the June 7th date makes sense any longer.
 7          THE COURT:  I intend to continue the matter and
 8   monitor it on a weekly basis as you two gentlemen seek
 9   counsel.
10          The codefendants have waived time, as I recall.
11          MR. COLIN:  Yes, they both have.
12          THE COURT:  And you gentlemen wish not to waive
13   time; is that correct?
14          THE DEFENDANT:  Right.
15          THE DEFENDANT:  I don't want to waive it.
16          THE COURT:  Okay.  And that's fine.  I think you
17   can appreciate if you do locate an attorney -- I know a
18   little about this case, enough to know it's complex -- and I
19   imagine most attorneys that you might hire are going to need
20   time, so please bear that in mind.
21          I'll continue the case for identification of
22   counsel.  As I mentioned, I will monitor it on a weekly
23   basis.
24          The next court date will be May 26th at 1:30 to see
25   what progress has occurred by then.
26          MR. COLIN:  Your Honor, is the Court going to bring
27   the other two defendants over?
28          THE COURT:  No.
```

1      **MR. COLIN:**  Your Honor, may I ask that the Court do

2   so, so that if there's going to be any change to the June 7th

3   date, we're all here together?

4      **THE COURT:**  I'm not going to order them, the other

5   defendants, into court on an identification of counsel issue.

6   Obviously, once we finalize the issue of representation, I'll

7   be happy to meet with all attorneys to address trial dates

8   and other issues, as well.

9      **MR. COLIN:**  If the Court will forgive me, I'm not

10  clear whether, in fact, David Edwards was arraigned on May

11  10th and whether the Court intends to arraign James Edwards

12  today.  I know that David Edwards appeared.

13     **THE COURT:**  I believe they have not been arraigned,

14  if the calendar is accurate.

15     Have you received copies of the charging documents,

16  the indictments?  You may well have.  I see you're holding

17  something.  Does that appear to be the indictment?  So, you

18  have received a copy of the indictment.

19     I'm assuming at this point your pleas are not

20  guilty, that I can render not guilty pleas without prejudice.

21     **THE DEFENDANT:**  I'm not prepared to enter.

22     **THE COURT:**  All right.  I will enter not guilty

23  pleas for you without prejudice to any motions that you or

24  your attorneys may have with reference to any charges.  That

25  way you're not prejudiced --

26     **THE DEFENDANT:**  I have to object to entering --

27     **THE COURT:**  All right.  You can object all you

28  want.  That's noted.  But again, if you understand what it

*Helen Holt-Smith, C.S.R., License No. 11927*

```
 1    means to indicate "without prejudice," it means this is
 2    without prejudice for any motion that you or your attorney
 3    wishes to bring with reference to the charges.
 4            MR. COLIN:  If I may, Your Honor, just for the
 5    benefit of your reporter because of the positioning, that was
 6    David Edwards speaking to the Court.
 7            THE COURT:  Thank you.  She appreciates that.
 8            All right.  Thank you.
 9            MR. COLIN:  As to James Edwards, his arraignment,
10    Your Honor?
11            THE COURT:  Enter not guilty pleas on behalf of the
12    defendants without prejudice.
13            THE DEFENDANT:  The other judge gave me a June 1st
14    date.  Now that's changed to May 28.
15            MR. COLIN:  Your Honor, he's referring to the
16    Complaint.  The defendants were originally charged in the
17    Complaint, extradited on that Complaint.  They're now here on
18    a superseding indictment.  I think we need to keep that
19    June 1st date.
20            THE COURT:  I'm not going to touch the June 1st.
21            MR. COLIN:  I'd be willing to dismiss that
22    Complaint in lieu of --
23            THE COURT:  I understand.
24            MR. COLIN:  Your Honor, can we address the costs
25    involved in James Edwards' transportation from Texas to here?
26    We're asking for costs in the amount of $1,310.
27            THE COURT:  So ordered.
28            MR. COLIN:  Thank you.
```

Helen Holt-Smith, C.S.R., License No. 11927

```
 1              THE COURT:   Thank you.   See you next week.
 2                              (Whereupon, the proceedings were
 3                          concluded.)
 4                          ---oOo---
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

*Helen Holt-Smith, C.S.R., License No. 11927*

8

```
1   COUNTY OF SANTA CLARA          )
                                    )        ss.
2   STATE OF CALIFORNIA            )

3

4                    REPORTER'S CERTIFICATE

5

6        I, HELEN HOLT-SMITH, a Certified Shorthand Reporter

7   for the State of California, do hereby certify that the

8   transcription of my stenographic notes in the matter of

9        People v. David Edwards, James Edwards

10  is a full, true, and correct transcription of the testimony

11  and proceedings had in the within-entitled matter to the best

12  of my ability.

13       I further certify that I have complied with CCP

14  Section 237(a)(2) in that all personal juror(s)' identifying

15  information has been redacted, if applicable.

16       Dated at Newark, California, this 14th day of June,

17  2004.

18

19                              HELEN HOLT-SMITH
                                Certified Shorthand Reporter
20                              California License #11927

21

22                              ---o0o---

23                              ATTENTION:

24  California Government Code Section 69954(d) states:

25       "Any court, party, or person who has purchased a
    transcript may, without paying a further fee to the reporter,
26  reproduce a copy or portion thereof as an exhibit pursuant to
    court order or rule, or for internal use, but shall not
27  otherwise provide or sell a copy or copies to any other party
    or person."

28
```

**21**

1  WILLIAM KENEFICK (59588)
   Acting Commissioner of Corporations
2  G. W. McDONALD  (55907)
   Assistant Commissioner
3  MARK BRECKLER (81577)
   Supervising Counsel
4  W. RICHARD SINTEK (134894)
   Corporations Counsel
5  R. MICHAEL LLEWELLYN (186154)
   Corporations Counsel
6  980 Ninth Street, 5th Floor
   Sacramento, CA  95814
7  Telephone:  (916) 322-6998
   Attorneys for Commissioner
8
              SUPERIOR COURT OF THE STATE OF CALIFORNIA
9
                  FOR THE COUNTY OF SACRAMENTO
10
                                    Case No.    00AS00776
11 THE PEOPLE OF THE STATE OF
   CALIFORNIA, by and through the          COMPLAINT FOR INJUNCTION AND
12 COMMISSIONER OF CORPORATIONS,           ANCILLARY RELIEF (VIOLATION OF
                                           CORPORATE SECURITIES LAW)
13          .
                 Plaintiff,                CORPORATIONS CODE §25110
14                                         (Qualification Requirement)

15               v.                        CORPORATIONS CODE §25401 (Disclosure
                                           Requirement)
16 HAPJACK MARKETING, INC.;
   INNOVATIVE BUSINESS SOLUTIONS,
17 LLC; HOTEL CONNECT, LLC; WORLD
   CASH NETWORK, LLC; BILLY RAY
18 SMITH; CLAUDE D. SMITH; MARK
19 L. EHRLICH; BRIAN T. GRIGGS; GARY M.
   APPELBLATT; DAVID D. FARRELL;
20 HAROLD P. COFFIN; AND DOES 1 through
   100,
21
22              Defendants.
23
24       THE PEOPLE OF THE STATE OF CALIFORNIA, by and through William Kenefick,

25 California Corporations Acting Commissioner and head of the California Department of

26 Corporations ("DOC"), allege as follows on information and belief:

27 ///

28 ///

                            -1-
                                                        149 B

JURISDICTION AND VENUE

1.    The California Corporations Commissioner ("Commissioner") brings this action to enjoin the defendants from violating the Corporate Securities Law of 1968 (California Corporations Code section 25000, et seq.), ("CSL") and to request necessary ancillary relief.

2.    The Commissioner brings this action pursuant to CSL section 25530 and Government Code section 11180 in his capacity as head of the DOC.

3.    Defendants have transacted and continue to transact business within Sacramento County and other counties of California. The violations of law described herein have occurred and will continue to occur within Sacramento County and elsewhere within California unless enjoined.

DEFENDANTS

4.    Hapjack Marketing, Inc.("Hapjack") is a California corporation, incorporated on or about August 1, 1994. Its principal place of business is 3649 West Beechwood, Fresno, California 93711. At all relevant times herein, Hapjack is controlled by Billy Ray Smith, Claude Smith, Brian Griggs and David Farrell.

5.    Hotel Connect, LLC ("HC") is a California limited liability company organized to conduct business in California on or about March 27, 1997. Its principal place of business is 3649 West Beechwood, Fresno, California 93711.

6.    Innovative Business Solutions, LLC ("IBS") is a California limited liability company organized to do business in California on or about July 19, 1996. Its principal place of business is 3649 West Beechwood, Fresno, California 93711. At all relevant times herein, IBS is controlled by Hapjack.

7.    World Cash Network, LLC ("WCN") was a Nevada limited liability company qualified to do business in Nevada on or about October 23, 1997. The Nevada Secretary of State revoked WCN's limited liability company status on or about July 1, 1999. Its principal place of business at all relevant times herein is 3649 West Beechwood, Fresno, California 93711. At all relevant times herein, WCN is controlled by Hapjack.

-2-

149 C

1    8.    Billy Ray Smith is an individual residing in Fresno County. At various times
2  pertinent hereto, he was an officer, director, member, manager or shareholder for Hapjack, HC,
3  IBS, and WCN. He was at all times pertinent hereto, a controlling person providing substantial
4  assistance to Hapjack, HC, IBS, and WCN.

5    9.    Claude D. Smith, brother of Billy Ray Smith, is an individual residing in Fresno
6  County. At various times pertinent hereto, he was an officer, shareholder, member, manager or
7  director for Hapjack, HC, IBS, and WCN. He was, at all times pertinent hereto, a controlling
8  person providing substantial assistance to Hapjack, HC, IBS and WCN.

9    10.    Mark L. Ehrlich ("Ehrlich") is an individual residing in Fresno County. At
10  various times pertinent hereto, he was an officer, member, manager or director for HC, IBS and
11  WCN. He was, at all times pertinent hereto, a controlling person providing substantial assistance
12  to HC, IBS and WCN.

13    11.    Brian T. Griggs ("Griggs") is an individual residing in Fresno County. At various
14  times, pertinent hereto, he was an officer, shareholder, director, member or manager for Hapjack,
15  HC, IBS, and WCN. He was, at all times pertinent hereto, a controlling person providing
16  substantial assistance to Hapjack, HC, WCN, and IBS.

17    12.    Gary M. Appelblatt ("Appelblatt") is an individual residing in Sacramento County. At all
18  times herein, he acted as trustee in connection with promissory notes issued by HC, WCN and
19  IBS. In connection with the promissory notes, he was at all times pertinent hereto, an offeror
20  within the meaning of CSL sections 25008 and 25017, and he was providing substantial
21  assistance to the co-defendants violating the CSL provisions alleged herein, all within the
22  meaning of CSL section 25403(b).

23    13.    David D. Farrell ("Farrell") is an individual residing in Fresno County. At
24  various times pertinent hereto, he was a director, officer, shareholder, member, or manager for
25  Hapjack, HC, IBS, and WCN. He was, at all times pertinent hereto, a controlling person
26  providing substantial assistance to Hapjack, HC, WCN, and IBS.

27    14.    Harold P. Coffin ("Coffin") is an individual residing in Fresno County. At
28  various times pertinent hereto, he was the Chief Financial Officer, director, officer, shareholder,

-3-

149 D

1    member, or manager for Hapjack, HC, IBS, and WCN.  In 1992 the California Board Of

2    Accountancy revoked Coffin's license to practice as a certified public accountant in California.

3    He was, at all times pertinent hereto, a controlling person providing substantial assistance to

4    Hapjack, HC, WCN, and IBS.

5        15.    Defendants DOES 1 through 100 are persons, corporations, partnerships, limited

6    liability companies, or other entities that have done acts alleged in this Complaint.  Plaintiff

7    alleges that said defendants, Does 1 through 100, at various times mentioned herein, have acted

8    and are continuing to act in concert with the defendants named in paragraphs 4-14; that each of

9    said Does participated in the alleged acts and transactions; and that each is responsible therefore.

10   Their true names and capacities, whether individual, corporate, associate or otherwise, are

11   unknown to plaintiff and are named herein pursuant to section 474 of the Code of Civil

12   Procedure as Does 1 through 100.  Plaintiff hereby asks leave to amend this complaint to show

13   their true names and capacities when they have been determined.

14       16.    Whenever any allegation is made in this Complaint to "Defendants" doing any

15   act, the allegation shall mean the act of each defendant acting individually, jointly and severally

16   and the conspiring of those defendants to so act.  Each defendant herein alleged to have

17   committed any act, did so pursuant to and in furtherance of a common plan, scheme and

18   conspiracy and as an agent for each and every co-defendant.  Each defendant acted in conspiracy

19   to violate the CSL.

20       17.    Whenever any allegation is made in this Complaint of the act of any company

21   defendant, the allegation shall mean acts done or authorized by the officers, directors, managing

22   partners, and the agents and employees of said company defendant while acting within the

23   course and scope of their employment.

24                         **STATEMENT OF FACTS**

25       18.    In sum, for approximately three years Defendants have been fraudulently

26   marketing unqualified securities in the form of short-term promissory notes.  Defendants have

27   obtained an estimated $20 million from the issuance, offer and sale of these unqualified

28   securities to hundreds of investors, many of whom are elderly California residents.

-4-

## IBS SHORT-TERM PROMISSORY NOTES

19.   IBS is a start-up business with no operating history and no financial statements. IBS was organized by Billy Ray Smith, Claude Smith, and Griggs to locate sites for the sale, installation and maintenance of automated teller machines ("ATMs") and cash ticket machines (CTMs").

20.   To raise funds, IBS issues nine-month promissory notes in denominations of $25,000 totaling $5 million. The offer and sale of IBS promissory notes is effected in part through the use of a written offering statement dated December 1, 1996 ("IBS Offering Statement"). The IBS Offering Statement was prepared or authorized by Defendants.

21.   At all times herein, attorney Gary M. Appelblatt of Sacramento, California, acted as trustee for the IBS promissory note issuance pursuant to the IBS Offering Statement. As such, IBS investors and prospective investors correspond with trustee Appelblatt's Sacramento office on a regular basis.

22.   IBS investors are initially promised a 13.35% annual rate of return, paid quarterly. However, principal is seldom repaid at the end of the first nine month promissory note term because investors are repeatedly offered and sold a replacement IBS promissory note for an additional nine month term at the increased annual rate of return of 15%.

23.   From late 1996 to the present, at least $5 million of IBS promissory notes have been offered and sold to at least 50 investors scattered throughout the United States, including California.

24.   Approximately $2 million of IBS notes remain outstanding and unpaid, accruing interest at the promised rate of 13.35% - 15% per annum.

## HC SHORT TERM PROMISSORY NOTES

25.   HC is a start-up business with no operating history and no financial statements. HC was organized by Billy Ray Smith, Claude Smith, and Griggs to locate sites for the sale, installation, and maintenance of telephone service in economy motel rooms.

26.   To raise funds, HC issues nine-month promissory notes in denominations of $25,000 totaling $10 million. The offer and sale of HC promissory notes is effected in part

-5-

1   through the use of written offering statements dated March 31, 1997 ("HC Offering
2   Statements"). The HC Offering Statements were prepared or authorized by Defendants.

3       27.    At all times herein, attorney Gary M. Appelblatt of Sacramento, California, acted
4   as trustee for the HC promissory note issuance pursuant to the HC Offering Statements. As such,
5   HC investors and prospective investors correspond with trustee Appelblatt's Sacramento office
6   on a regular basis.

7       28.    HC investors are initially promised a 13.35% annual rate of return, paid quarterly.
8   However, principal is seldom repaid at the end of the first nine month promissory note term
9   because investors are repeatedly offered and sold a replacement HC promissory note for an
10  additional nine month term at the increased annual rate of return of 15%.

11      29.    From mid-1997 to the present, approximately $10 million of HC promissory notes
12  have been offered and sold to at least 200 investors scattered throughout the United States,
13  including California.

14      30.    Approximately $8 Million of HC notes remain outstanding and unpaid, accruing
15  interest at the promised rate of 13.35% - 15% per annum.

16                        **WCN SHORT-TERM PROMISSORY NOTES**

17      31.    WCN is a start-up business with no operating history and no financial statements.
18  WCN was organized by Billy Ray Smith, Claude Smith, Griggs, and Ehrlich to locate sites for
19  the sale, installation, and maintenance of ATMs and CTMs.

20      32.    To raise funds, WCN issues nine-month promissory notes in denominations of
21  $25,000 totaling $5 million. The offer and sale of WCN promissory notes is effected in part
22  through the use of a written offering statement dated September 1, 1997 ("WCN Offering
23  Statement"). The WCN Offering Statement was prepared or authorized by Defendants.

24      33.    At all times herein, attorney Gary M. Appelblatt of Sacramento, California, acted
25  as trustee for the WCN promissory note issuance pursuant to the WCN Offering Statement. As
26  such, WCN investors and prospective investors correspond with trustee Appelblatt's Sacramento
27  office on a regular basis.

28

149 G

1    34.    WCN investors are initially promised a 13.35% annual rate of return, paid

2  quarterly.  However, principal is seldom repaid at the end of the first nine month promissory note

3  term because investors are repeatedly offered and sold a replacement WCN promissory note for

4  an additional nine month term at the increased annual rate of return of 15%.

5    35.    From late 1997 to the present, at least $5 million of WCN promissory notes have

6  been offered and sold to at least 100 investors scattered throughout the United States, including

7  California.

8    36.    Approximately $4 million of WCN notes remain outstanding and unpaid,

9  accruing interest at the promised rate of 13.35% - 15% per annum.

10                **HAPJACK MARKETS THE PROMISSORY NOTES**

11    37.    Promissory notes issued by IBS, HC, and WCN are offered and sold to the

12  investing public by sales agents organized and paid monetary commissions by Hapjack.

13    38.    Hapjack acts as master agent by locating, recruiting and purportedly training

14  these sales agents to raise funds for IBS, HC, and WCN by offering and selling promissory notes

15  as more fully described in the offering statements.

16    39.    On occasion, Hapjack uses the services of P. Michael Goodman doing business as

17  GAC Marketing to locate, recruit, and train sales agents.  P. Michael Goodman has been

18  permanently barred from working in the securities industry since April of 1996.

19    40.    Many of the sales agents located by Hapjack are life and health insurance

20  salespersons who target the elderly as prospective investors.  Most of these sales agents are not

21  licensed to offer and sell securities such as the promissory notes issued by IBS, HC and WCN.

22

23                        **FIRST CAUSE OF ACTION**

24    **OFFER AND SALE OF UNQUALIFIED SECURITIES IN VIOLATION OF CSL**
                    **SECTION 25110 (ALL DEFENDANTS)**
25

26    41.    Plaintiff incorporates by reference paragraphs 1 through 40 of this Complaint as

27            though fully set forth herein.

28  ///

-7-

149 H

42.     CSL section 25110 provides in relevant part as follows:

It is unlawful for any person to offer or sell in this state any security in an issuer transaction . . . whether or not by or through underwriters . . . unless such sale has been qualified . . . or unless such security or transaction is exempted or not subject to qualification under Chapter 1 (commencing with Section 25100) of this part. . . .

43.     The nine-month promissory notes issued by IBS, HC, and WCN are securities within the provisions of the CSL.

44.     The Defendants offered for sale and sold the securities within the state of California within the meaning of CSL sections 25008 and 25017 by making offers within California or by having money paid for those securities mailed, wired or otherwise sent to and received by Defendants while geographically within California.

45.     The securities referred to herein are issued by IBS, HC, and WCN. Thus, the sales referred to herein are "issuer transactions" within the meaning of CSL sections 25010 and 25011.

46.     The securities referred to herein are issued, offered and sold without Defendants obtaining qualification by the Commissioner.

47.     The securities referred to herein are not exempt from the requirement of qualification.

48.     In selling these securities without qualification, Defendants offer and sell, or direct or aid and abet, or substantially assist, the offer and sale of such unqualified, non-exempt securities in violation of CSL section 25110. Unless enjoined by this Court, Defendants will continue to violate CSL section 25110.

## SECOND CAUSE OF ACTION

### MISREPRESENTATION OR OMISSION OF MATERIAL FACTS IN VIOLATION OF CSL SECTION 25401 (ALL DEFENDANTS)

49.     Plaintiff realleges and incorporates by reference paragraphs 1 through 48 of this Complaint as though fully set forth herein.

///

-8-

149 I

50.    CSL section 25401 states as follows:

It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

51.    The marketing of these securities is conducted by Hapjack as described herein. Agents recruited and purportedly trained by Hapjack are instructed to provide prospective investors with the IBS Offering Statement, the HC Offering Statements, and/or the WCN Offering Statement.

52.    In offering and selling the IBS nine-month promissory note securities referred to herein, Defendants make, aid and abet, or substantially assist the making of, specific untrue statements and/or misrepresentations concerning material facts to some or all prospective investors. In offering and selling the IBS nine month promissory note securities referred to herein, Defendants also omit to state, aid and abet, or substantially assist the omission of, material facts to some or all prospective investors. The misrepresentations or omissions include, but are not limited to, the following:

A.    Investors were falsely told that audited annual financial statements and unaudited quarterly financial statements for IBS are available to investors.

B.    Investors were not told that IBS no longer has the services of its experienced key executive, Jeffrey McKay.

C.    Investors were falsely told that trustee Gary Appelblatt controls investor funds.

D.    Investors were falsely told that the IBS securities offering will close as of September 1, 1997.

E.    Investors were falsely told that investors can receive principal and interest for a maximum of two terms totaling 18 months.

F.    Investors were falsely told that a major source of repayment of principal and interest to investors is income/profit from processing merchant transactions for use of the ATMs and CTMs.

-9-

1        G.      Investors were falsely told that the maximum sales commission payable from

2  investor proceeds is 7% of the investment.

3        H.      Investors were not told that investor funds have been and are being transferred to

4  different entities controlled by Defendants.

5        I.      Investors were not told that some of the collateral allegedly securing the

6  promissory notes is no longer in existence.

7        J.      Investors were not told that superior site locations for ATMs or CTMs were

8  allocated to different entities controlled by Defendants, thereby leaving inferior site locations to

9  investors.

10      53.     In offering and selling the HC nine month promissory note securities referred to

11  herein, Defendants make, aid and abet, or substantially assist the making of, specific untrue

12  statements and/or misrepresentations concerning material facts to some or all prospective

13  investors.  In offering and selling the HC securities referred to herein, Defendants also omit to

14  state, aid and abet, or substantially assist the omission of, material facts to some or all

15  prospective investors.  The misrepresentations or omissions include, but are not limited to, the

16  following:

17        A.      Investors were falsely told that audited annual financial statements and quarterly

18  unaudited financial statements for HC are available to investors.

19        B.      Investors were not told that HC no longer uses the services of experienced key

20  executive, William Yotty.

21        C.      Investors were falsely told that trustee Gary Appelblatt controls investor funds.

22        D.      Investors were falsely told that the offering will close December 1, 1997.

23        E.      Investors were falsely told that the offering is for a maximum of $5 million.

24        F.      Investors were falsely told that a major source of repayment of principal and

25  interest to investors is income/profit from telephonic equipment placed in motel rooms.

26        G.      Investors were falsely told that investors can receive principal and interest for a

27  maximum of two terms totaling 18 months.

28

1        H.    Investors were falsely told that the maximum sales commission payable from
2    investor proceeds is 7% of the investment.

3        I.    Investors were not told that investor funds have been and are being transferred to
4    different entities controlled by Defendants.

5        J.    Investors were not told that some of the collateral allegedly securing the
6    promissory notes is no longer in existence.

7        54.    In offering and selling the WCN nine month promissory note securities referred to
8    herein, Defendants make, aid and abet, or substantially assist the making of, certain untrue
9    statements and/or misrepresentations concerning material facts to some or all prospective
10   investors. In offering and selling the WCN securities referred to herein, Defendants also omit to
11   state, aid and abet, or substantially assist the omission of, material facts to some or all
12   prospective investors.  The misrepresentations or omissions include, but are not limited to, the
13   following:

14       A.    Investors were falsely told that audited annual financial statements and unaudited
15   quarterly financial statements for WCN are available to investors.

16       B.    Investors were falsely told that trustee Gary Appelblatt controls investor funds.

17       C.    Investors were falsely told that the offering will close June 1, 1998.

18       D.    Investors were falsely told that investors can receive principal and interest for a
19   maximum of two terms totaling 18 months.

20       E.    Investors were falsely told that a major source of repayment of principal and
21   interest to investors is income/profits generated from processing merchant transactions for use of
22   the ATMs or CTMs.

23       F.    Investors were not told that some of the collateral initially securing the
24   promissory notes is no longer in existence.

25       G.    Investors were not told that investor funds have been and are being transferred to
26   different entities controlled by Defendants.

27

28

149 L

1      H.    Investors were not told that superior site locations for ATMs or CTMs were

2 allocated to different entities controlled by Defendants, thereby leaving inferior site locations to

3 investors.

4      I.    Investors were falsely told that the maximum sales commission payable from

5 investor proceeds is 7% of the investment.

6      55.    The misstatements and omissions referred to herein are of material facts within

7 the meaning of CSL section 25401 as construed by pertinent case law because they concern

8 matters which a reasonable investor would consider in deciding whether to invest.

9      56.    Defendants' misrepresentations and omissions are in connection with the offer

10 and sale of securities.

11      57.    Defendants' misrepresentations and omissions are in violation of CSL section

12 25401. Unless enjoined, Defendants will continue to violate CSL section 25401.

13      WHEREFORE, plaintiff prays for:

14      1.    Orders of preliminary and permanent injunction enjoining defendants Hapjack

15 Marketing, Inc., Innovative Business Solutions, LLC, Hotel Connect, LLC, World Cash

16 Network, LLC, Billy Ray Smith, Claude D. Smith, Mark L. Ehrlich, Brian T. Griggs, Gary M.

17 Appelblatt, David D. Farrell, and Harold P. Coffin, and such Does as may be subsequently

18 named, from violating Corporations Code section 25110, or aiding and abetting or substantially

19 assisting the violations thereof, by directly or indirectly offering to sell or selling securities

20 including but not limited to those in the form of nine month promissory notes issued by

21 Innovative Business Solutions, LLC, Hotel Connect, LLC, and World Cash Network, LLC.

22      2.    Orders of preliminary and permanent injunction enjoining defendants Hapjack

23 Marketing, Inc., Innovative Business Solutions, LLC, Hotel Connect, LLC, World Cash

24 Network, LLC, Billy Ray Smith, Claude D. Smith, Mark L. Ehrlich, Brian T. Griggs, Gary M.

25 Appelblatt, David D. Farrell, and Harold P. Coffin, and such Does as may be subsequently

26 named, from violating Corporations Code section 25401, or aiding and abetting or substantially

27 assisting the violations thereof, by directly or indirectly offering to sell or selling securities in the

28 form of nine month promissory notes issued by Innovative Business Solutions, LLC, Hotel

-12-

149 M

1   Connect, LLC, and World Cash Network, LLC, or any other security, in this state by means of

2   any written or oral communication which contains untrue statements of any material fact or

3   omits or fails to state any material fact necessary to make the statements made, in light of the

4   circumstances under which they were made, not misleading, including but not limited to the

5   misrepresentations and omissions complained of herein;

6         3.     The appointment of an independent auditor or other designated fiduciary or

7   officer of the Court ("Auditor"), pursuant to and subject to the rights, duties, protections and

8   privileges provided in Corporations Code section 25530 and such additional rights, privileges,

9   duties and responsibilities as this Court may order. Said Auditor shall be provided complete

10  access to all assets, bank accounts, personnel, books and records of defendants Hapjack

11  Marketing, Inc., Innovative Business Solutions, LLC, Hotel Connect, LLC, and World Cash

12  Network, LLC, for the purpose of: (a) confirming collateral pledged to investors; (b) preparing

13  current financial statements including but not limited to balance sheets, income statements and

14  statements of changes in financial condition; and (c) tracing investor proceeds; all at the expense

15  of these entities.

16        4.     Judgment requiring defendants Hapjack Marketing, Inc., Innovative Business

17  Solutions, LLC, Hotel Connect, LLC, and World Cash Network, LLC and such Does as may be

18  subsequently named to be jointly and severally liable to pay full restitution to all known

19  investors who have not been repaid principal and/or interest as promised;

20        5.     Judgment requiring all defendants and such Does as may be subsequently named

21  to be jointly and severally liable to pay civil penalties to the California Corporations

22  Commissioner for each specific violation, according to proof, pursuant to Corporations Code

23  section 25535.

24        6.     Judgment requiring all defendants and such Does as may be subsequently named

25  to disgorge all ill-gotten gains in connection with the offer and sale of securities.

26        7.     This Court to retain jurisdiction of this action to implement and carry out the

27  terms of all orders and decrees that may be entered herein or to entertain any suitable application

28  or motion by plaintiff for additional relief within the jurisdiction of this Court; and

1    8.    Such other and further relief as this Court may d   / necessary and proper.

2    Dated: 2/10/00

3

4                                        WILLIAM KENEFICK
                                         Acting Commissioner of Corporations
5

6    By:    W. Richard Sintek,

7           W. RICHARD SINTEK
            Corporations Counsel
8           Attorney for Plaintiff

9

10.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-14-

1

2

3

4

5

6

7

ENDORSED

DEC - 7 2001

By E. Higginbotham, Deputy

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 FOR THE COUNTY OF SACRAMENTO

10   THE PEOPLE OF THE STATE OF         Case No. 00AS00776
     CALIFORNIA, by and through the
11   COMMISSIONER OF CORPORATIONS,

12                                      STATEMENT OF DECISION
                        Plaintiff,     (CRC 232)

13
                        v.             Trial Date: November 2, 2001
14
     HAPJACK MARKETING, INC.;
15   INNOVATIVE BUSINESS SOLUTIONS,
     LLC; HOTEL CONNECT, LLC; WORLD
16   CASH NETWORK, LLC; BILLY RAY
     SMITH; CLAUDE D. SMITH; MARK L.
17   EHRLICH; BRIAN T. GRIGGS; GARY M.
     APPELBLATT; DAVID D. FARRELL;
18   HAROLD P. COFFIN; AND DOES 1 through
     100,
19

20                      Defendants.

21

The above-referenced matter came on regularly for trial in Department 15 on November 2, 2001,

before the Honorable Judy Hersher. Karen L. Patterson, Mark J. Breckler, James K. Openshaw and

Daniel P. O'Donnell appeared for the plaintiff, the People of the State of California by and through the

Commissioner of Corporations ("the Commissioner"). There was no appearance by or on behalf of the

non-settling defendants. The Court thereupon confirmed that notice of the trial had been served in

accordance with Code of Civil Procedure § 594 and proceeded to receive evidence on November 2 and

5, 2001, against those defendants, including Claude D. Smith, Billy Ray Smith, David D. Farrell, Hotel

-1-

1   Connect, LLC, World Cash Network, LLC, Innovative Business Systems, LLC and Hapjack Marketing,

2   Inc. The seven defendants are referred to collectively hereafter as "defendants."[1]  Plaintiff did not

3   request a court reporter.

4          Evidence was admitted in the form of offers of proof on behalf of sworn witnesses who were

5   present in the courtroom, and who confirmed and/or amended the offers for accuracy upon questioning

6   by the Court.  Witnesses whose testimony was admitted in this fashion included Raymond Miller,

7   Leonard Mastrandrea, Susan Chase, Eugene Chase, Linda Brunetti, Harold P. Coffin, Gary Appelblatt,

8   Edward Prentice and Jeff Robertson.

9   No objection being heard, and the Court confirming the authenticity of the transcripts, additional

10  evidence was admitted in the form of deposition testimony of Billy Ray Smith, Brian T. Griggs and

11  Mark L. Ehrlich, and the sworn examination testimony of Mike Goodman and Robert V. Lilly.

12         Declaration testimony was admitted from Mildred N. Gray, Vera Keller, Willian D. Zalabak and

13  Carolyn Olson.  Documentary exhibits were also received into evidence.  The Court denied admission of

14  the declaration testimony of  Chuck Teel and Jeffrey McKay for lack of adequate foundation.

15         No other objections were asserted to either the form or substance of the testimony of any of the

16  witnesses, or to any of the documentary exhibits that were admitted by the Court, which were substantial

17  in number.

18         Having heard, read, and considered the evidence, the Court hereby makes the following findings

19  of fact and reaches the following conclusions of law:

20                              **FINDINGS OF FACT**

21         1. From approximately late 1996 until late 1999, all defendants engaged, collectively and

22  individually, in the offer and sale of approximately 528 9-month promissory notes, in minimum

23  principal amounts of $25,000, issued by defendants Innovative Business Solutions, LLC (IBS), Hotel

24  Connect, LLC (HC), and World Cash Network, LLC (WCN).  The notes were sold throughout the

25

---

26   [1]  Four additional defendants, Gary L. Appelblatt, Harold P. Coffin, Mark L. Ehrlich and Brian T. Griggs, reached

27   settlements with the Commissioner prior to trial.  The Commissioner received reports prior to trial that defendant Billy Ray
     Smith died in August of 2001 but has received no formal notice of his death.  The Commissioner elected to proceed to seek a

28   judgment against him. (See 1 Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group) ¶ 2:503,
     page 2-85 rev. #1 2000.)

1    United States, including California and Sacramento County, and were supposed to be used to raise
2    capital to fund business operations of the three issuing companies.

3        2. Defendant IBS was formed during mid-1996, purportedly to sell, install, operate and service
4    automated teller machines, debit card equipment and credit card terminals. Ex. 4, page 9 (this page is
5    numbered "3" at its bottom center). IBS made an initial offering of $5 million in 9-month promissory
6    notes on December 1, 1996. Between January 14, 1997 and July 13, 1999, IBS 9-month promissory
7    notes were sold in a total amount of approximately $3.28 million. Testimony of Jeff Robertson
8    (Robertson testimony), Ex. 99. Defendant Billy Ray Smith was one of the initial owners of IBS but later
9    sold his entire interest in the company to his brother Claude for one dollar ($1) because "Claude Smith
10   wanted to take it over." Deposition testimony of Billy Ray Smith (BR Smith Deposition, page 125, line
11   3).

12       3. Defendant Hotel Connect, LLC ("Hotel Connect") was formed in March of 1997, purportedly
13   to purchase, install and maintain telephone equipment in hotel rooms. Hotel Connect made an initial
14   offering of $5 million in 9-month promissory notes in March of 1997; in December of 1997 the offering
15   was increased to $10 million. Between May 14, 1997 and August 23, 1999, Hotel Connect 9-month
16   promissory notes were sold in a total amount of approximately $12.25 million. Robertson testimony;
17   Ex. 99. Claude Smith was the CEO of Hotel Connect and provided overall management and directed its
18   operations. Deposition testimony of Mark L. Ehrlich ("Ehrlich testimony), pages 30-31. Billy Ray
19   Smith was an original owner of 26% of Hotel Connect. BR Smith Deposition.

20       4. World Cash Network, LLC ("World Cash") was formed in September of 1997, purportedly
21   to install, operate and service automated teller machines, debit credit card equipment and terminals,
22   credit card equipment and terminals and scrip machines and their associated equipment. Ex. 6, page 13
23   (this page is numbered "6" at its bottom center). World Cash made an initial offering of $5 million in
24   9-month promissory notes in September of 1997. Between November 12, 1997 and September 16,
25   1999, World Cash 9-month promissory notes were sold in a total amount of approximately $6.10
26   million. Robertson testimony; Ex. 99. Mark Ehrlich was hired by Claude Smith to serve as the
27   president of World Cash. Ehrlich testimony, page 61.

28

STATEMENT OF DECISION

1    5. The 9-month promissory notes issued by IBS, Hotel Connect and World Cash were marketed
2  by and through defendant Hapjack Marketing, Inc. (Hapjack), which served as the "master agent" of the
3  enterprise. Billy Ray Smith owned 100% of the stock of Hapjack. BR Smith Depo. Claude and Billy
4  Ray Smith were the only directors and owners of Hapjack. Deposition testimony of Brian Griggs, page
5  18, line 23 to page 19, line 24 ("Griggs Testimony"). Mark L. Ehrlich, who served as the purported
6  president of both Hotel Connect and World Cash, understood the officers of Hapjack to be Claude
7  Smith, Billy Ray Smith and Brian Griggs. Ehrlich testimony, page 73, lines 12-15. Robert Lilly, an
8  insurance agent who sold notes issued by all three of the companies, testified that he understood the
9  control people of Hapjack to be Claude Smith, Billy Ray Smith and Brian Griggs. Page 15. He testified
10  that Claude Smith and Billy Ray Smith were the "head honchos." Page 16.

11    6. Hapjack located, recruited, motivated and contracted with agents to sell the notes, organizing
12  a network of "people who had a client base." Ehrlich testimony, page 74, lines 17-18. Hapjack hosted a
13  gathering of more than 100 prospective sales agents for the promissory notes at the Sundowner Hotel in
14  Las Vegas during the first half of 1997. Testimony of Edward Prentice ("Prentice testimony.") The
15  seminar lasted three days and two nights and Hapjack paid for room and food. Lilly, page 50.

16    7. Defendant David Farrell was a marketing agent for Hapjack. Griggs testimony, page 146,
17  lines 14-24; Lilly, page 17. Farrell provided services to Hapjack in the nature of supporting its broker
18  dealers. Testimony of Prentice.

19    8. At all times relevant to this lawsuit, all seven of the defendants conducted their business
20  operations from the same premises, 3649 Beechwood Avenue in Fresno. During some relevant time
21  periods they leased additional space at nearby 3621 Beechwood Avenue.

22    9. Each of the note offerings by IBS, Hotel Connect and World Cash was made through the use
23  of an offering circular titled "Confidential Private Placement Disclosure Document" ("offering
24  circular") which constituted the primary disclosure document provided to prospective investors.
25  Appelblatt testimony; Griggs testimony, page 50, pages 18-52, page 80, lines 7-16; Exs. 4, 6, 8 and 9.

26    10. Each of the offering circulars contained a representation that attorney Gary M. Appelblatt
27  ("Appelblatt") had agreed to serve as Trustee pursuant to the terms of a Trust Indenture that was made
28  Exhibit "F" to each of the offering circulars. (Ex. 4, page 11 (this page is numbered "5" at its bottom

-4-

1  center); Ex. 6, page 12 (this page is numbered "5" at its bottom center); Ex. 8, page 11 (this page is

2  numbered "4" at its bottom center); Ex. 9, page 11 (this page is numbered "4" at its bottom center).

3      11. Appelblatt testified that he was contacted by Claude Smith, with whom he was previously

4  acquainted, in approximately November of 1996, about whether he would consider serving as trustee for

5  investors in 9-month notes issued by IBS. Appelblatt met on November 26, 1996 in Modesto with

6  Claude Smith, Billy Ray Smith, Brian Griggs and Jeff McKay to discuss the proposal further. Exhibit

7  32, page 2. Following those discussions Appelblatt agreed to serve as trustee for IBS, pursuant to a

8  retention letter he wrote dated November 29, 1996. (Ex. 29.) Thereafter Appelblatt also performed

9  similar duties for Hotel Connect and World Cash on the same terms, though he never wrote separate

10  retention letters relating to those other two companies. Appelblatt testimony.

11      12. Section 7.01 of the Trust Indentures for IBS, Hotel Connect and World Cash provided that

12  the trustee Appelblatt would maintain four trust accounts: (a) the Note Distribution Account, (b) the

13  Issuer Account, (c) the Reserve Account, and (d) the Agent Commission Account. Copies of the Trust

14  Indentures are Exhibits "F" to each of the offering circulars, which are Exs. 4, 6, 8, and 9. Section 7.02

15  of each trust Indenture provided that the trustee was to segregate 7% of the investor funds in the Agent

16  Commission Account, 10% to the Reserve Account, and the balance to the Issuer Account. Exhibits 73-

17  75 are separate copies of the Trust indentures of each of the three note issuers. Additional copies of the

18  Trust Indentures are part of the investor files of Leonard Mastrandrea and Susan Chase, admitted as

19  Exhibits 47 and 48.

20      13. In fact, however, the trustee Appelblatt commingled and maintained only a single trust

21  account, to which he deposited all funds received from investors for the purchase of the notes.

22  Appelblatt retained 10% of every note purchase in that trust account, and transmitted the remaining 90%

23  directly to whichever of the three companies had issued the note. Appelblatt testimony.

24      14. Section 3.06 of the Trust Indentures of IBS, Hotel Connect and World Cash provided that

25  each of the three note issuers would furnish the trustee audited annual financial statements and

26  unaudited in-house quarterly financial statements "as soon as such are available" and that "The Trustee

27  shall retain such information for the benefit of the Noteholders." In fact, however, none of the three

28

STATEMENT OF DECISION

1 | companies ever had any audited or unaudited financial statements prepared, so no such statements were
2 | ever provided to the trustee Appelblatt. Appelblatt testimony; Coffin testimony.

3 |      15. Purchasers of the promissory notes issued by the three companies were promised interest at
4 | the rate of 13.35% per year, payable quarterly. Each note contained a provision allowing renewal for
5 | one additional 9-month period at the option of the investor, and provided that the interest rate would
6 | increase to 15% during the renewal period. Exs. 4, page 28 (Ex. B of subscription agreement); Ex. 6,
7 | page 28, Ex. "A"; Ex. 8, page 28, Ex. "B."

8 |      16. The offering circulars represented to investors that their interest and principal would be paid
9 | and repaid out of the operating revenues of the three businesses. Exs. In fact, however, none of the three
10 | businesses ever derived operating revenues sufficient to meet their interest and principal repayment
11 | obligations. The defendants quickly fell behind in repaying principal to investors as the notes came due,
12 | and eventually halted payments of principal and interest entirely.

13 |      17. Numerous letters were admitted into evidence in which the trustee Gary Appelblatt pointed
14 | out to the three companies the names of investors whose note repayments were overdue. Exs. 21, 24,
15 | 25, 26, 33-37. Yet the defendants continued to use the same offering circulars to new investors
16 | throughout the period during which the notes were being sold, thereby continuing to represent that
17 | principal and interest would be repaid from revenues of the three businesses even after it was clear that
18 | the businesses were not generating any profits and that repayments, if made at all, would necessarily be
19 | made from the funds of new investors.

20 |      18. The defendants finally stopped selling the notes in September of 1999. Thereafter, the
21 | defendants relocated to Las Vegas.   Approximately $12,028,353.40 million in principal, plus interest,
22 | remains in default and unpaid to investors. Of the 528 investors who purchased promissory notes, 299
23 | have not received a return of their principal.

24 |      19. The offering circulars for all of the 9-month promissory note offerings of the three
25 | companies stated that:

26 |         These securities have not been approved or disapproved by the Commissioner of Corporations of
        the State of California or by any other state regulatory agency or the Securities and Exchange
27 |         Commission.

28 |

-6-

1  Ex. 4, page 4, Ex. 6, page 5, Ex. 8, page 5, Ex. 9, page 5.

2  Each of the offering circulars also stated:

3
4
5
> By virtue of the fact that the aggregate sum of the notes shall be five million dollars or less and that the note will only be offered to maximum [sic] of 35 unaccredited investors and an undetermined number of accredited investors, the company believes that the notes are securities exempt from registration under the Securities Act of 1933 pursuant to 17 C.F.R. § 230.505.

6
7   Edward Prentice testified, however, that he sold 9-month promissory notes for HC and was never given
8   any training or supervision as to who was suitable for purchasing. He testified that he gave the Hotel
9   Connect offering circular to prospective investors prior to their purchases and had an opportunity to read
10  it himself. Based upon his reading of the offering circular, it appeared to him that the notes should only
11  be sold to accredited investors, that is, investors with a million dollars net worth or a quarter of a million
12  in income. But he talked to defendant Farrell at the Las Vegas convention held by Hapjack for
13  prospective sales agents, and Farrell told him that it was not a problem, that he could sell the notes to
14  non-accredited investors.

15      20. Each of the offering circulars contained a table describing the proposed Use of Proceeds of
16  the promissory note sales, which contemplated sales commissions of 7%. Ex. 4, page 10; Ex. 6, page
17  13; Ex. 8, page 13; Ex. 9, page 13 (each of these four pages is numbered "6" at its bottom center). In
18  addition, Section 7.01 of each of the Trust Indentures indentures specified that 7% of the amount paid by
19  each investor for the promissory notes would be segregated in a trust account called the "the Agent
20  Commissioner Account." Exs. 73-75. In fact, however, total sales commission expenses were
21  approximately 35% for IBS, approximately 24% for HC and approximately 27% for WCN. Robertson
22  testimony; Ex. 99. The trustee Gary Appelblatt took notes at a meeting on November 26, 1996, with
23  Claude Smith, Billy Ray Smith, Brian Griggs and Jeff McKay, reflecting that sales commissions of 15%
24  were discussed. That meeting took place before selling of the notes commenced. Appelblatt testimony;
25  Ex. 32, page 2. Such high commission expense, which was not revealed to the investors, substantially
26  reduced the amount of note revenue available for operating expenses of the three businesses, and thereby
27  substantially reduced the odds that they would ever achieve profitability.

28

-7-

1    21. Hapjack received a commission of about 10% for the sale of each note, and also earned a fee

2 on renewals of the 9-month notes. BR Smith Deposition; Goodman testimony)  Agents recruited by

3 Hapjack also received commissions "over and above" the fee to Hapjack.  BR Smith Deposition;

4 Prentice testimony; Goodman testimony.   Robert Lilly, for example, testified that he received 10%

5 commissions for sales he made of the 9-month promissory notes of all three companies.  Lilly testimony,

6 page 20.  He also received commissions on renewals. Lilly testimony, pages 38, 42-43.

7    22. Mike Goodman owns and operates a business under the fictitious name GAC Marketing

8 (GAC) which uses networks of sales agents to sell various products and financial programs.  Mike

9 Goodman Deposition (Goodman Deposition), pages 15-16.  GAC became involved in the 9-month

10 promissory note program through Claude Smith (page 34), and sold 9-month promissory notes of IBS,

11 Hotel Connect and World Cash.  Goodman Deposition, pages 72, 87.  GAC also provided training for

12 agents who sold the notes.  Goodman Deposition, pages 36-39.  GAC's main address is in Merced but

13 Claude Smith allowed it to use space at 3649 Beechwood in Fresno.  Goodman Deposition, page 5.

14 GAC had no written commission agreement with Hapjack.  Instead, Goodman negotiated a verbal

15 agreement with Claude Smith.  Goodman Deposition, page 47.  Under that agreement, GAC received a

16 portion of the commission received by each agent it trained who sold a note.  Goodman Deposition,

17 pages 31, 37.  In addition to the commissions received by each agent and GAC, Hapjack also received a

18 commission on sales made by agents trained by GAC because "they made all this possible."  Goodman

19 Deposition, page 46.  GAC received a commission of 2.5% on initial sales and renewals of notes.

20 Goodman Deposition, page 89.  Goodman was told by Claude Smith that each note could be renewed

21 one or two times.  Goodman deposition, page 89.

22    23. Some of the HC 9-month promissory notes were sold through a marketing business called

23 River City Financial, LLC, which Billy Ray Smith owned with Edward Prentice ("Prentice").  Prentice

24 testified that Billy Ray Smith owned 80% of the business and Prentice owned 20%.  River City received

25 a 10% commission on Hotel Connect notes sold by River City, and also received an override on

26 commissions earned by agents it recruited.  Hapjack Marketing paid the commissions on Hotel Connect

27 promissory notes but Hapjack did not contract directly with the agents.  The agents contracted with

28

-8-

1    Hotel Connect. Claude Smith and Billy Ray Smith identified themselves to Prentice as representatives
2    of Hapjack. Prentice testimony.

3        24. The court admitted live and declaration testimony from eight witnesses who invested in 9-
4    month promissory notes issued by IBS, Hotel Connect and World Cash, including:

5        25. Raymond Miller, who testified concerning $100,000 he and his wife invested in an IBS note
6    purchased from agent Robert Lilly, mailing their money to David Farrell at Hapjack Marketing at 3649
7    Beechwood in Fresno, payable to IBS. Soon after their investment, the Millers received a "welcome"
8    letter from Billy Ray Smith, dated May 28, 1998. Smith signed the letter as "president" (Ex. 20), even
9    though the offering circular states that Jeff McKay was the IBS president. (Ex. 4.)

10        26. Leonard Mastrandrea, who that he testified that on or about August 21, 1998, he invested
11    $25,000 in a 9-month promissory note issued by Hotel Connect through his agent Ed Prentice.

12        27. Eugene and Susan Chase, who testified that they invested $40,000 in a 9-month promissory
13    note issued by Hotel Connect on or about December 17, 1998, in reliance upon their agent Ed Prentice,
14    whom Eugene Chase believed to be a financial planner and adviser, and who later told them he would
15    write a letter on their behalf claiming hardship in an effort to get their money back. Ed Prentice
16    confirmed that he told Hapjack Marketing that the Chases had a hardship because he thought that by
17    saying that he could get their money back for them. Prentice testified that Billy Ray Smith told him it
18    would be no problem, but Smith did not say where Hotel Connect would obtain the money to pay the
19    Chases back. Despite the assurance of Billy Ray Smith, the Chases never received a return of their
20    principal.

21        28. Linda Brunetti, who testified that her husband invested $40,000 of IRA money in a Hotel
22    Connect 9-month promissory note in August of 1999. She and her husband Tony invested $110,000 into
23    a 9-month promissory note of World Cash in September of 1999. The investments were made through
24    agent Ted Schindler who was a friend and associate of Tony Brunetti and through whom the Brunettis
25    had previously made conservative investments, mostly government-backed securities.

26        29. Mildred N. Gray, who testified that she is an 82-year-old widow who purchased a 9-month
27    promissory note issued by World Cash on or about May 19, 1998 from an agent named Dennis
28    Whitfield. Ex. 119.

-9-

1    30.  William D. Zalabak, a 74-year-old retiree who purchased a note issued by Hotel Connect in

2   the amount of $204,250.94 on or about December 9, 1997 and a note issued by World Cash in the

3   amount of $89,043.17 from a man named Joe Don Garrett.  Ex. 132.

4    31.  Vera Keller, a widow who purchased a note issued by Hotel Connect in the amount of

5   $25,000 on or about September 9, 1997 from a man named Donald Beacon.  Ex. 121.

6    32.  Carolyn Olson, who offered a declaration on behalf of the estate of Ruth McClure, who

7   purchased a purportedly "secured" promissory note from IBS on or about December 17, 1997 in the

8   amount of $89,743.00.  Ex. 123.

9    33.  The investor witnesses offered similar accounts of having invested in the notes after being

10   approached by agents who stated that they would provide quarterly interest of 13.35% during the first 9-

11   month period which would increase to 15% if the notes were renewed for a second nine-month period.

12   Most of the investors who testified (the Millers, Mastrandrea, Zalabak, Keller and McClure) did renew

13   their notes at the end of the original 9-month period after receiving the promised interest payments

14   during the first nine-month period.  Four of the investors, (Millers, Zalabak, Vera Keller and Ruth

15   McClure), renewed their notes a second time, even though the notes provided only for a single 9-month

16   renewal.  Zalabak was offered an opportunity to extend his note a third time, for a fourth 9-month

17   period, in January of 2000, but declined.  Two other investors, Mildred Gray and the Chases, denied that

18   they renewed their notes but nevertheless did not receive a return of their principal at the end of nine

19   months though they did continue to receive some interest payments.  Two of the investors, Mastrandrea

20   and Gray, testified that their subscription agreements contained information that they did not provide

21   inflating their net worth and prior investment experience.  Ex. 47 (Mastrandrea).  All of the investors

22   testified that their interest payments had eventually stopped and that their efforts to recover their

23   principal had been unsuccessful, either in whole or in substantial part.  The Brunettis did succeed in

24   recovering the 10% of their principal that had been held by the trustee Appelblatt.

25    34.  The evidence established that defendants Claude and Billy Ray Smith dominated and

26   controlled the operations of the other defendants and disregarded the separate and distinct status of IBS,

27   HC, WCN and Hapjack.  As one example, Billy Ray Smith testified in his deposition that when financial

28   trouble occurred at IBS, Hapjack paid some of its commissions back so that investors could be repaid

-10-

1  amounts they had invested in promissory notes. He described the payment as a "loan" but
2  acknowledged that there was no supporting documentation. BR Smith Deposition, pages 168-169.

3      35. Harold P. Coffin ("Coffin"), an accountant, testified that such undocumented transfers of
4  funds between legally distinct business entities was typical of the manner in which the defendants
5  conducted their business operations. Coffin testified that the defendants employed him in late 1997
6  through his prior acquaintance with Mark Ehrlich, who held the title of President of IBS. World Cash
7  originally employed Coffin, as its chief financial officer, but over a period of four to six months his job
8  duties expanded to include the other two note issuing companies as well. Coffin testimony. Coffin was
9  the chief financial officer of World Cash. Griggs testimony, page 77, lines 20-23.

10     36. Ehrlich had a title but Claude Smith did the day-to-day decision-making and the Coffin
11  always understood the three principals of IBS, Hotel Connect and World Cash to be Brian Griggs and
12  the Smith brothers, Claude and Billy Ray. Those three did not have titles in any companies but they
13  hired people and gave them titles. Claude Smith headed up staff meetings. Coffin testimony.

14     37. Coffin's testimony was corroborated by Brian Griggs, who testified that when he performed
15  consulting services for World Cash he reported to Claude Smith and no one else. Page 119, lines 15-
16  20. Griggs testified further that he worked for Hapjack at the request of Claude Smith. Page 17, line 24
17  to page 18, line 1. Griggs testimony, page 119, lines 15-20. Griggs negotiated consulting contracts for
18  IBS and World cash with Claude Smith. Page 9, lines 3-6; page 9, line 24 to page 10, line 1. In
19  addition, Coffin was hired by Claude Smith, who got his name from Mark Ehrlich. Griggs testimony,·
20  pages 48-49.

21     38. Mark Ehrlich was hired by Claude Smith and Brian Griggs to serve as the president of Hotel
22  Connect, and that the two of them told him what his duties and responsibilities were. Ehrlich testimony,
23  page 21.

24     39. When Coffin began working for the companies, the accounting for IBS, Hotel Connect and
25  World Cash was being done by Tony Pien. After Coffin began working for the defendants as chief
26  financial officer, Pien worked for Coffin as the "controller" of World Cash. Coffin observed that Pien
27  maintained a big columnar sheet with columns for each of the bank accounts maintained for each of the
28  defendant companies as well as other business entities of the defendants. Each morning Pien called the

1  bank to get the bank balances for each account, some of which would be negative and some positive.

2  Pien would then meet with Claude Smith, Billy Ray Smith and Brian Griggs and the three of them

3  would instruct Pien to transfer money into and out of the various accounts. The inter-company transfers

4  were a daily occurrence and were not explained or labeled, so Coffin identified them as "loans" in the

5  records he created. Coffin testified that he was unsuccessful in efforts to stop the practice but that he

6  attempted to impose some order on it, and created records that constitute the best accounting records the

7  company had. Coffin never created or saw any financial statements for any of the three companies that

8  issued the promissory notes, either audited or unaudited. Coffin testimony.

9  **CONCLUSIONS OF LAW**

10  1. The 9-month promissory notes offered and sold by the defendants are securities as defined by

11  the California Corporate Securities Law, Corporations Code § 25000 et seq. (CSL). Corporations Code

12  § 25019; *Leyva v. Superior Court* (1985) 164 Cal.App.3d 462, 470. Each of the offering circulars

13  reflects that the notes constitute securities. Ex. 4, page 4; Ex. 6, page 5; Ex. 8, page 5; Ex. 9, page 5.

14  2. The general purpose of the CSL is to protect the public from unsubstantial, unlawful and

15  fraudulent investment schemes by promoting full disclosure of all information necessary to make

16  informed and intelligent investment decisions. (*People v. Park* (1978) 87 Cal.App.3d 550, 565; *People*

17  *v. Syde* (1951) 37 Cal.2d 765, 768.) Its basic regulatory purpose is to protect the public against spurious

18  schemes, however ingeniously devised, to attract risk capital. (*Leyva v. Superior Court* (1985) 164

19  Cal.App.3d 462, 470.)

20  3. To achieve its purposes, the CSL prohibits the offer and sale of securities unless they have

21  either been properly qualified, or are exempt from the qualification requirement. (Corporations Code §

22  25110.) The burden of proving an exemption or exception to the qualification requirement is upon the

23  person claiming it. (Corporations Code § 25163.) The fundamental purpose of the qualification

24  requirement is to ensure that a securities seller has made a full, complete, accurate disclosure of all

25  information relevant and material to the buyer's decision to purchase. (*Fine v. Superior Court* (1997) 52

26  Cal.App.4th 1258, 1265.) Avoidance of that disclosure process by an unqualified seller necessarily

27  makes fraud possible. (*Id.*) For example, 10 Cal. Code Regs., title 10, § 260.140.05 provides that an

28  open qualification normally will not be approved if the business in which the issuer is engaged in not

-12-

1   reasonably anticipated to produce profits within a reasonable period of time, presumptively twenty-four

2   months. It provides further that the Department of Corporations may require prospective financial

3   information submitted by an application to be examined by an independent certified public accountant as

4   a pre-condition to qualification.

5        4. The defendants, and each of them, knowingly offered and sold securities in violation of

6   California Corporations Code §25110. The offering circulars associated with each of the note offerings

7   contain the representation that the defendants believed the note offerings to be exempt from registration

8   because they were only going to be offered to a maximum of 35 unaccredited investors. Ex. 4, page 18

9   (the page is numbered "12" at its bottom center; Ex. 6, page 19 (the page is number "12" at its bottom

10  center); Ex. 8, page 19 (the page is numbered "12" at its bottom center); Ex. 9, page 19 (the page is

11  numbered "12" at its bottom center). This language appears to constitute an attempt to take advantage

12  of the limited offering exemptions available under state and federal law for offering limited to investors

13  meeting specified income, net worth and investment sophistication criteria. The attempt fails, however,

14  because the trial testimony of Edward Prentice established that the companies' sales agents were not

15  informed of such a limitation and, to the contrary, were affirmatively told by defendant Farrell that the

16  there was no limitation on the investors to whom the notes could be offered. Moreover, two investors,

17  Mastrandrea and Gray, testified that the information that was written on their Note Purchaser's

18  Suitability Questionnaires (Exhibit "E" to each of the offering circulars) was false, indicating that the

19  defendants were fabricating investor qualification information.

20       5. The defendants, and each of them, knowingly offered and sold securities by means of written

21  and oral communications which included untrue statements of material fact. These communications also

22  omitted to state material facts necessary to avoid misleading the public, in violation of California

23  Corporations Code §25401. Those communications included untrue statements concerning (1) the

24  exemption of their security offerings from the qualification requirement of Corporations Code § 25110;

25  (2) untrue statements concerning the trust accounts that were supposed to have been maintained by the

26  trustee, Appelblatt; and (3) untrue statements that quarterly financial statements and annual audited

27  financial statements would be provided to the trustee Appelblatt. Defendants also omitted to state

28  material facts including: the actual amount of the sales commissions being paid to sales agents for the

-13-

1 notes, that notes were remaining unpaid months after they became due and after investors requested

2 repayment; that the companies were not generating revenues from which the notes could be repaid; and

3 that repayments were being made, if at all, from funds paid in by new investors.

4      6. If the acts of the defendants did not constitute the direct offer and sale of securities in

5 violation of California Corporations Code §§25110 and 25401, their activities would constitute knowing

6 provision of substantial assistance to another in violation of the provisions of the California

7 Corporations Code §25403.

8      7. Under the alter ego doctrine, the distinct entity of the corporate form may be disregarded, and

9 acts of the corporation and its stockholders and officers may be attributed to one another, when justice

10 and equity can best be accomplished, and fraud and unfairness defeated, by a disregard of the distinct

11 entity of the corporate form. *Mid-Century Ins. Co. v. Gardner* (1992) 9 Cal.App.4[th] 1205, 1212.

12      8. It is not sufficient to show merely that a creditor will remain unsatisfied if the corporate veil is

13 not pierced; in almost every instance where a party attempts to invoke the doctrine he is an unsatisfied

14 creditor. Instead, the purpose is to afford an unsatisfied creditor some protection where conduct amount

15 to bad faith makes it inequitable for the equitable owner of a corporation to hide behind its corporate

16 veil.

17      9. There is no litmus test to determine when the corporate veil will be pierced, but there are two

18 general requirements: (1) that there be such unity of interest and ownership that the separate

19 personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as

20 those of the corporation alone, an inequitable result will follow. *Mesler v. Bragg Management Co.*

21 (1985) 39 Cal.3d 290, 300.

22      10. Considerations relevant to the alter ego analysis include commingling of funds and other

23 assets; the failure to segregate funds of the individual and the corporation; the unauthorized diversion of

24 corporate funds to other than corporate purposes; the treatment by an individual of corporate assets as

25 his own; the ownership of all the stock by a single individual or family; the domination or control of the

26 corporation by the stockholders; the use of a single address for the individual and the corporation; the

27 disregard of formalities and the failure to maintain arm's-length transactions with the corporations.

28 (*Mid-Century, supra*, 9 Cal.4[th] at 1213, n.3.)

-14-

1   11. The alter ego doctrine applies to limited liability companies to the same extent as to
2   corporations. (Corporations Code § 17101.)

3   12. The evidence warrants application of the alter ego doctrine to disregard the separate business
4   forms of the four business-entity defendants, IBS, Hotel Connect, World Cash and Hapjack, and to hold
5   each of them, and each of the three individual defendants jointly and severally liable for all of the debts,
6   damages and liabilities of the others relating to and arising out of the offer and sale of the 9-month
7   promissory notes issued by IBS, Hotel Connect and World Cash. The evidence reflects that at all times
8   the defendants conducted their operations from common premises in Fresno, California, and that
9   defendants Claude Smith and Billy Ray Smith dominated and controlled the four business-entity
10  defendants, holding and exercising all real decision-making authority while avoiding formal titles and
11  giving those titles to their employees. The evidence further reflects that Claude Smith and Billy Ray
12  Smith manipulated the funds and bank accounts of the business defendants in total disregard of their
13  formal legal separateness. The evidence also reflects that defendant David Farrell provided marketing
14  services and support relating to sales of the promissory notes, and in that capacity advised sales agents
15  that there were no limitations upon the investors to whom the notes could be offered, advice which was
16  contrary to statements in the offering circulars and rendered specious the claim of the defendants that the
17  note offerings were exempt from the qualification requirement of the CSL.

18  13. Under these circumstances an inequitable result would follow if any of the seven defendants
19  were allowed to assert its formal legal distinctness and separateness from any of the other defendants as
20  a ground for avoiding liabilities relating to the offer and sale of the 9-month promissory notes issued by
21  IBS, Hotel Connect and World Cash.

22  14. Corporations Code § 25530(a) provides that a permanent injunction shall be granted upon a
23  proper showing that any person has engaged in any act or practice constitution a violation of the CSL.
24  In the present action the defendants stipulated to a preliminary injunction that has been in effect since
25  October 12, 2000. Overwhelming evidence of hundreds of violations of the CSL by the defendants
26  warrants issuance of a judgment making that injunction permanent.

27  15. Section 25530(b) provides:

28  If the commissioner determines it is in the public interest, the commissioner may include in any
    action authorized by subdivision (a) a claim for ancillary relief, including but not limited to, a

-15-

1        claim for restitution or disgorgement or damages on behalf of the persons injured by the act or
2        practice constituting the subject matter of the action, and the court shall have jurisdiction to
         award additional relief.

3   The CSL was patterned after the federal Securities Act of 1933. (*Moreland v. Department of*
4   *Corporations* (1987) 194 Cal.App.3d 506, 512.) Federal law is therefore treated as "persuasive" in
5   cases interpreting the CSL, and is often consulted. (*See, e.g., Leyva, supra,* 164 Cal.App.3d 462, 471;
6   *People v. Schock* (1984) 152 Cal.App.3d 379, 387.)

7        16. The term "disgorgement" was not added to § 25530 until 1981, but it has been held that the
8   amendment was only declarative of existing law, because the relief it authorizes was already
9   encompassed in the statutory term "restitution." (*People v. Martinson* (1986) 188 Cal.App.3d 894, 900-
10   901.) The primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive
11   violators of their illegal gains, thereby effectuating the deterrence objectives of those laws. (*SEC v.*
12   *Milan Capital Group, Inc.* (S.D.N.Y., Aug. 14, 2001, No. 00 Civ. 0108) 2001 U.S. Dist. Lexis 11804.)
13   A person may be held jointly and severally liable for disgorgement with an entity he or she controls.
14   (*Hately v. SEC* (9th Cir. 1993) 8 F.3d 653, 656.)

15        17. The evidence reflects that the defendants received a total of over $20 million from investors,
16   of which approximately $12,028,353.40 remains unpaid. A judgment requiring disgorgement in that
17   amount against all of the defendants, jointly and severally, is appropriate

18        18. Corporations Code § 25535 provides that any person who violates any provision of the CSL
19   "shall be liable for a civil penalty not to exceed twenty-five thousand dollars ($25,000) for each
20   violation." Under California law, the question of what constitutes "a violation" for purposes of a civil
21   penalty provision is generally determined on the basis of all the circumstances of the case, including the
22   type of violation involved, the number of victims, the amount of harm inflicted on each of the victims,
23   and the degree of repetition. (*See, e.g., People v. Witzerman* (1972) 29 Cal.App.3d 169, 180.)

24        19. In the present case, the sale of each promissory note violated both Corporations Code §
25   25110 and § 25401. In addition, the notes were renewed up to twice per investor, creating a total
26   number of three transactions arguably amounting to a maximum of six violations per investor. This
27   Court determines, however, that a relatively conservative interpretation of the term "violation" is

28

1  appropriate in this case, deeming each investor rather than each transaction to constitute each violation,

2  for a total of 528 violations by the defendants. This interpretation is appropriate since the maximum

3  civil penalty of $25,000 per violation is the same as the minimum investment amount.[2] Defining the

4  term "for each violation" in this manner results in a maximum civil penalty of $13.2 million against each

5  of the defendants.

6      20. This Court determines that imposition of the <u>maximum</u> civil penalty of $25,000 is

7  appropriate. In *State of California v. City and County of San Francisco* (1979) 94 Cal.App.3d 522, 531,

8  a case in which the state sought imposition of civil penalties for water pollution, the trial court ruled that

9  once the plaintiff state had proved a discharge in violation of the Water Code, the burden shifted to the

10  defendant to establish, by a preponderance of the evidence, that the amount of penalty imposed should

11  be less than the maximum. The Court of Appeal affirmed, stating:

12      Penalties are designed to deter as well as compensate. A penalty statute presupposes that its
        violation produces damage beyond that which is compensable. ¶ . . . ¶ The burden of
13      demonstrating that its pollution of the bay and ocean was of a magnitude less than the liquidated
        damages provided for in section 13385 was properly placed with the city. The city introduced no
14      evidence in mitigation of damages and is, therefore, liable in the amount of $ 10,000 for each day
15      in which it violated the Water Code.

16  (94 Cal.App.3d 522, 531, 531-32.)

17      21. A similar rule is appropriate in the present case for the additional reason that the defendants

18  have voluntarily and knowingly elected not to appear at the trial at all despite full knowledge of the

19  nature and magnitude of the claims asserted against them. By their action they have implicitly conceded

20  that have no evidence to assert in mitigation of the maximum penalty provided for by law.

21      **THEREFORE,** it is the decision of this Court that plaintiff shall have judgment, individually

22  and collectively or jointly, against the seven remaining defendants, specifically Claude D. Smith, Billy

23  Ray Smith, David D. Farrell, Hotel Connect, LLC, World Cash Network, LLC, Innovative Business

24  Systems, LLC and Hapjack Marketing. Inc. as follows:

25

26

27

28  [2]  It is also conservative, however, since many victims invested much more than the minimum amount.

1    (1)    Disgorgement of the sum of $12,028,353.40, plus interest at the legal rate from date of
2    entry of judgment;

3    (2)    Civil penalties of $13.2 million; and

4    (3)    The temporary injunction shall now become final and permanent.

5    **THE COURT FURTHER FINDS THAT**

6        The Commissioner has entered into four (4) pre-trial settlement agreements with defendants
7    Gary M. Appelblatt, Mark L. Ehrilich, Harold P. Coffin and Brian T. Griggs. In each of the four
8    settlements, the Commissioner and defendants agreed to payment of various amounts, all designated as
9    civil penalties. The total amount of the settlements styled civil penalties is $875,000.

10        The Commissioner advised the Court that as of December 5, 2001, he had received $83,500 and
11    that the funds remained in the custody of the Department of Corporations pending calculation of the
12    investigation and litigation costs that the Department advised it is entitled by law to deduct before
13    turning the money over to the State Treasurer pursuant to Government Code section 13978.6(b).[3]

14        The Commissioner further advised the Court that the funds, once deposited with the State
15    Treasurer, pursuant to the separation of powers doctrine, were beyond the reach of the Court's power
16    absent appropriation and direction by the state legislature.

17    **THE COURT THEREFORE NOW FURTHER HOLDS THAT**

18    (4)    It is in the interests of justice and equity that this Court maintain continuing jurisdiction
19            over this matter, until such time as all funds subject to disgorgement and civil penalties
20            are obtained and distributed.

21    (5)    No funds collected or received as a result of this judgment shall be allocated or disbursed
22            except upon prior written approval of this Court.

23    (6)    No further settlements in satisfaction of the judgment rendered by this Court may be
24            entered into except upon prior written approval of the Court.

25

26

---

27    [3] The Court, not having this issue before it, makes no ruling as to the propriety of this course of action or the exclusive
28    allocation made in the settlement agreements to civil penalties.

-18-

1    (7)    The Commissioner, and or his duly designated representative or attorney, is ordered to

2    appear by noticed motion before this Court within 60 days to advise the Court as to what

3    steps he intends to take to execute on this Court's judgment, and to submit and receive

4    approval of the appointment of a receiver, if appropriate, pursuant to Government Code

5    section 13975.1, to collect, transfer and control all property subject to this judgment in a

6    manner to be directed or ratified by this Court.

7

8

9    Dated: _Dec. 7, 2001_

10

11

12    By: _____

13    JUDY HOLZER HERSHER

     Judge of the Superior Court

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-19-